PARTIDO POPULAR DEMOCRÁTICO y SAMUEL CEPEDA, recurrentes, *v.* GERINELDO BARRETO PÉREZ, ADMINISTRADOR GENERAL DE ELECCIONES y OSVALDO MOLINA, recurridos.

*Número:* O-81-27 *Resuelto:* 23 de junio de 1981

---

200

*Pedro E. Ortiz Álvarez, José A. Andreu García, José Ariel Nazario* y *Guillermo Mojica Maldonado,* abogados de los recurrentes; *Miguel A. Pagán, Eunice Seín Llompart* y *José A. Carlo,* abogados del recurrido Administrador General de Elecciones; *Carlos Santos González, Luis E. López Correa, Alex González* y *Nelson Pagán Rodríguez,* abogados del recurrido señor Osvaldo Molina.

EL JUEZ SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

El Partido Popular Democrático y su candidato a la

Cámara de Representantes por el Distrito Representativo Núm. 35, Sr. Samuel Cepeda, recurren ante este Tribunal para que revisemos una resolución de la Junta Revisora Electoral de 14 de enero de 1981, enmendada por resoluciones de 16 y 21 de enero de 1981, que declara electo para representante por dicho distrito al Sr. Osvaldo Molina, del Partido Nuevo Progresista. Ordenamos la transcripción de todos los testimonios vertidos ante la Junta y, una vez sometida dicha transcripción ante nos, (1) concedimos a las partes los plazos reglamentarios para presentar sus respectivos alegatos. El caso quedó finalmente sometido por las partes para nuestra decisión el primero de mayo.

Se plantea ante nos que la Junta Revisora Electoral incidió al aplicar criterios equivocados al decidir sobre recusaciones de electores cuya validez le fue planteada. Coincidimos en que los criterios utilizados por la Junta no son los más adecuados ni están en armonía con la norma fundamental de la Constitución, que ordena garantizar la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y proteger al ciudadano en el ejercicio de la franquicia electoral. (2) Precisa que bosquejemos —más adelante los discutiremos *in extenso*— los criterios que deben aplicarse al escrutar todo ataque al derecho de un elector al voto. Dichos criterios tienen que estar enmarcados en el principio de que el derecho al voto es la más preciada de las prerrogativas del pueblo, porque es a través del voto que el pueblo ejerce su poder soberano y expresa su voluntad. Teniendo ese principio fundamental en mente, consideramos de esencial aplicación las siguientes normas:

(1) se presume la validez del voto emitido por un elector;

---

(1) Consta de 6,413 páginas.

(2) "Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral." Constitución del Estado Libre Asociado de Puerto Rico, Art. II (Carta de Derechos), Sec. 2.

(2) quien recuse un voto tiene el peso de probar los hechos en que se ampara;

(3) la prueba que anule un voto ha de ser clara, robusta y convincente;

(4) toda recusación ha de cumplir estrictamente los requisitos de ley;

(5) se dará amplia oportunidad al elector recusado para comparecer y defender la validez de su voto;

(6) al entender en una recusación se atenderá únicamente a los fundamentos en ella expresados, y a ningún otro;

(7) un voto no podrá anularse, ni menguarse su validez, por fallas de las que no puede responsabilizarse al elector;

(8) el domicilio de un elector se determinará conforme a los criterios establecidos en la Ley Electoral, teniendo siempre en cuenta su *animus manendi* o intención de allí permanecer;

(9) se mantendrá la validez de una papeleta electoral votada siempre que pueda determinarse con razonabilidad la intención del votante; y

(10) ningún impedimento físico de un elector será fundamento válido para privarle del derecho a ejercer el sufragio.

Expondremos a continuación los antecedentes históricos y los hechos que motivan el presente recurso, para dar una adecuada perspectiva a los asuntos que plantea; expondremos luego los fundamentos jurídicos de los criterios esbozados; y finalmente, a base de dichos criterios, y en consideración de las pruebas testificales y documentales, analizaremos caso por caso cada uno de los votos en controversia y adjudicaremos como corresponda en Derecho.

I

*Antecedentes Históricos y Hechos*

A. *Antecedentes Históricos*

La historia del proceso democrático en Puerto Rico, es decir, la participación del pueblo en la elección de su gobierno, ha sido breve y de un aprendizaje azaroso. Se redujo en los primeros cuatrocientos años a partir del descubrimiento, a esporádicos pujos eleccionarios para la

selección de regidores y alcaldes ordinarios, no siendo hasta el 1810 que se celebraron las primeras elecciones generales. Desde entonces y hasta que se instauró el régimen autonómico y se celebraron las últimas elecciones bajo la soberanía de España el 27 de marzo de 1898, ocasionalmente hubo comicios electorales según los vaivenes y los cambios políticos de la Madre Patria, que comenzaba a desperezarse, tras el letargo de siglos, de su tradicional régimen monárquico absolutista. [3]

A partir de las "elecciones de los cien días", así denominadas porque se celebraron durante varios días de votación fijados separadamente desde julio de 1899, en que comenzaron en Adjuntas, hasta enero de 1900, en que concluyeron en Yauco, [4] y con las primeras elecciones bajo la Ley Foraker, celebradas el 6 de noviembre de 1900, [5] el pueblo puertorriqueño tuvo sus primeras experiencias electorales bajo la bandera estadounidense; comenzó la etapa de regularidad en la celebración de elecciones, primero cada dos años, y luego cada cuatro años, bajo la Ley Jones y bajo el Estado Libre Asociado, y se inició un proceso de aceleración en el desarrollo de la participación democrática del pueblo en la formación de su gobierno y respecto a sus decisiones fundamentales. Si bien cada comicio electoral continuó siendo enconado, se produjo una evolución lenta, pero firme, y con cada experiencia se fue

---

[3] Véase *P.S.P., P.P.D. y P.I.P.* v. *Romero Barceló*, 110 D.P.R. 248 (1980), opinión disidente del Juez Presidente, Señor Trías Monge. Consúltese Bolívar Pagán, *Historia de los partidos políticos puertorriqueños*, Barcelona, M. Pareja-Montaña, 1971, T. I.

[4] Por lo reñido y enconado de dicha contienda electoral, matizada por tumultos y choques sangrientos, Luis Muñoz Rivera la llamó las elecciones de "las cien batallas campales". *Obras completas de Luis Muñoz Rivera* (1890-1900), Madrid, Ed. Puerto Rico, 1925, T. 1, pág. 256. Un observador de la época, al notar la coincidencia del terrible huracán de San Ciriaco (8 de agosto de 1899) con la pendencia de dichas elecciones, apuntó que "la furia del temporal no fue mayor que la furia con que se combatían los bandos opuestos". Bolívar Pagán, *op. cit.*, pág. 61.

[5] Bolívar Pagán, *op. cit.*, págs. 73-75.

creando en el pueblo puertorriqueño una profunda y celosamente bien guardada conciencia del valor del voto como su principal arma y piedra angular del sistema democrático.

Esa evolución se ha manifestado tanto en el aspecto substantivo como en el procesal. En lo substantivo, el derecho al voto dejó de ser patrimonio de unos pocos para ser patrimonio de prácticamente toda persona adulta. Las barreras raciales y por razón de sexo, las exigencias sobre poseer bienes de fortuna y el requisito de saber leer y escribir, y haber cumplido veintiún años de edad fueron limitaciones de otras épocas, que han ido desapareciendo hasta quedar final y permanentemente erradicadas en los pronunciamientos constitucionales que obligan a garantizar el derecho al sufragio universal, igual y directo, [6] y que fijan en dieciocho años la edad para ser elector y prohíben que nadie sea privado del derecho al voto por no saber leer y escribir o por no poseer propiedad. [7]

En el aspecto procesal la evolución ha sido igualmente dinámica. Las turbulentas y, muchas veces, cruentas controversias de otros tiempos han dado paso a climas de tranquilidad y seguridad, sobre todo contra la coacción física o económica. La compraventa de votos ha pasado a ser un recuerdo triste de nuestra historia, superado por una férrea voluntad de hacer valer el voto como cuestión de vergüenza y de dignidad. La Constitución expresamente manda que se garantice la secretividad del voto y se proteja al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. [8] En obediencia a ello, la legislación que en diferentes épocas se ha promulgado en relación con los procesos electorales ha establecido pautas para viabilizar y proteger el ejercicio del sufragio y ha

---

[6] Art. II, Sec. 2, Constitución del Estado Libre Asociado.

[7] Art. VII, Sec. 4 de la Constitución, según enmendado en referendo efectuado el 1 de noviembre de 1970.

[8] Art. II, Sec. 2.

dispuesto sanciones penales para quienes obstaculicen o coaccionen al elector.[9] Se ha liberalizado el concepto sobre el domicilio, eliminando el requisito de residencia de un año.[10] Y se han establecido procedimientos estrictos para la recusación de electores.[11]

A partir de las elecciones generales celebradas en noviembre de 1940 y hasta las del 1968 transcurrió un período que podría llamarse de estabilidad política en el sentido de que no hubo cambios en cuanto al partido político en el poder. Con las elecciones del 1968 se inició un período de cambios cada cuatro años, y no puede negarse que las campañas políticas en estos últimos tiempos han evidenciado también un cambio desafortunado en el nivel del debate público. El desarrollo de la radio y la televisión, y en particular el de este último medio, ha permitido que las campañas políticas penetren directamente en el seno de los hogares, sin la confrontación de las muchedumbres. Las técnicas de los anuncios comerciales han sido aprovechadas al máximo mediante la utilización de expertos en

[9] Véanse los artículos del Código Electoral adoptado por Ley Núm. 1 de 13 de febrero de 1974, Núms. 4-001 (Carta de Derechos del Elector), 7-018 (voto de personas ausentes), 7-056 (prohibición de arrestar a un elector antes, durante o después de votar), 7-078 (prohibición sobre revelación de forma de votar), 9-002 a 9-025 (delitos electorales) y 10-004 (obligatoriedad de que la votación sea secreta), 16 L.P.R.A. secs. 2131, 2348, 2386, 2408, 2501 a 2525, y 2554, respectivamente; y la vigente Ley Electoral, Núm. 4 de 20 de diciembre de 1977, que derogó al mencionado Código Electoral, pero mantuvo las pautas y sanciones que hemos relacionado. En particular véanse sus Arts. 2.006 (garantía del derecho al voto y prohibición de arrestar al elector), 5.040 (voto de personas ausentes), 8.001 a 8.035 (prohibiciones y delitos electorales), 16 L.P.R.A. secs. 3056, 3240, y 3351 a 3383, respectivamente.

[10] La Ley Electoral de 1919 (Núm. 79 de 25 de junio) requería que el elector votase en el precinto en que "hubiere residido durante un año, con antelación a la fecha de las elecciones". Dicha disposición se enmendó en 1965 (Ley Núm. 3 de 5 de octubre) para sustituir "hubiere residido" por "tuviere su domicilio establecido de buena fe". El Código Electoral de 1974 eliminó el plazo de un año (véase su Art. 4-002 (16 L.P.R.A. sec. 2132)). La vigente Ley Electoral mantuvo la disposición de dicho Código en sus Arts. 2.002, 2.003, y 2.007 (16 L.P.R.A. secs. 3052, 3053 y 3057, respectivamente).

[11] Véase Ley Electoral de 1977, Art. 5.034 (16 L.P.R.A. sec. 3234), a que se hará referencia más adelante.

la propaganda audiovisual. Y, en ocasiones, mediante tales medios, se ha hecho uso efectivo del argumento demagógico y del ataque personalista. La agresividad descontrolada violenta los ánimos, de suyo perturbados por los graves problemas económicos de nuestro tiempo. Todo ello ha sido motivo de intranquilidad para el pueblo puertorriqueño y posiblemente de recelo.

Desde el 1936 el electorado puertorriqueño se habituó al sistema de votación llamado de colegio cerrado. [12] El día de las elecciones cada elector acudía a su colegio electoral, se le identificaba en las listas electorales, y allí permanecía desde la hora en que se cerraba el colegio hasta que le correspondía su turno en la lista para recibir su papeleta electoral, marcarla según su preferencia y depositarla en la urna. Al cerrarse el colegio, se impartía a todos los electores allí congregados una orientación general sobre el procedimiento de votación. El sistema tenía ventajas y desventajas. Mediante la Ley Electoral vigente optó el legislador por cambiarlo por el sistema de colegio abierto. También se cambió el sistema de inscripción de electores, requiriéndose de cada uno acudir a un determinado lugar para ser retratado y prepararle una tarjeta de identificación electoral que se utilizaría en relación con el nuevo sistema de colegio abierto.

Por diversos motivos, muchos electores no pudieron comparecer a retratarse o se abstuvieron de hacerlo. De 2,070,049 electores inscritos, solamente 1,518,313 fueron fotografiados y de ese total, 336,133 no habían recibido sus tarjetas de identificación electoral para el 28 de agosto de 1980. [13] No se anticipaba posibilidad alguna de garantizar el voto a estos electores mediante el sistema de colegio abierto. Ello movió a la Asamblea Legislativa a aprobar, escasamente a dos meses plazo de la fecha de las elec-

---

[12] Implantado mediante enmienda a la Ley Electoral de 1919 por la Ley Núm. 3 de 29 de junio de 1936.

[13] Véase *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló*, supra, esc. 3.

ciones, la Ley Núm. 3 de 8 de septiembre de 1980, mediante la cual se dispuso un sistema mixto de colegio abierto para los electores inscritos que tuvieran tarjeta de identificación electoral y colegio cerrado para los que no la tuvieran. Los electores que pudieran votar en colegio abierto votarían entre las 9:00 de la mañana y las 3:00 de la tarde, hora en que se cerrarían los colegios para que comenzaran a votar los que no tuvieran tarjeta. Este sistema mixto, que en el argot popular se denominó de "colegio entreabierto", fue objeto de un fuerte ataque constitucional por los tres partidos de oposición al partido de gobierno. Su principal fundamento fue que el sistema mixto propiciaría el fraude mediante el doble voto, en violación del precepto constitucional de que las leyes garantizarán el sufragio universal, *igual*, directo y secreto.

En decisión dividida cuatro a tres sostuvimos la validez de la ley impugnada.[14] Consideramos que la Constitución, en su Art. VI, Sec. 4, da a la Asamblea Legislativa "un amplísimo margen de autoridad para legislar en asuntos de materia electoral", citando de *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741 (1976), y dijimos: "Apreciadas en conjunto las circunstancias apuntadas, no nos parece que pueda afirmarse —aún aceptando que el sistema adoptado no es el más deseable— que los mecanismos de ley dispuestos para la evitación de fraude en las próximas elecciones resultan tan deficientes e ineficaces como para sostener la conclusión de que existe una probabilidad fundada de que sus resultados se vean viciados por un apreciable número de votos fraudulentamente emitidos."[15]

---

[14] *Id.* La decisión se produjo con los votos de los Jueces Asociados Señores Dávila, Torres Rigual, Díaz Cruz e Irizarry Yunqué. El Juez Presidente Señor Trías Monge disintió, en opinión a la que se unió el Juez Asociado Señor Rigau, en la que concluyó que el sistema mixto se presta al fraude en violación del Art. II, Sec. 2 de la Constitución. El Juez Asociado Señor Negrón García disintió también, mediante opinión en la que concluyó que el sistema mixto se prestaba a la violación de la secretividad del voto. El Juez Asociado señor Martín se inhibió.

[15] Esta aseveración, ante el resultado cerrado de las elecciones. que obvia-

Nuestra decisión se produjo y se publicó prontamente el 17 de octubre de 1980, faltando solamente diez y ocho días para las elecciones. Hasta entonces prevaleció la incógnita sobre el método o sistema de votación a emplearse, circunstancia que tuvo que agravar la ansiedad e intranquilidad en los ánimos del electorado. Únese a esto el hecho de que importantes sectores de opinión pública habían objetado la aprobación de la Ley Electoral de 1977 y mostraban recelo en cuanto a los nuevos organismos creados por dicha ley y la colocación de todo el sistema rector y supervisor de las elecciones generales en manos de nuevos funcionarios que sustituyeron a los que ocupaban posiciones similares bajo la legislación anterior. Tal era el clima psicológico que había en Puerto Rico en anticipación de los comicios en que el pueblo esperaba expresar su voluntad.

B. *Los Hechos*

Llegó el 4 de noviembre de 1980, día de las elecciones generales. De 2,071,775 electores inscritos acudieron a las urnas 1,623,952 o un 78.38 por ciento.[16] Depositados los sufragios, el pueblo se retiró a esperar los resultados. A la medianoche todavía se desconocían. Diferentes radioemi-

---

mente no se anticipaba, plantea serias interrogantes. Se demostró al Tribunal, y así lo consignamos en nuestra opinión *per curiam*, que el Registro del Cuerpo Electoral contenía "de 25,000 a 50,000 asientos defectuosos que corresponden a personas ya fallecidas, o a electores con otros asientos de inscripción, y que pueden, por ende, ser utilizados para votar una segunda vez". Participaron en las elecciones 1,623,952 votantes. El margen de ventaja que dio la victoria al candidato al cargo de gobernador por el partido de gobierno fue de solamente 3,434 votos, según cifras ofrecidas por la Comisión Estatal de Elecciones luego de finalizado el escrutinio general.

[16] Estas cifras marcan un cambio bastante considerable en la tendencia que se evidenció durante los últimos doce años de una cada vez mayor participación en los comicios electorales. En 1968 votó un 74.4% (922,822 de 1,176,895 inscritos), en 1972 votó un 80.4% (1,250,978 de 1,555,504), y en 1976 votó un 86.1% (1,464,600 de 1,701,217), según cifras oficiales. Surge la interrogante de si ese retraimiento pudo ser debido en parte al trasiego en la legislación y procedimientos electorales, y a la intranquilidad e incertidumbre que todo ello debió producir.

soras y estaciones televisoras transmitían los partes oficiales y extraoficiales. Los oficiales, de la Comisión Estatal de Elecciones, se producían lentamente, indicando una elección reñida como nunca se había registrado. Los extraoficiales —de las oficinas centrales de los diferentes partidos— se daban con más frecuencia y, como era de esperarse, daban mayor énfasis a aquellos resultados que les favorecían. En determinado momento se paralizó el funcionamiento del sistema de computadoras de la Comisión Estatal. Avanzaba la madrugada. Amaneció el 5 de noviembre sin que aún se supiera el resultado. La incertidumbre continuaría por días y semanas.

El día siguiente a las elecciones la Comisión Estatal decidió, por acuerdo unánime de sus miembros, publicar los resultados preliminares para el cargo de gobernador al amparo del Art. 6.007 de la Ley Electoral, 16 L.P.R.A. sec. 3267. Conforme al Art. 1.004 (16 L.P.R.A. sec. 3004), la Comisión está integrada por un Administrador General, quien será su Presidente, y un Comisionado Electoral en representación de cada uno de los partidos políticos principales.[17] Dicha Comisión es "el organismo responsable de estructurar e inspeccionar todos los procedimientos de naturaleza electoral" en cualquier elección y tendrá, entre otros deberes, el de "(e) [a]tender, investigar y resolver los asuntos o controversias que se sometan a su consideración por cualquier parte interesada". Art. 1.013 (16 L.P.R.A. sec. 3013).

El resultado preliminar publicado en obediencia a dicho acuerdo indicaba que el candidato por el Partido Popular había obtenido 734,095 votos, en comparación con los 733,370 del candidato del Partido Nuevo Progresista,

---

[17] El Administrador General es nombrado por el Gobernador con el consejo y consentimiento de una mayoría de los miembros que componen cada Cámara de la Asamblea Legislativa. Art. 1.005 (16 L.P.R.A. sec. 3005). Los Comisionados Electorales y los Comisionados Alternos representativos de los partidos políticos son nombrados por el Gobernador a petición del organismo directivo central del partido que representen. Art. 1.012 (16 L.P.R.A. sec. 3012).

restando por computarse 25 unidades electorales correspondientes a 17 precintos, 12,000 votos ausentes y 18,562 papeletas recusadas. Véase *P.P.D.* v. *Barreto Pérez*, 110 D.P.R. 376 (1980).

El 7 de noviembre la Comisión tomó el acuerdo unánime de efectuar el escrutinio general ordenado por el Art. 6.008 de la Ley Electoral, 16 L.P.R.A. sec. 3268, mediante un conteo de votos papeleta por papeleta, acuerdo que fue ratificado por unanimidad el 9 de noviembre con la modificación de que el conteo se iniciaría el lunes siguiente, 10 de noviembre. No obstante, el mismo día 9 el Comisionado Electoral del Partido Nuevo Progresista propuso la reconsideración de dicho acuerdo y que no se iniciara el escrutinio general hasta que se adjudicaran los votos ausentes. Se opusieron los Comisionados Electorales de los otros tres partidos. No habiendo unanimidad, le tocó decidir al Administrador General, a tenor del Art. 1.014(e), 16 L.P.R.A. sec. 3014(e).[18] Su decisión fue a favor de la propuesta del Comisionado del Partido Nuevo, convirtiéndose así, por disposición del citado Art. 1.014(e), en la decisión de la Comisión. Esta decisión fue apelada por los tres partidos de oposición ante la Junta Revisora Electoral, que la confirmó y ordenó, además, al Administrador, que expidiera una nueva publicación en forma oficial del resultado de las elecciones. Así lo hizo el Administrador inmediatamente, proclamando ganador al candidato a gobernador del Partido Nuevo Progresista por 750,343 votos contra 747,787 de su más cercano contrincante, el candidato del Partido Popular Democrático.

---

[18] Dispone dicho inciso (e):

"(e) Todo acuerdo de la Comisión Estatal de Elecciones deberá ser aprobado por unanimidad de los votos de los Comisionados presentes al momento de efectuarse la votación. Cualquier cuestión sometida a la consideración de dicha Comisión que no recibiere tal unanimidad de votos será decidida, en pro o en contra por el Administrador General de Elecciones cuya decisión se considerará como la decisión de la Comisión Estatal de Elecciones y podrá apelarse en la forma provista en la sec. 3023 de este título."

Esta decisión de la Junta y la consiguiente actuación del Administrador motivaron el caso citado dos párrafos antes, de *P.P.D.* v. *Barreto Pérez*, supra. En opinión de 14 de noviembre revocamos la decisión recurrida y ordenamos la continuación del escrutinio general. Hicimos el siguiente llamado:

> El país está atravesando momentos de gran dificultad y tensión. En estas trabajosas circunstancias, es imprescindible que se actúe con serenidad y sensatez. Lo vital es que triunfe el pueblo entero de Puerto Rico; que no se reduzca la calidad de su democracia ni se mancille la limpieza de sus procesos electorales; que se respeten escrupulosamente nuestra Constitución y nuestras leyes. Hacemos un llamado al país para mantener en toda ocasión la máxima tranquilidad y mesura.

Se inició el escrutinio general precinto por precinto y papeleta por papeleta. Para mediados de diciembre se escrutó el Distrito Representativo Núm. 35, que comprende los precintos siguientes: el Municipio de Río Grande (97), el de Luquillo (98), el de Fajardo (99), el de Culebra (100), el de Vieques (101), y los barrios Machos, Pueblo, Río Abajo y Sacos del Municipio de Ceiba (102). Ley Electoral, Art. 5.008 (16 L.P.R.A. sec. 3208) y véase, además, el Art. VIII, Sec. 1 de la Constitución. El Partido Nuevo Progresista postuló al Sr. Osvaldo Molina para Representante a la Cámara por dicho Distrito Representativo. El Partido Popular Democrático postuló al Sr. Samuel Cepeda. Al finalizar dicho escrutinio el candidato Molina aventajó al candidato Cepeda por cinco votos. El Partido Popular y el señor Cepeda oportunamente acudieron ante la Junta Revisora Electoral mediante sendos recursos en que impugnaron actuaciones de la Comisión Estatal de Elecciones, alegando incorrecciones en cómputos y en la adjudicación de papeletas que, al ser revisadas, arrojarían un balance a su favor. Por su parte, el Sr. Molina también recurrió a la Junta Revisora y alegó adjudicaciones incorrectas de papeletas que, al corregirse, aumen-

218

tarían su ventaja. Los casos quedaron radicados ante la Junta, con los números JR-80-274 a JR-80-285.

Aparte de la importancia que en sí tiene que se adjudique como electo por dicho Distrito a quien legítimamente lo fue, la determinación del ganador es fundamental para fines del control de la Cámara de Representantes. Ya hemos señalado lo reñida de la elección, dramatizada, en cuanto a los candidatos a gobernador se refiere, en el margen de ventaja del ganador: unos 3,434 votos frente a una votación total de más de 1,600,000. El Senado fue ganado por el Partido Popular al elegir quince senadores contra doce del Partido Nuevo. La Cámara de Representantes, compuesta de 51 miembros, ([19]) quedó igualmente dividida entre los dos partidos mencionados —25 representantes cada uno— y su control dependerá de a cuál partido se adjudique el Distrito Núm. 35.

La Junta Revisora Electoral consolidó todos los casos y procedió a celebrar vistas en que las partes ofrecieron prueba testifical y documental. Dichas vistas se sucedieron en días laborables y feriados, bajo horarios que se extendieron hasta avanzada la noche y en forma irregular debido a dificultades para citar testigos, ([20]) teniendo que fraccionarse los casos y alterarse constantemente el orden de la prueba. Las vistas comenzaron el 18 de diciembre de 1980 y se extendieron hasta la madrugada del 10 de enero de 1981. Cuatro días más tarde, el 14 de enero, la Junta emitió una extensa resolución en que analizó el caso de cada elector cuyo voto estuvo en controversia, y finalmente descontó veintiocho votos de los adjudicados por la Comisión al candidato Cepeda y siete votos de los adjudicados igualmente al candidato Molina, quedando así adjudicada la elección a este último. Su margen de ventaja sobre

([19]) Art. III, Sec. 3 de la Constitución.

([20]) El período de vistas coincidió con el apogeo de la temporada navideña, que inevitablemente produjo problemas adicionales.

Cepeda se redujo a veintitrés votos mediante resoluciones enmendatorias de 16 y 21 de enero de 1981.

La decisión de la Junta no fue unánime. Su presidente, Sr. Schmidt Monge, y la miembro asociada Sra. Irizarry suscribieron la resolución mayoritaria. El miembro asociado Sr. Dapena Yordán emitió una opinión separada en que concluyó que el candidato Cepeda ganó la elección con ventaja de siete votos.

En su recurso ante nos los recurrentes impugnan la decisión de la Junta Revisora a base de varios planteamientos que pueden resumirse de la manera siguiente: (1) haber aplicado criterios restrictivos respecto al derecho al voto en la adjudicación de una papeleta en que, según alegan, era clara la intención del elector; en la determinación del domicilio de los electores; y en la adjudicación de controversias sobre transferencias de electores; (2) no haber aplicado criterios estrictos respecto del deber del recusador de cumplir rigurosamente con los requisitos impuestos por ley; y respecto a los fundamentos de las recusaciones al anular votos por fundamentos no invocados por el recusador; (3) utilizar el criterio sobre preponderancia de la prueba al decidir sobre su valor y suficiencia para anular el voto de un elector; y (4) haber actuado con pasión, prejuicio y parcialidad.

No nos atendremos a este orden ni a este resumen de los planteamientos en el análisis de las cuestiones planteadas. Como ya adelantamos, expondremos los criterios normativos que son aplicables en estos casos y luego analizaremos cada caso conforme a las pruebas ofrecidas y a dichos criterios.

## II

### *Criterios Normativos*

Los criterios normativos que expondremos, y que entendemos son los únicos compatibles con el mandato constitucional de que se **garantice** "la expresión de la voluntad del pueblo mediante el sufragio universal, igual,

directo y secreto" y libre de toda coacción, fueron esbozados esquemáticamente en los párrafos introductorios de esta opinión. Procederemos a su discusión, agrupando algunos por su íntima relación y en aras de la brevedad.

A. *Presunción de validez del voto, peso de la prueba y su valor y suficiencia para anularlo o restringirlo.*

Cuando el Octogésimoprimer Congreso y el Presidente de los Estados Unidos aprobaron la Ley Pública 600 el 3 de julio de 1950, ofrecida al pueblo de Puerto Rico "con el carácter de un convenio" para su aprobación o rechazo, y fue aceptada por el pueblo en referendo celebrado el 4 de junio de 1951, se inició el proceso democrático que culminó en la adopción de la Constitución del Estado Libre Asociado y su promulgación el 25 de julio de 1952. Con ello se puso fin a un período de cuatro siglos y medio, iniciado con el descubrimiento en el 1493, en que la organización y disposición de nuestro gobierno estuvo en manos de poderes extraños a la soberanía del pueblo de Puerto Rico, ejercidos desde las distantes metrópolis de Madrid, primero, y Washington, después, sin nuestra participación ni aprobación. [21]

El procedimiento que culminó en la adopción de la Constitución constituye, pues, el jalón más importante de nuestra historia política; el primero y único ejercicio, hasta aquí, del derecho de nuestro pueblo a disponer la manera como ha de organizarse y regirse nuestro gobierno. Al así hacerlo, nuestro pueblo tomó conciencia de su derecho natural a organizarse políticamente sobre una base plenamente democrática, promover el bienestar general y asegurarse para sí y para su posteridad el goce cabal de los derechos humanos, y declaró solemnemente en el Preámbulo de la Constitución:

---

[21] Para una reciente exposición sobre el desarrollo y alcance de la actual relación entre Puerto Rico y Estados Unidos, véase *Córdova & Simonpietri Ins. v. Chase Manhattan Bank*, 649 F.2d 36 (1981), en su parte II.

Que el sistema democrático es fundamental para la vida de la comunidad puertorriqueña;

Que entendemos por sistema democrático aquel donde la voluntad del pueblo es la fuente del poder público, donde el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas;

. . . . . . . .

En armonía con estos principios y teniendo en cuenta las experiencias de su azaroso progreso en el ejercicio de la franquicia electoral, a que nos referimos en páginas anteriores en la Parte I de esta opinión, se consignó el siguiente mandato en la Carta de Derechos, Art. II de la Constitución, en su Sec. 2:

Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral.

Nuestra Asamblea Legislativa se ha preocupado por cumplir ese mandato a través de la legislación que ha adoptado para regir los procesos electorales. Toca a este Tribunal hacer su parte como celoso guardián para que se cumpla. Reconocemos en el derecho al voto uno de los derechos fundamentales del pueblo y, como tal, es nuestra obligación hacerlo observar y respetar. No se observaría ni respetaría si permitiésemos que el voto emitido pudiera ser anulado o que su valor pudiera ser mermado por cualquier ataque. La legalidad se presume; la desviación del cumplimiento de la ley tiene que ser probada. Respecto al ejercicio del derecho al voto no podemos exigir menos. Goza de la presunción de legalidad y validez, y quien lo impugne tiene la carga de la prueba para destruir dicha presunción.

Los padres de la Constitución federal no incluyeron el derecho del pueblo al voto entre sus disposiciones, quizás por ser un derecho natural que no se cuestiona en el sis-

tema democrático. El reconocimiento de ese derecho del pueblo quedó implícito, no obstante, en las enmiendas XV, XIX y XXIV, que prohíben toda limitación del sufragio por razón de raza, color o condición previa de esclavitud; todo discrimen por razón de sexo en el ejercicio del derecho; y toda restricción del mismo por adeudar alguna capitación o cualquier contribución.

Desde *Yick Wo* v. *Hopkins*, 118 U.S. 356, 370 (1886), reconoció el Tribunal Supremo federal la naturaleza fundamental del derecho al sufragio, "debido a que preserva todos los demás derechos". Y en *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964), expresó:

> El derecho de votar libremente por el candidato que el elector desee es esencial a toda sociedad democrática. Cualquier restricción de ese derecho ataca el corazón de los gobiernos representativos.

Los principios enunciados en los citados casos y en otras citas que recogimos en *Ortiz Angleró* v. *Barreto Pérez*, 110 D.P.R. 84 (1980), aplicables bajo la Constitución federal, lo son con más fuerza bajo la Constitución nuestra que, como tantas veces hemos señalado, ordena expresamente garantizar el sufragio universal, igual, directo y secreto y la protección contra toda coacción en su ejercicio. Así lo hemos reconocido repetidamente. *P.S.P.*, *P.P.D.*, *P.I.P.* v. *Romero Barceló*, supra; *P.P.D.* v. *Barreto Pérez*, supra; *P.S.P.* v. *Comisión Estatal de Elecciones*, 110 D.P.R. 400 (1980).

 Como principio general, las determinaciones de hechos se hacen en casos civiles a base de la preponderancia de la prueba (Regla 10(F) de Evidencia) y en casos criminales se requiere que la culpabilidad se pruebe más allá de duda razonable (Regla 110 de Procedimiento Criminal). Cuando se ataca la validez del sufragio, no estamos ni en un caso civil ordinario ni en el ámbito del Derecho penal. El criterio de preponderancia de la prueba es adecuado para dirimir conflictos entre ciudadanos, las más de

las veces centrados en consideraciones económicas. Pero no puede ser criterio, bajo la Constitución del E.L.A., que le asigna al voto lugar tan preeminente que se preste a destruir lo que es, en esencia, la vida misma del sistema democrático representativo. Aun en casos civiles en ocasiones se han establecido requisitos más exigentes que la mera preponderancia de la prueba para establecer un hecho. [22] El debido proceso de ley impone que, para la negación de un derecho fundamental, el valor y suficiencia de la prueba sean medidos con criterios más rigurosos.

En *Addington* v. *Texas*, 441 U.S. 418, 423 (1979), expresó el Tribunal Supremo:

> La función de un criterio de prueba, en cuanto dicho concepto tiene cabida en la Cláusula del Debido Proceso y en la función de determinar los hechos, es la de "instruir al juzgador sobre el grado de confianza que nuestra sociedad entiende que él debe tener en la corrección de sus conclusiones sobre los hechos para un tipo particular de adjudicación". *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurrente). El criterio sirve para ubicar el riesgo de error entre los litigantes y para indicar la relativa importancia que la decisión final debe tener.

En atención a esos principios el Tribunal Supremo

---

[22] Para ejemplos, hemos requerido prueba "clara y robusta" para rebatir la presunción de que bienes adquiridos durante el matrimonio se reputan gananciales, *Arroyo* v. *Vicario et al.*, 28 D.P.R. 804 (1920), *Cruz* v. *Sucn. González*, 72 D.P.R. 308 (1951), *Espéndez* v. *Vda. de Espéndez*, 85 D.P.R. 437 (1962), citado y seguido en *García* v. *Montero Saldaña*, 107 D.P.R. 319, 335 (1978); hemos establecido el criterio de "prueba sólida, clara y convincente" para probar fraude, *González* v. *Rivera*, 42 D.P.R. 313 (1931), *The Texas Co.* v. *Estrada y Alvarez, Int.*, 50 D.P.R. 743 (1936), *Serrano* v. *Torres*, 61 D.P.R. 162 (1942), *Sucn. Gómez* v. *Colón*, 63 D.P.R. 104 (1944), *Nine* v. *Ortiz*, 67 D.P.R. 940, 952 (1947), *Feliciano* v. *P. Cedeño, S. en C.*, 78 D.P.R. 39 (1955), *Monclova* v. *Financial Credit Corp.*, 83 D.P.R. 770 (1961), *Banco Crédito* v. *Chico Sagastibelza*, 90 D.P.R. 125, 134 (1964), escolio 10; y hasta *Ocasio* v. *Díaz*, 88 D.P.R. 676 (1963), se requería "prueba robusta y convincente" para la acción de filiación basada en la posesión de estado, criterio de prueba que tuvo que ceder ante la disposición sobre inviolabilidad de la dignidad del ser humano y su prohibición de "discrimen alguno por motivo de raza, color, sexo, *nacimiento, origen o condición social*, ni ideas políticas o religiosas". Art. II de la Constitución (Carta de Derechos), Sec. 1. (Énfasis nuestro.)

reconoció la existencia de tres criterios de prueba para diferentes clases de acciones. Expresó que "[e]n un extremo está el típico caso civil sobre una disputa monetaria entre partes privadas. Como la sociedad tiene un interés mínimo en el resultado de tales pleitos privados, la obligación del demandante de probar su caso se cumple mediante una mera preponderancia de la prueba. Los litigantes comparten así, por igual, el riesgo de error". (Pág. 423.) "En casos penales" —continuó diciendo el Tribunal— "los intereses del acusado son de tal magnitud que históricamente y sin necesidad de un requerimiento constitucional explícito han sido protegidos por criterios de prueba diseñados para excluir, en cuanto sea posible, que se produzca un fallo erróneo. En la administración de la justicia criminal la sociedad impone casi todo el riesgo de error sobre sí misma. Ello se cumple requiriendo bajo la Cláusula del Debido Proceso que el Estado pruebe la culpabilidad del acusado, más allá de duda razonable."

■ De aquí pasa el Tribunal Supremo a reconocer el criterio intermedio de prueba, que es adjetivada con combinaciones de palabras como "clara", "robusta", "inequívoca", "convincente", y que, citando de *Woodby* v. *INS*, 385 U.S. 276, 285 (1966), "no es extraña al Derecho civil". Este criterio es aplicable, según la naturaleza del interés o derecho de que se trate.

En *Addington* se trataba del criterio de prueba requerido para determinar, en una acción civil, si una persona estaba tan enferma mentalmente como para disponer su reclusión en un hospital para enfermos mentales. El Estado de Texas requirió para ello "prueba clara, inequívoca y convincente". Se sostuvo la procedencia y aplicación de dicho criterio en consonancia con el debido proceso de ley.

■ En *Woodby* v. *INS*, supra, caso en que se trataba de la deportación de un ciudadano, y en *Schneiderman* v. *United States*, 320 U.S. 118, 159 (1943), en que se trataba

de un proceso de desnaturalización, ambos citados en *Addington,* se sostuvo que aplicaba el criterio de "prueba clara, inequívoca y convincente". Se señaló, pág. 432, citando de Webster's *Third New International Dictionary,* 2494 (1961), que el término "prueba inequívoca" significa "prueba que no admite duda, una carga que se aproxima a, si es que no excede, la requerida en casos penales".

Recientemente, en *Fedorenko* v. *United States,* 449 U.S. 490 (1981), en que se traba de un procedimiento de desnaturalización, el Tribunal Supremo federal señaló que el criterio ha de depender del derecho involucrado y dijo: "Cualquier criterio menos estricto sería inconsistente con la importancia del derecho en juego [*at stake*]". Véanse, al mismo efecto, *Costello* v. *United States,* 365 U.S. 265, 269 (1961) ("American citizenship is a precious right"); *Baumgartner* v. *United States,* 322 U.S. 665, 675–676 (1944); *Woodby* v. *INS,* supra, pág. 285, y *Schneiderman* v. *United States,* supra, pág. 122, *inter alia.*

*Vance* v. *Terrazas,* 444 U.S. 252 (1980), no se opone a lo que aquí sostenemos. En *Vance* se planteó si el Congreso, al disponer sobre pérdida de ciudadanía, puede establecer requisitos de prueba menos rigurosos que aquellos reconocidos en casos criminales y en casos civiles en que esté en peligro la libertad del ciudadano. El Tribunal resolvió que sí en decisión dividida cinco a cuatro. La mayoría sostuvo la autoridad del Congreso para requerir que se pruebe, por preponderancia de prueba, la intención del ciudadano de renunciar a su ciudadanía americana y que no sea meramente un acto voluntario de jurar fidelidad a un país extranjero. Esta decisión ya ha sido objeto de fuerte crítica. Véase *Evidentiary Proof in Expatriation Proceedings,* Nota en 57 Chi. Kent L. Rev. 323 (1981).

La situación ante nos es distinta. No se ha reconocido por el Tribunal Supremo de Estados Unidos un criterio de prueba específico para el caso de recusación del voto de un elector. En Puerto Rico no cabe otra conclusión, bajo

la Constitución del Estado Libre Asociado, que el criterio a utilizarse debe ser el de la prueba clara, robusta y convincente. Cualquier otro criterio violentaría el sitial privilegiado que tal documento le reconoce al ejercicio del sufragio libre de coacción y a su secretividad. *Ortiz Angleró* v. *Barreto Pérez*, supra. Esta norma es comparable a la utilizada por distintos estados al amparo de diversas fuentes.

Muchas jurisdicciones estatales en los Estados Unidos se pronuncian a favor de una exigencia mayor que la mera preponderancia de prueba para anular el voto. En *Guerra* v. *Peña*, 406 S.W.2d 769, 775–776 (Tex. 1966), al señalar que el peso de la prueba para demostrar la ilegalidad de determinado número de votos impugnados recayó sobre quien los impugnaba, el tribunal expresó que la prueba a tal efecto tenía que ser "clara y satisfactoria". En *Pope* v. *Howle*, 149 So. 222 (Ala. 1933), se exigió prueba concluyente de que el elector no tenía derecho a votar en el lugar donde emitió su voto. En *Buzard* v. *Griffin*, 358 P.2d 155, 159–160 (Ariz. 1960), se exigió prueba clara y convincente, no predicada en especulación o conjetura como la necesaria para probar fraude electoral. *Cf. Esteves* v. *Srio. Cámara de Representantes*, 110 D.P.R. 585 (1981). La presunción de la legalidad del voto debe ser rebatida por prueba afirmativa. *Hubbard* v. *McKey*, 193 So.2d 129 (Miss. 1966). Inferencias, conjeturas o prueba de referencia no son suficientes para anular el voto. Las dudas se resuelven a favor del ejercicio del derecho al voto. Como veremos más adelante, al discutir lo referente a la determinación del domicilio, se ha requerido un mayor peso de prueba para un cambio de domicilio que para establecer su continuación, y que dicha prueba sea clara y convincente. Veánse, *Application of People ex rel. Croen*, 152 N.Y.S.2d 706 (1956); *McGee* v. *Bragg*, 53 A.2d 428 (N.H. 1947). *In re Estate of Ludenslager*, 240 A.2d 477 (Penn. 1968); *Hamlin* v. *Holland*, 256 F.Supp. 25 (E.D. Penn. 1966); *Collins* v.

*Collins*, 199 S.E.2d 626 (Ga. 1973); *Jones* v. *State*, 176 S.E. 896 (1934); *Atkinson* v. *Thomas*, 407 S.W.2d 234 (Tex. 1966); *Ex parte Weissinger*, 22 So.2d 510–514 (1945), *inter alia*.

■ En resumen, para destruir la presunción de validez e integridad del voto se requiere que quien lo impugna descargue el peso de así demostrarlo mediante prueba clara, robusta y convincente, no afectada por reglas de exclusión ni a base de conjeturas.

■ Erró la Junta Revisora al aplicar consistentemente el criterio de preponderancia de la prueba y a base de ello privar a numerosos electores de su franquicia electoral. La finalidad que la Ley Electoral reconoce a las determinaciones de hechos de la Junta no implica una obligada abstención por nuestra parte de examinar dichas determinaciones. Hay que verlas dentro del marco del Derecho aplicable y, en cuanto al derecho fundamental al sufragio se refiere, a base de las normas que exigen que ese derecho se garantice y se haga valer. Cuando las determinaciones de hechos, en un asunto de tanta trascendencia, se basan en un criterio de prueba erróneo, ni podemos ni debemos estar obligados por ellas. En tales circunstancias es nuestro deber reevaluar la prueba a tenor de los criterios correctos y hacer las determinaciones que sean procedentes.

B. *Requisitos de la recusación; sus fundamentos; oportunidad al elector.*

■ La recusación es un entredicho contra la validez del voto. Si bien no lo anula de primera intención, su propósito es precisamente anularlo. (23) Y porque se hace en el

_____

(23) Dice el Art. 6.003 de la Ley Electoral, 16 L.P.R.A. sec. 3263:

"Sec. 3263. Papeleta recusada

"Toda papeleta recusada se contará a favor de los candidatos para quienes fue marcada, salvo que por cualquier motivo dicha papeleta fuere también protestada o no adjudicada.

"Si posteriormente a una elección se demostrare que una papeleta recusada

colegio de votación, en el momento en que el elector se propone recibir la papeleta electoral, marcarla y echarla en la urna, constituye una obstrucción de ese proceso a que el elector se ve sometido. Ello es irritante y en nada ayuda a mantener el clima de tranquilidad, paz y sosiego deseable en un momento de tanta trascendencia para el sistema democrático como lo es el momento en que el ciudadano va a expresar su voluntad.

La recusación de un elector tiene el resultado de violar la secretividad del voto, una de las condiciones que deben ser garantizadas por ley conforme lo ordena el Art. II, Sec. 2 de la Constitución, tantas veces citado. Es así porque al recusarse a un elector ha de identificarse la papeleta en que vota, de manera que pueda luego descontarse su voto si a la postre se decidiese que debe anularse. La identificación se hace, según dispone la Ley Electoral en su Art. 5.034 (16 L.P.R.A. sec. 3234), de la siguiente manera: "La papeleta de todo elector cuyo voto se recuse deberá marcarse al dorso con la palabra 'Recusado', seguida de una breve anotación firmada por la persona o el inspector de colegio que hace la misma, exponiendo la razón de tal recusación, *el número de tarjeta de identificación electoral de la persona afectada,* el municipio, precinto y número de colegio electoral. Si el elector recusado niega su recusación, deberá hacerlo *bajo su firma y juramento al dorso de la papeleta,* pero si no la negare, su voto no se contará y será nulo". (Énfasis nuestro.)

Bajo el sistema mixto de votación dispuesto para las pasadas elecciones por la Ley Núm. 3 de 8 de septiembre de 1980, de colegio abierto por la mañana y cerrado desde las 3:00 de la tarde, se agudizó un poco más el problema para aquellos electores que no tenían una tarjeta de identificación electoral al presentarse a votar, aun si aparecían inscritos. En tal caso debían presentar una declaración

fue votada por una persona o elector sin derecho a votar en ella, la Comisión ordenará la anulación de su voto así como la rectificación del escrutinio."

jurada y, si se negaban a ello, se les recusaba, indicándose al dorso de la papeleta, entre otras cosas, *"el nombre del elector*, su número de identificación electoral", etc., y su voto no se adjudicaría en el escrutinio del Colegio. Ley Núm. 3 de 8 de septiembre de 1980, Sec. 9(a). La disposición se transcribe *in extenso* en *P.S.P., P.P.D., P.I.P.* v. *Romero Barceló*, supra, en la opinión disidente del Juez Asociado Señor Negrón García. La posibilidad de que el citado sistema mixto de votación se prestara a que se violara el derecho al voto secreto fue uno de los fundamentos de dicha disidencia. (²⁴) Véase escolio 14, *ante*.

▉ Considerada la naturaleza fundamental del derecho al voto y el hecho de que la recusación ha de permitir que se conozca cómo vota el elector recusado, las disposiciones de ley que permiten y reglamentan la recusación, tanto en cuanto a los fundamentos en que pueda basarse como en cuanto al procedimiento para ello, deben ser de estricto cumplimiento. Solamente así puede cumplirse la obligación constitucional de garantizar el derecho al sufragio "universal, igual, directo y secreto" y de proteger al ciudadano "contra toda coacción en el ejercicio de la prerrogativa electoral". Constitución, Art. II, Sec. 2.

La Ley Electoral establece el procedimiento para recusar a un elector en su art. 5.034 (16 L.P.R.A. sec. 3234), que dispone:

_____

(²⁴) Expresó el hermano Juez:

"Notamos, pues, que únicamente por excepción los autores de la Constitución concibieron y contemplaron se pudiera interferir o alterar la secretividad del voto. Por nuestra parte, nos hemos pronunciado en el sentido de que el objetivo del voto secreto de un ciudadano es asegurarle contra y protegerlo de las coacciones, para garantizarle la libertad de poder entrar a la caseta electoral, solo con su conciencia, y hacer allí su cruz, secretamente, sin que a nadie le importe cómo y dónde la hizo. *P.N.P.* v. *Tribunal Electoral*, 104 D.P.R. 741 (1976). Repetimos, es esencial que el voto sea confidencial, pues con ello 'se evitan coacciones y represalias que pondrían en peligro la independencia del elector y la consiguiente sinceridad de su sufragio'. Pérez Serrano, *op. cit.*, pág. 364. Sólo por *excepción*, basada en un interés apremiante y legítimo, producto de un racional balance de alternativas, resulta cognocible abrir el voto al escrutinio público." (Pág. 298.)

### Sec. 3234. Recusación de un elector

Todo elector o inspector que tuviere motivos fundados para creer que una persona que se presenta a votar lo hace ilegalmente, o que dicha persona ha votado ya en otro colegio electoral o precinto, podrá recusar su voto por los motivos que lo hicieren ilegal a virtud de las disposiciones de este Subtítulo, pero dicha recusación no impedirá que dicha persona emita su voto. La papeleta de todo elector cuyo voto se recuse deberá marcarse al dorso con la palabra "Recusado", seguida de una breve anotación firmada por la persona o el inspector de colegio que hace la misma, exponiendo la razón de tal recusación, el número de tarjeta de identificación electoral de la persona afectada, el municipio, precinto y número de colegio electoral. Si el elector recusado niega su recusación, deberá hacerlo bajo su firma y juramento al dorso de la papeleta, pero si no la negare, su voto no se contará y será nulo. El Administrador enviará a cada Colegio de Votación un modelo de recusación para orientar a la Junta del Colegio de Votación cómo cumplimentar una recusación.

■ Se nos plantea que la Junta Revisora Electoral erró al considerar los méritos de recusaciones en que el recusador no firmó. Meramente indicó a manuscrito, por ejemplo: "Yo, Fulano, recuso al elector Zutano por no residir en el Precinto X." Entendemos que tal recusación es insuficiente y no debió ser atendida.

■ "Firma" y "nombre" no son una misma cosa. En los casos de estas recusaciones el recusador puso su nombre al comienzo del escrito de recusación, pero no lo firmó, violándose así el requisito de que la recusación esté firmada por el recusador.

■ La firma es el "nombre y apellido, o título, de una persona, *que ésta pone con rúbrica al pie de un documento escrito de mano propia o ajena, para darle autenticidad o para obligarse a lo que en él se dice"*. (Énfasis nuestro.) *Diccionario de la Real Academia Española*, 19na ed. Véase, para una definición similar, Rivera García, *Diccionario de Términos Jurídicos*, Equity Publishing Corp.,

1976, pág. 103. En *Castañer* v. *Trib. Superior*, 81 D.P.R. 869 (1960), se planteó si un escrito de puño y letra en que su otorgante se identificó al principio ("Yo, Adele Bandler Castañer, casada con José Castañer y residiendo en el camino Borinquen de Aguadilla, casilla de correos 762, declaro . . .") y luego procedió a disponer su última voluntad para cuando muriera, pero no firmó al final, era válido como testamento ológrafo. Se resolvió que no era válido, y se dijo, págs. 871–872:

> Es indudable que el término jurídico "firma" tiene una individualidad caligráfica distinta a la mera redacción manuscrita del nombre propio para otros fines distintos a la solemne suscripción de la voluntad final de un escrito. El ilustrado Juez sentenciador hizo suya la definición de "firma" contenida en la Sentencia del Tribunal Supremo de España de 5 de enero de 1924: "por firma de una persona se entiende la que ésta, en todos los actos de su vida, lo mismo en aquellos más importantes y solemnes que en los corrientes, en su relación con las demás personas, acostumbra a *estampar al pie* de sus escritos". (Énfasis en el original.)

█ Lo determinante de si un documento está firmado, no es si en él aparece el nombre de su otorgante manuscrito por él. Su nombre viene a constituir su firma cuando lo escribe al pie del escrito para significar su voluntad final, dándole su autenticación personal y asumiendo con ello la obligación de atenerse a lo que en él se expone.

█ En cuanto a los fundamentos de la recusación, es necesario que se hagan constar para que el elector pueda tener la oportunidad de contestarla. Nótese que la ley le exige que la conteste bajo juramento, lo cual lleva consigo las penalidades del perjurio. Si se da un determinado fundamento para la recusación debe atenerse al mismo. La recusación es, para fines de la impugnación del voto, la alegación del recusador. Sería impropio y reñido con el debido proceso de ley escudriñar, al resolver la recusación, otros posibles motivos no alegados por el recu-

sador. Al exponer el recusador al dorso de la papeleta de votación, el motivo que le mueve a recusar al elector, le da oportunidad a éste de contradecirlo en la misma papeleta, antes de marcarla y depositarla en la urna. Si luego, al escrutar dicha papeleta recusada para determinar si debe adjudicarse o no, se invocasen otros motivos para anular el voto, se estaría haciendo una determinación *ex parte*, es decir, por motivos de que no se advirtió al elector en el momento de recusarse su voto.

En resumen, la inobservancia del procedimiento y requisitos estatuidos para perfeccionar una recusación la hacen inefectiva. Pasada esta prueba, al considerar los méritos de la misma, solamente deberá atenderse a los fundamentos en ella expuestos. Dijimos en *P.S.P.* v. *Comisión Estatal de Elecciones*, 110 D.P.R. 400 (1980):

> Corolario de lo expuesto: cualquier papeleta votada que no haya sido recusada válidamente, de cumplir con los demás requisitos, es un voto de incuestionable puridad, que posteriormente no puede bajo ninguna circunstancia ser objeto de impugnación y examen. Razones prácticas tales como que no existe constancia de la identidad del elector, que se estaría vulnerando la secretividad del sufragio y que nunca podría imprimírsele finalidad a la contienda electoral lo impiden. (Pág. 443.)

Finalmente, el elector debe tener amplia oportunidad de defender su voto. La Ley Electoral consagra entre los derechos y prerrogativas de los electores "garantía a cada persona del derecho al voto, igual, libre, directo y secreto". Art. 2.001, inciso 2 (16 L.P.R.A. sec. 3051(2)). Ello está en armonía con el mandato constitucional. Para que esa garantía sea efectiva, el elector cuyo voto se impugna debe tener derecho a contradecir la recusación, Art. 5.034 (16 L.P.R.A. sec. 3234), y a comparecer y ser oído en la vista en que se examine y pueda adjudicarse la procedencia de la recusación. A ese fin, debe ser citado con suficiente antelación y de manera efectiva. No debe

bastar, a este efecto, un mero diligenciamiento negativo de una citación. Debe quedar demostrado que se hicieron esfuerzos razonables para notificarle. El valor de un voto no puede hacerse depender de unas diligencias incompletas que en ocasiones son hechas por personas que pudieran tener mucho interés en que dicho voto no se cuente.

Lo expresado no quiere decir que el elector no tenga obligaciones que cumplir para hacer valer su voto, una vez se le recusa. Ya nos hemos referido al Art. 5.034 de la Ley Electoral, 16 L.P.R.A. sec. 3234, que dispone la manera de recusar a un elector y que requiere que "[s]i el elector recusado niega su recusación, deberá hacerlo bajo su firma y juramento al dorso de la papeleta, pero si no la negare, su voto no se contará y será nulo". Conforme a esta disposición, el elector no puede cruzarse de brazos. Si no niega la recusación en el momento en que es hecha y ésta expone hechos que, de ser ciertos, constituyen motivo válido para anular su voto, éste no se contará y será nulo.

*C. Fallas de las que no debe responsabilizarse al elector; casos de transferencias.*

Al considerar los planteamientos que se suscitan en relación con las transferencias de electores, nos parece conveniente referirnos a los cuatro casos específicos sobre el particular, apartándonos un tanto del esquema que nos habíamos trazado.

Se trata de cuatro electores que votaron papeleta íntegra [25] a favor del Partido Popular Democrático y, por tanto, de su candidato, Sr. Cepeda. Sus votos fueron anulados total o parcialmente por la Comisión Estatal de Elecciones, confirmada por la Junta Revisora Electoral, por haber votado en precintos del Distrito Representativo

---

[25] "'Papeleta Íntegra' significará aquella en que el elector vota por la candidatura completa de un solo partido político." Art. 1.003(28), (16 L.P.R.A. sec. 3003(28)).

Núm. 35 y no en otro lugar en que aparecían inscritos. [26] Dichos electores habían solicitado oportunamente su transferencia a los respectivos precintos en que votaron. No hay controversia en cuanto a que el domicilio de dichos electores radicaba donde votaron.

El Art. 2.003 de la Ley Electoral, 16 L.P.R.A. sec. 3053, dispone entre otros requisitos para que una persona tenga derecho a votar, que "esté debidamente inscrito con antelación" a la fecha de una elección. El Art. 2.014 (16 L.P.R.A. sec. 3064) contempla el que un elector inscrito en un precinto traslade su inscripción a otro donde tenga su domicilio para el día de las elecciones y donde, por tal motivo, tendrá derecho a votar. A tal fin, deja que sea la Comisión Estatal de Elecciones la que disponga por reglamento el mecanismo de la transferencia. Dice dicho artículo en su primer párrafo, que es lo aquí pertinente:

> La Comisión establecerá mediante reglamento un sistema para que cualquier elector inscrito pueda solicitar que, por razón de haber cambiado el domicilio, se transfiera su inscripción de un precinto a otro.

En obediencia a dicha disposición, la Comisión promulgó el 15 de mayo de 1979 un reglamento para las inscripciones parciales de electores mediante el cual se reglamentó el procedimiento de transferencia. A tenor de este reglamento se constituyeron juntas compuestas por representantes de cada partido político principal. La función de estas juntas era llenar los formularios de solicitudes de inscripción y solicitudes de transferencia. Regla 8 del Reglamento. Cada partido tenía la obligación de designar a una persona para que trabajara en el colegio en esta tarea de llenar dichos formularios. Estos funcionarios se rotaban en el proceso de llenarlos, Regla 10(a) del Reglamento, de manera que la función de llenar las solicitudes de inscripción o transferencia no recayera siempre

---

[26] Hay la excepción de una electora que no aparecía inscrita, que incluiremos en esta parte por haberse tratado como una transferencia.

en una persona, representante de un solo partido. La Comisión tenía la obligación de disponer la organización de recursos técnicos para permitir que se hiciera en forma centralizada la asignación del correspondiente distrito de inscripción de las peticiones válidas de transferencia; que se ordenara la exclusión del peticionario del precinto en donde se había inscrito originalmente; y se incluyera en el precinto donde había establecido su nuevo domicilio. Regla 16 del Reglamento.

Ante el problema que planteaba el alto número de electores cuya solicitud de transferencia no fue procesada, la Comisión Estatal de Elecciones adoptó un acuerdo el 28 de octubre de 1980 en que dispuso, entre otras cosas, lo siguiente:

> *Caso A—* En los casos de electores que hayan solicitado transferencia y la misma no fue procesada, o el elector fue mal ubicado por la Comisión, el elector deberá llevar consigo su copia de transferencia o podrá solicitar una fotocopia a su partido o a la Comisión para acreditar tal situación. En estos casos el elector deberá votar donde aparece en lista y su voto se adjudicará completo en el colegio. [27]

Llegó el 4 de noviembre de 1980, día de las elecciones. Al presentarse al colegio donde le correspondía votar, un gran número de electores se confrontó con el hecho de que

---

[27] Los demás criterios para adjudicar los votos de electores que no eran residentes del precinto, según la Resolución del 28 de octubre de 1980, fueron los siguientes:

"*Caso B—* Aquellos electores que sin haber hecho transferencia, por error han sido mal ubicados fuera del precinto donde habitualmente residen, deberán votar donde aparecen en lista y su voto también se adjudicará completo en el colegio.

"*Caso C—* En los casos de electores que aparecen en las listas de precintos donde ya no residen y que no efectuaron una transferencia, podrán votar donde aparecen en lista pero su voto será recusado y no se adjudicará en el colegio.

"La adjudicación se hará por la Comisión Estatal durante el escrutinio general si fuera necesario, pero en todo caso será contado solamente para los puestos de Gobernador, Comisionado Residente, Senador y Representante por Acumulación y dependiendo dónde resida, podrá tener validez local.

"Estos electores deberán indicar bajo juramento su nueva dirección con expresión al municipio y precinto, si lo conocen." Apéndice, pág. 286.

su nombre no aparecía en la lista electoral, a pesar de que había gestionado la correspondiente transferencia. Ante dicha situación la Comisión Estatal de Elecciones acordó permitir, ese mismo día, que una persona que dijera ser elector cualificado pudiera votar sin aparecer en las listas, siempre y cuando mostrara su tarjeta de identificación electoral o copia de su petición de inscripción o transferencia. De este modo, un elector cuya solicitud de transferencia no hubiera sido tramitada por la Comisión podía votar a tenor de los acuerdos del 28 de octubre y 4 de noviembre de 1980, en cualquiera de los siguientes sitios: (1) en el precinto de origen (Caso A), o (2) en el precinto a donde solicitó ser transferido.[28] Los electores que fueran a votar a tenor de esta segunda alternativa tenían que hacerlo en un colegio especial denominado F-1, bajo el sistema de colegio cerrado.

Veamos ahora, por separado, los casos de los electores José A. Acosta Anglada (JR-80-278), Héctor Ramírez Aponte (JR-80-280) y Rafael T. Rodríguez Rodríguez (JR-80-284), quienes tienen en común que figuraban inscritos en precintos distintos de aquel en que votaron. Más adelante nos ocuparemos del caso de la electora María Luz Morales Meléndez (JR-80-283), que plantea una situación particular.

*José A. Acosta Anglada* (JR-80-278)

En las elecciones de 1976 este elector votó en Río Piedras, precinto 109, que era donde aparecía inscrito y le correspondía votar. En agosto de 1977 se mudó para Luquillo y en 1978 se presentó a un colegio de inscripción de aquella localidad y gestionó una solicitud de transferencia a ese precinto. En abril de 1979 el Sr. Acosta se mudó para Fajardo y en octubre de ese mismo año ges-

---

[28] No discutimos en esta ocasión el poder de la Comisión Estatal de Elecciones para propiciar, aunque fuere mediante acuerdo unánime, que electores no cualificados por razón de su residencia, votaran e influyeran de este modo en el resultado de las elecciones en un lugar al que no pertenecían.

tionó una transferencia para ese precinto. Luego de esta segunda transferencia, la Comisión le expidió una tarjeta de identificación electoral.

El 4 de noviembre de 1980 el elector se presentó a votar al Colegio 14 de Fajardo, pero no apareció en la lista. El comisionado local de su partido le instruyó que permaneciera en el lugar, pues él tenía tarjeta electoral. El Sr. Acosta votó esa tarde en un colegio especial denominado F-1, que funcionó bajo el sistema de colegio cerrado.

Su voto fue adjudicado únicamente a las candidaturas nacionales, *i.e.*, gobernador, comisionado residente, y senador y representante por acumulación. Su voto no fue adjudicado al candidato a representante por el Distrito Núm. 35, por quien votó.

No hay controversia en cuanto a que el domicilio de este elector es Fajardo.[29] Se discute únicamente si su transferencia del precinto 109 al precinto 35 se perfeccionó.

La Comisión no tramitó la solicitud de transferencia del Sr. Acosta, porque el funcionario de mesa que escribió la información que le suministró el elector escribió en el espacio provisto para identificar el precinto en que aparecía inscrito, dentro de tres recuadros, el número de clave "065" y al lado, "Río Piedras".[30] (Véase Anejo A.)

Lo incorrecto de esta información no es "Río Piedras", pues allí era donde efectivamente aparecía inscrito el elector, sino el número de clave. Según la Comisión, al escribirse en dichos recuadros "065" se estaba indicando que el elector estaba inscrito en Ponce, porque el precinto 65 pertenece a Ponce y no a Río Piedras. El error aparentemente surgió cuando el funcionario que tomó la información, en vez de escribir "109" escribió "065", que es el código asig-

---

[29] Lo era para la fecha de la transferencia, así como para el 4 de noviembre de 1980, día en que votó.

[30] El facsímil de esta parte es el siguiente: 065 Río Piedras.

nado para otros fines al Municipio de San Juan, del cual Río Piedras es parte. (Véase Anejo B.)

*Héctor Ramírez Aponte* (JR-80-280)

El elector Héctor Ramírez Aponte se inscribió en Caguas en 1975, pero no votó en las elecciones generales de 1976. Luego de este evento se mudó para Canóvanas y allí solicitó una transferencia en el 1979. Posteriormente se mudó para Río Grande y el 6 de julio de 1980 solicitó nuevamente una transferencia para dicho precinto. Poco tiempo después se retrató y recibió una tarjeta de identificación electoral que presentó el día de las elecciones para poder votar. Mas su nombre no apareció en la lista electoral. Aun así votó en el colegio F-1, a tenor del procedimiento adoptado ese mismo día por la Comisión. Su voto fue anulado. La Comisión no adjudicó su voto porque el número de identificación electoral de Héctor Ramírez Aponte, el elector, correspondía al de su hermana Adela Ramírez Aponte y no a él.

Sobre el motivo de este error, el Lic. Ramón Ruiz Roche, Secretario de la Comisión Estatal de Elecciones, declaró que "[l]a única explicación posible es que al momento de la transferencia se le haya asignado el número electoral de su hermana Adela a este elector y que, por lo tanto, se transfirió su hermana Adela en vez del elector [y] eso automáticamente elimina a este elector de las listas electorales". (T.E., Vol. II, pág. 250.) Agregó que la única forma en que el elector pudo haber contribuido a dicho error es que él mismo hubiese incluido el número de su hermana en la solicitud de transferencia, mas, sin embargo, en este caso en particular, el espacio correspondiente apareció en blanco. (*Id.*, pág. 251.)

En revisión, la Junta resolvió confirmar a la Comisión, pero por otro fundamento, a saber, que la solicitud de transferencia no se perfeccionó válidamente (Resolución, pág. 186), ya que el elector dejó en blanco el espacio corres-

pondiente al número del elector y que, por tanto, debió votar en Caguas y no en Río Grande.

*Rafael T. Rodríguez Rodríguez* (JR-80-284)

Este elector aparecía inscrito en el precinto 109 de Río Piedras (T.E., Vol. III, pág. 475). La Comisión Estatal de Elecciones le expidió una tarjeta de identificación electoral. (Véase el *Exhibit* 37.) El Sr. Rodríguez se mudó para Fajardo y el 6 de julio de 1980 solicitó su transferencia para dicho precinto.

El día de las elecciones generales (4 de noviembre de 1980), no apareció en las listas electorales de Fajardo, por lo que tuvo que votar en un colegio especial F-1. Presentó su tarjeta de identificación y copia de la solicitud de transferencia y votó papeleta íntegra. Su voto fue adjudicado a candidaturas nacionales, mas no a favor del candidato a representante, porque no apareció en los expedientes de la Comisión solicitud alguna de transferencia. Estando el caso en revisión ante la Junta, apareció finalmente la solicitud de transferencia de este elector. Sin embargo, la Junta confirmó la decisión de no adjudicar su voto a las candidaturas locales, en vista de que se omitió suplir el número del precinto de origen y el de identificación electoral en la solicitud de transferencia.

Los errores u omisiones suscitados en las tres solicitudes de transferencia que aquí nos atañen se refieren a dos datos en particular: (1) error u omisión del número del precinto de origen del elector; y (2) omisión de su número electoral.

En cuanto al primero, el Lic. Ramón Ruiz Roche, Secretario de la Comisión Estatal de Elecciones, declaró ante la Junta Revisora Electoral que no es normal que un elector conozca la información relacionada con el número de clave de su precinto, pues para eso el funcionario de colegio tiene sobre la mesa un libro del cual toma dicha información. (T.E., Vol. II, pág. 218.)

240

En cuanto al segundo, el Lic. Ruiz Roche declaró que la *práctica común* es que en la mayoría de los casos el encasillado relativo al número de elector *aparezca en blanco*. (T.E., Vol. II, pág. 251.)

■ No hay duda de que los errores u omisiones no se debieron a actuaciones fraudulentas o delictivas del elector o de algún funcionario. En última instancia fueron omisiones o actuaciones negligentes. Constituyeron meros errores de forma, y, por lo tanto, no tuvieron consecuencias. Independientemente de a quién deba atribuírsele el error (si al elector, al funcionario de colegio o a la propia Comisión), se trata de información beneficiosa para acelerar el trámite administrativo, pero que no es indispensable para llevar a cabo la transferencia.[31] Tanto es así, que el "Manual de

---

[31] Los recurridos insisten en la teoría de que los funcionarios de mesa que actuaron en el proceso de inscripción y transferencia son personas afiliadas a los distintos partidos políticos, que aportan trabajo voluntariamente y sin remuneración y que, por tanto, no son funcionarios públicos o empleados como tales de la Comisión Estatal de Elecciones.

El proceso de inscripción electoral es una función gubernamental. La responsabilidad vicaria que tiene la Comisión por las actuaciones que a su nombre realizan estos funcionarios de los distintos partidos políticos no puede estar subordinada a criterios de empleo en su acepción ortodoxa de tarea-salario.

Dichos funcionarios no son, tampoco, empleados de los electores que asisten al colegio a inscribirse o transferirse. Son un brazo indispensable de la Comisión, organismo administrativo que por ley viene obligado a poner en práctica el proceso electoral. Nadie niega que sin la colaboración de todos los partidos políticos y sus afiliados este proceso sería más imperfecto y azaroso de lo que en realidad ha demostrado ser. Pero la ausencia de vínculo laboral no excluye que lo consideremos dentro del marco más celebrado de la agencia. El funcionario de colegio que actúa en el proceso electoral es agente de la Comisión Estatal de Elecciones y no del elector. *Cf. Board of Registration Com'rs* v. *Campbell*, 65 S.W.2d 713, 718 (Ky. 1933) (Los funcionarios que participan en el proceso son funcionarios públicos y, como tales, generalmente se consideran agentes del Estado y no de los electores ni de los partidos políticos que los designan.).

Como tal recae sobre la Comisión la ineludible obligación de suplirles el material de trabajo, brindarles orientación, facilitarles manuales de instrucción y mantener una estrecha supervisión del trabajo que realizan. En fin, que en lugar de que la Comisión opere bajo la teoría de "manos afuera", debe ejercer un grado sumo de atención hacia la participación que la ley le tiene reservada a dichos funcionarios y absorber con mayor desvelo la responsabilidad que sus actos no fraudulentos ni delictivos acarrean.

Instrucciones" para los Miembros de las Comisiones Locales Electorales y las Juntas de Inscripción de Colegio instruía a los funcionarios del siguiente modo: ". . . Los escribientes deberán pedirle al peticionario que les informe el número de identificación electoral, si es que éste lo conoce. Este no será requisito indispensable para aceptar la Solicitud de Transferencia." (4ta ed., San Juan, sept. 1979, Parte III, inciso 4, pág. 8.)

▮▮▮ Cabe advertir, además, que no toda irregularidad en el proceso electoral puede dar lugar a la confiscación del voto. Para que esto suceda, la irregularidad debe ser de tal naturaleza que afecte la justedad e igualdad del proceso electoral. En *Upton* v. *Knuckles*, 470 S.W.2d 822, 827 (Ky. 1971), el criterio se expresó del siguiente modo:

> La prueba debe demostrar violaciones tan flagrantes, extensas y corruptas como para destruir la honradez e igualdad de la elección. [Citas] Solamente en el tipo más flagrante de caso se privará a los votantes de su derecho a causa de actuaciones ilegales de los funcionarios electorales.

▮▮▮ Declaró el Lic. Ruiz Roche que un error como el ocurrido en este caso hubiera podido ser corregido por la Comisión con un mínimo de esfuerzo adicional, si hubiera habido algún tiempo disponible. (T.E., Vol. II, pág. 220.) En este caso, señala, no lo hubo pues la solicitud de transferencia del elector no era la única. Había miles de ellas. Ante esta realidad no podemos convalidar el criterio de la Junta, que le atribuyó carácter confiscatorio a un mero error de forma. Aun cuando la Comisión alegue exceso de trabajo como excusa para no haber subsanado el error a tiempo, el derecho al sufragio no puede estar subordinado a la eficiencia o ineficiencia administrativa en la tarea de viabilizar el proceso electoral. Ya hemos señalado, *ante*, que el sufragio es un derecho constitucional fundamental.

▮▮▮ El gobierno puede imponer como requisito al ejercicio del derecho al voto, que una persona que cuali-

fique de otro modo para ser elector se inscriba. *Ortiz Angleró* v. *Barreto Pérez*, supra. También puede exigir que un elector debidamente inscrito que mude su residencia para otro lugar gestione una transferencia para el nuevo barrio o precinto. El Estado puede exigir que el elector acuda a inscribirse o gestionar su transferencia al lugar y en la fecha que determine, siempre que conceda una oportunidad razonable para ello. *Ortiz Angleró* v. *Barreto Pérez*, supra. También puede requerir que el elector brinde toda aquella información que sea indispensable o necesaria para completar el proceso de inscripción o transferencia. Información relativa al sexo, edad y domicilio es importante para que el Estado se asegure de que la persona posee las cualificaciones necesarias para ser elector, y para prevenir el fraude electoral. *State* v. *Hillenbrand*, 130 N.E. 29 (Ohio 1920); Anotación, *Validity of Statute Requiring Information as to Age, Sex, Residence, etc., As Condition of Registration or Right to Vote*, 14 A.L.R. 260.

■ Todos estos son requisitos razonables y hasta necesarios que el Estado puede imponer por su carácter apremiante para evitar el engaño, garantizar la certeza del escrutinio y establecer la voluntad del pueblo expresada libremente en las urnas. En su aplicación estos requisitos deben implantarse de tal forma que no impongan al elector condiciones de difícil cumplimiento o exigencias que menoscaben su derecho al voto o desalienten su ejercicio.

■ El procedimiento adoptado en los acuerdos tomados por la Comisión satisfizo estos criterios. Sin embargo, en su aplicación, al atribuirle carácter confiscatorio a un mero error de forma, la Comisión ha rebasado el propio texto de la ley, los acuerdos y el Reglamento, pues no hemos podido hallar en ellos disposición alguna que exija la interpretación de nulidad radical adoptada

por la Comisión y convalidada por la Junta. [32] Tal interpretación tuvo el efecto de invalidar injustificadamente el ejercicio de la franquicia electoral.

En estos tres casos las personas son electores debidamente cualificados para votar que se mudaron de otro precinto para un precinto comprendido en el Distrito Representativo Núm. 35, que acudieron al lugar y en la fecha que dispuso la Comisión para realizar la transferencia, que brindaron la información requerida por los funcionarios de colegio como resultado de lo cual se les llenó la correspondiente solicitud de transferencia, la cual firmaron, y se marcharon a sus casas bajo la creencia de que se completaría felizmente el trámite y que podrían votar en el lugar para el cual solicitaron la transferencia.

No surge del expediente ante nosotros que alguien hubiese alertado a estos electores respecto a que cualquier omisión o error en su solicitud tendría efecto confiscatorio sobre su derecho al voto, que por tal razón debían estar atentos a que los funcionarios de colegio llenaran correctamente el formulario, y que debían montar guardia sobre el trámite de su solicitud ante la Comisión.

Respecto a las peticiones de inscripción, la Regla 14 del Reglamento para las Inscripciones Parciales dispuso que la Comisión no le daría curso a las solicitudes que contuvieran errores de forma u omisiones. En su lugar, la Comisión venía obligada a notificar a los electores "por escrito a la dirección postal ofrecida en la petición de inscripción concediéndole un término de quince (15) días para que [comparecieran] ante la Comisión Local para presentar la documentación omitida, suplir la información no ofrecida o mostrar causa por la cual no debían ser excluidos del Registro del Cuerpo Electoral". Pero el

---

[32] Por supuesto, esto hace innecesario considerar si el criterio de nulidad radical sería constitucionalmente permisible. Cuando se puede resolver un asunto mediante un análisis estatutario, se hace innecesario considerar el aspecto constitucional. *Pacheco* v. *Srio. Instrucción Pública*, 108 D.P.R. 592, 601 (1979).

Reglamento nada dispuso en cuanto a algún mecanismo similar (con notificación al elector) para corregir los errores de forma u omisiones en las solicitudes de transferencia. Al tramitar las solicitudes de transferencia, la Comisión optó por utilizar un procedimiento que frustraba la transferencia ante el más mínimo error. El Lic. Ruiz Roche declaró que cuando se suscitaba un error de esta naturaleza, la solicitud no era procesada. En su lugar, se hacía una lista de solicitudes de transferencias no procesadas que se le enviaba a los partidos. (T.E., Vol. II, pág. 217.) Al elector no se le notificaba, aun cuando aparecía de la propia solicitud de transferencia su nueva dirección. (T.E., Vol. II, pág. 218.) Tampoco se exhibía esa lista en ningún sitio público. (T.E., Vol. III, págs. 486–87.)

Los recurridos alegan que los electores afectados por este procedimiento tuvieron amplia oportunidad de enterarse a tiempo de que sus solicitudes no habían sido procesadas, ya que hubo una campaña publicitaria de orientación que debió despertar en cada elector que había solicitado una transferencia la curiosidad de averiguar su status electoral. Tal proposición es inaceptable, pues colocaría siempre sobre el elector, y nunca sobre el Estado, la obligación de supervisar el trámite administrativo de la Comisión Estatal de Elecciones.

■ En estos tres casos, sin embargo, los electores votaron en el lugar en que les correspondía y han tenido la oportunidad de ser oídos. Han podido demostrar que eran electores cualificados y que sus votos deben ser contados. Por esta razón no es necesario resolver ahora si la cláusula de debido proceso de ley de nuestra Constitución o la de Estados Unidos exige que la Comisión notifique a la persona, con anterioridad al evento electoral, que su solicitud de transferencia ha sido rechazada por defectos o irregularidades en la misma. A nuestro juicio, el acuerdo del 4 de noviembre de 1980 que permitió votar a los electores en el lugar para el que habían solicitado su transferencia,

satisfizo la exigencia constitucional de debido procedimiento de ley.

Las jurisdicciones estatales en Estados Unidos han mantenido los mismos criterios aquí expresados. Véanse, *Celler* v. *Larkin,* 335 N.Y.S.2d 791 (1972); *Jaycox* v. *Varnum,* 226 P. 285 (1924); *Goss* v. *Klipfel,* 146 P.2d 217 (1944); *Haggard* v. *Misko,* 83 N.W.2d 483 (1957).

*María Luz Morales Meléndez* (JR-80-283)

El caso de esta electora es un tanto diferente de los tres que hemos comentado. El 6 de junio de 1980 ella hizo una solicitud de transferencia para el precinto de Río Grande, donde está domiciliada. El día de las elecciones votó en un colegio especial F-1 por no aparecer en la lista electoral. Su voto fue anulado porque no figuraba inscrita ni para las elecciones del 1976 ni para las del 1980.

Plantea ante nos la parte recurrente que puede inferirse que la inscripción de la electora se perdió. Se basa en el testimonio vertido ante la Junta por el Secretario de la Comisión, Lic. Ruiz Roche, en el sentido de que ha sucedido "en otros casos" que "estando inscritos no se ha podido localizar la inscripción y más adelante se ha podido comprobar que está inscrito". (T.E., Vol. III, pág. 458.) No creemos que esa expresión sea suficiente, por sí sola, para inferir que la inscripción de la electora Morales Meléndez se perdió.

El testimonio de la electora sugiere, por el contrario, que ella estaba en la creencia de que el 6 de julio de 1980 fue a inscribirse, no a transferirse. En esa ocasión, al presentarse ante un funcionario de una mesa, éste le preguntó "¿dónde usted vive?" y ella contestó que en Río Grande, "pero yo vivía en Country Club". (T.E., Vol. II, pág. 1170.) Pudo interpretar el funcionario que ella solicitaba transferirse de Country Club a Río Grande y que no se trataba de una primera inscripción. No se le preguntó si votó en las elecciones del 1976. Por ello preparó una solicitud de transferencia y no una de inscripción.

El 6 de julio de 1980, fecha en cuestión, se estaban llevando a cabo simultáneamente inscripciones parciales y transferencias de electores. Para cada asunto había un formulario distinto, aunque parecido. (Véase la ilustración que se incluye como Anejo "C"). Uno de los formularios se titulaba "Petición de Inscripción como Elector" y el otro "Solicitud de Transferencia". Ambos formularios requerían la siguiente información:

(a) nombre completo del elector;
(b) nombre del padre y de la madre;
(c) sexo, color de ojos y estatura;
(d) lugar de nacimiento;
(e) fecha de nacimiento;
(f) dirección postal y residencial;
(g) lugar y fecha de la petición o solicitud;
(h) firma del elector, y
(i) autenticación de la firma.

En el formulario de "Solicitud de Transferencia" de la Sra. Morales (Anejo "D") aparece relacionada toda esta información. No aparece, por supuesto, su estado civil ni alusión alguna a su ciudadanía, pues ésta era la única información adicional que requería la petición de inscripción, no la solicitud de transferencia.

La Comisión no le dio curso a la solicitud de transferencia, porque la Sra. Morales no apareció inscrita. Tampoco le notificó ese hecho a la electora. En su lugar, incluyó su nombre en la lista de transferencias no procesadas, de lo cual la electora jamás se enteró. El día de las elecciones fue a votar utilizando, como hemos dicho, la copia de la solicitud de transferencia. Se le anuló el voto.

▮ Consideramos que con la información provista en la solicitud de transferencia de la electora, la Comisión, una vez constató la ausencia de inscripción previa, estaba en condiciones de considerar esa solicitud como lo que era: una petición de inscripción. La Comisión, un organismo especializado en materia electoral, debió prever la situa-

ción en que un elector, por su propio error, ignorancia o negligencia, o por el error, ignorancia o negligencia de los demás, llenara un formulario en vez de otro. Una situación similar surgió cuando la Comisión tuvo que autorizar las llamadas transferencias administrativas. En su alegato, la parte recurrida describe la situación de este modo:

> La Comisión además, en ánimo de liberalidad, al darse cuenta de que aproximadamente casi 19,000 electores se habían confundido y al llenar el formulario F-1 entendieron que estaban llenando una petición de transferencia, decidió por acuerdo unánime, convalidar las F-1 como transferencias, en lo que se ha venido a mal llamar transferencias administrativas. Las F-1 fueron los formularios que al momento de retratarse los electores llenaron en ánimo de que apareciera corregida su dirección única y exclusivamente para efectos del Proyecto de la Tarjeta de Identificación del Elector con su fotografía y a fin de que en su Tarjeta Electoral apareciera su dirección correcta.

Si se pudo considerar un formulario de cambio de dirección como una solicitud de transferencia, no vemos razón para que no pudiera considerarse una solicitud de transferencia como una petición de inscripción. Así, al aplicar el mismo criterio de liberalidad en uno y otro caso, se era igualmente justo.

No debemos olvidar lo dicho en *P.S.P.* v. *Comisión Estatal de Elecciones*, supra, pág. 433:

> El evento comicial envuelve a una población que excede el millón y medio de todo tipo de personas, de las más diversas posiciones sociales y condiciones intelectuales y académicas. Bajo esa óptica, hemos de recordar la admonición constitucional de que "[n]adie será privado del derecho al voto por no saber leer o escribir. . . .", Art. VI, Sec. 4. En su correcta dimensión este postulado puede conllevar, en sus variadas manifestaciones, una prohibición a que se anule el voto porque el elector no siga instrucciones que sólo afectan de manera mínima el interés legislativo que persigue reconocer la verdadera voluntad del elector.[33]

---

[33] Recordemos, además, que conforme a la vigente Ley Electoral los inca-

██ Una vez resuelto que la solicitud de transferencia debió considerarse como una petición de inscripción, la Comisión venía obligada a notificar al elector de cualquier omisión o defecto de forma que imposibilitara concluir el trámite. Ya hemos señalado la Regla 14(b) del Reglamento para las Inscripciones Parciales, que dispone que cuando de la faz de la petición "se desprende que el elector no cualifica para ser incorporado al Registro del Cuerpo Electoral [porque, por ejemplo, no surja, como en este caso, si el peticionario es ciudadano de Estados Unidos o no] la Comisión notificará por escrito a la dirección postal ofrecida en la petición de inscripción, concediéndole un término de quince (15) días para que comparezca ante la Comisión Local para presentar la documentación omitida, suplir la información no ofrecida o mostrar causa por la cual no deba excluirse del Registro del Cuerpo Electoral".

En este caso no se hizo tal notificación. Se violó de este modo el derecho que la propia Ley Electoral reconocía a dicha electora. *Cf. State ex rel. Barancik* v. *Gates*, 134 So.2d 497, 500 (Fla. 1961), en que se resolvió que viola la cláusula de debido procedimiento de ley de la Constitución federal eliminar del registro electoral, sin notificación previa, a un elector. No obstante, la electora pudo ejercer su franquicia electoral, a pesar de que su voto fue impugnado. En la vista que se celebró ante la Junta; nadie presentó prueba de que la Sra. Morales no era una electora cualificada. La prueba se concretó a establecer que ella no aparecía inscrita. Su voto es válido y debe ser contado.

D. *Domicilio.*

El concepto "domicilio" es muchas veces confundido con el de "residencia", particularmente en el lenguaje popular, y en ocasiones se advierte la errónea sinonimia aun en el lenguaje técnico legal. La vigente Ley Electoral y las que

---

pacitados mentales también votan, aun los recluidos en instituciones para enfermos mentales, a menos que hubieren sido declarados como tales por algún tribunal. Arts. 2.003 y 2.005 (16 L.P.R.A. secs. 3053 y 3055).

le precedieron no han sido excepción. Así, vemos que el Art. 2.007 (16 L.P.R.A. sec. 3057) requiere de todo elector que al inscribirse para poder votar, lo haga "en el sitio de su residencia legal" y, al llenar el formulario o petición de inscripción deberá consignar, por disposición del inciso (h) de dicho artículo, lo siguiente:

(h) Domicilio, expresando, en el caso de zona urbana, municipio, nombre del sector, barrio o urbanización, nombre o número de la calle, número del bloque y de la casa según fuere el caso; en la zona rural, todo lo anterior y, además, el nombre del camino vecinal más cercano a la casa donde viviere, el kilómetro y hectómetro de la carretera más cercana.

Parecería que esta disposición supone que el domicilio es donde la persona reside, un lugar específico identificable mediante una precisa dirección por calle y número de casa, nombre de urbanización o barrio, etc. Abunda en ello que conforme al Art. 2.023 (16 L.P.R.A. sec. 3073) en su inciso (b), es motivo de exclusión de un elector de la lista de peticiones de inscripción "(b) [q]ue el elector no era residente de la dirección señalada en su petición a la fecha de inscripción, ni lo es en el momento de la recusación". Ese mismo fundamento podría invocarse para recusar a un elector en el momento en que se presente a votar. Véase el Art. 5.034 (16 L.P.R.A. sec. 3234).

Como veremos, tal suposición no cuadra ni con el concepto jurídicamente aceptado en Puerto Rico de lo que es el domicilio de una persona, ni con la definición que de dicho término hace la Ley Electoral para fines del lugar en que un elector tiene derecho a votar. Dice la citada ley en su Art. 2.004 (16 L.P.R.A. sec. 3054):

Sec. 3054. Domicilio de los electores

A los efectos de este Subtítulo, el domicilio de un elector será aquel que constituye su residencia legal y el mismo se determinará conforme las siguientes normas:

(a) Toda persona tiene un domicilio.

(b) Sólo puede haber un domicilio.

(c) La residencia legal o domicilio es el lugar donde una persona reside habitualmente, cuando no es llamada a otra parte para trabajar u otro objeto temporal y al cual retorna en las épocas de descanso.

(d) El domicilio o residencia legal puede cambiarse mediante la unión del acto y del intento.

(e) No puede perderse un domicilio hasta tanto se adquiera otro nuevo.

Disponiéndose que, no se interpretará que ha adquirido domicilio en Puerto Rico y, por tanto, no tendrá derecho a votar ningún miembro de un cuerpo militar o agencia, departamento u organismo del Gobierno de los Estados Unidos de América por el mero hecho de estar acantonado o en servicio en la Isla.

■ Esta definición claramente implica que una persona puede estar domiciliada en un lugar donde no resida, pues "[e]l domicilio o residencia legal puede cambiarse mediante la unión del acto y del intento" (*sic*) y "[n]o puede perderse un domicilio hasta tanto se adquiera otro nuevo". (Incisos (d) y (e), antes transcritos.) De ello se colige que una persona que tenga su domicilio establecido allí donde reside, podría mudarse a residir a otro lugar y con ello no perder el domicilio en el primer lugar hasta que, unido al acto de residir en el segundo sitio, exista la intención de allí permanecer, que es cuando adquiriría domicilio en el segundo lugar. Por la complejidad que diferentes factores pueden crear en la determinación sobre cuál es el domicilio de una persona, y para nuestro caso el de un elector, no se discute que se trata de una cuestión mixta de hechos y de derecho, sujeta al escrutinio judicial. Véase *Fiddler* v. *Srio. de Hacienda*, 85 D.P.R. 316, 322 (1962).

Examinemos la trayectoria estatutaria y jurisprudencial del concepto desde la adopción del Código Político Administrativo en 1902, que en su Art. 11 (1 L.P.R.A. sec. 8) dispone:

Sec. 8. Domicilio

Toda persona tiene domicilio legal. Para determinar el lugar de domicilio se observarán las siguientes reglas:

1. Es el lugar donde reside habitualmente una persona, cuando no es llamada a otra parte para trabajar u otro objeto temporal, y al cual retorna en las épocas de descanso.

2. Sólo puede haber un domicilio.

3. Para los efectos de la competencia de los tribunales, no puede perderse un domicilio hasta no adquirirse otro.

4. Es domicilio de los hijos no emancipados el domicilio de su padre, y después de la muerte de éste, el de su madre.

5. El domicilio de la esposa se presume ser el del marido.

6. El domicilio de un menor no casado, sujeto a tutela, es el de su tutor.

7. El domicilio puede cambiarse sólo mediante la unión del acto y del intento.

Antes de la adopción del Código Político se habían celebrado las primeras elecciones generales bajo la soberanía norteamericana, las llamadas "de los cien días", para las cuales se dispuso lo siguiente mediante la Orden General 160, serie de 1899:

VIII. Para tener derecho a votar en estas elecciones se requieren las condiciones siguientes:

. . . . . . . .

(e) A los ciudadanos o súbditos de naciones extranjeras que reúnan las condiciones antedichas se les permitirá votar en las elecciones municipales, siempre que hubiesen residido en Puerto Rico durante cinco años inmediatamente anteriores a la fecha de las elecciones, y los últimos seis meses de dicho período, dentro de la municipalidad en que se verifican las elecciones; y siempre que, además, hubiesen renunciado a su nacionalidad, bajo juramento que deberá ser tomado por el juez municipal, o un oficial del ejército; y a dicha renuncia deberá acompañar la declaración de su propósito de hacerse ciudadano de los Estados Unidos.

Este decreto no requirió domicilio a los electores, limitándose al concepto de residencia propiamente dicho. Igualmente se dispuso, a este respecto, en la Ley Electoral y de Inscripciones de 8 de marzo de 1906 y en la de 12 de marzo de 1908. Se reconocía el derecho al voto a "[t]odo varón, ciudadano de Puerto Rico o de los Estados Unidos, de veintiún años o más el día de las elecciones, que no

estuviere legalmente incapacitado y *que hubiere residido durante un año, con antelación a la fecha de las elecciones, en el municipio donde se celebrare la elección . . .*". (Énfasis nuestra.) Se disponía que el elector tendría derecho a votar "en el precinto electoral donde estuviere inscrito su nombre".

No obstante hacerse referencia en dichas disposiciones a residencia, no a domicilio, este Tribunal, en *El Pueblo* v. *Menéndez*, 19 D.P.R. 383 (1913), resolvió que un maestro de escuela que de lunes a viernes trabajaba en Ciales y regresaba a la residencia de su madre en Manatí los viernes, no perdió por razón de su trabajo su domicilio en Manatí, pues nunca tuvo intención de cambiarlo a Ciales y, por tanto, tenía derecho a inscribirse y votar en Manatí. Esta decisión introdujo el concepto de domicilio en materia electoral, concepto que aparece por primera vez estatuido, para fines electorales, en la Ley Para Establecer Inscripciones y Elecciones, Núm. 79 de 25 de junio de 1919. Esta ley no se apartó de las anteriores en cuanto mantuvo el requisito de residencia "durante un año, con antelación a la fecha de las elecciones, en el municipio en donde se celebrare la elección", pero incluyó en su Sec. 15 el concepto de domicilio, adoptándolo del Código Político de 1902, en los siguientes términos:

> Para los efectos de la inscripción, será necesario que la persona resida de buena fe en el municipio en que trata de inscribirse como elector, con un año de anterioridad por lo menos al día de la elección.
> El domicilio, que es la residencia legal del elector, se determinará de acuerdo con las reglas siguientes:
> (1) Toda persona tiene un domicilio.
> (2) Sólo puede haber un domicilio.
> (3) La residencia legal o domicilio es el lugar donde una persona reside habitualmente, cuando no es llamada a otra parte para trabajar u otro objeto temporal, y al cual retorna en las épocas de descanso.
> (4) El domicilio o residencia legal sólo puede cambiarse mediante la unión del acto y del intento.

(5) No puede perderse un domicilio hasta tanto se adquiera otro nuevo.

Anticipado así el concepto de domicilio en la Ley del 1919, vino a sustituir por primera vez al de residencia de la legislación anterior, en la Ley Núm. 3 de 5 de octubre de 1965 (16 L.P.R.A. sec. 41). La definición de domicilio adoptada en la Ley del 1919, transcrita en el párrafo precedente, fue incorporada *fide literis* en la Ley del 1965 y en la Ley Electoral vigente, a base de la cual se celebraron las elecciones generales del 1980. La disposición de la vigente ley, Art. 2.004 (16 L.P.R.A. sec. 3054), aparece transcrita en los primeros párrafos de esta parte de la presente opinión.

Es de notarse que el concepto de residencia, limitado por los primeros estatutos electorales a su definición lingüística precisa, ha ido evolucionando, adjetivándose para al fin llegar a ser, en lo concerniente al ejercicio del derecho al sufragio, el lugar en que el votante tiene establecido su domicilio, eliminándose restricciones tanto de tiempo como de espacio. Hemos visto cómo las leyes de principios de este siglo requerían que el elector votase donde hubiere *residido* durante por lo menos un año para el día de las elecciones. El Código Electoral del 1974 recogió el concepto de domicilio de la Ley del 1965 y modificó el requisito de un año de "residencia", para que fuera de cuatro meses. Disponía en su Art. 4.002 (16 L.P.R.A. sec. 2132) (Suplemento de 1975):

Sec. 2132. Requisitos para ser elector

Será elector de Puerto Rico todo ciudadano de los Estados Unidos que cumpla dieciocho (18) años de edad o más a la fecha de una elección general, que esté domiciliado en Puerto Rico, que en el día de una elección esté debidamente inscrito en el precinto electoral donde resida con cuatro (4) meses de anticipación a dicha elección, y que no esté legalmente incapacitado para votar. El Tribunal Electoral podrá reducir el término de cuatro (4) meses tomando en consideración la última fecha en que se permitan cambios en el

Registro de Electores, la eficiencia administrativa y las garantías que deben prevalecer contra el fraude electoral.

Al ser derogado dicho Código en 1977 por la vigente Ley Electoral, ésta adoptó esta misma disposición, pero sin incluir el requisito de residencia. Dice en su Art. 2.003 (16 L.P.R.A. sec. 3053):

Sec. 3053. Requisitos del elector

Será elector de Puerto Rico todo ciudadano de los Estados Unidos de América y de Puerto Rico domiciliado en la Isla que, a la fecha de una elección haya cumplido los diez y ocho (18) años de edad, esté debidamente inscrito con antelación a la misma y no se encuentre legalmente incapacitado para votar.

El requisito de residencia lo incluye la actual ley en el Art. 2.007 (16 L.P.R.A. sec. 3057), pero añadiéndose el adjetivo "legal". Este artículo regula lo concerniente a la inscripción de electores y comienza diciendo: "Todo peticionario de inscripción comparecerá personalmente a un local de inscripción *en el sitio de su residencia legal . . .*". (Énfasis nuestro.) Entre la información que deberá incluirse en la petición de inscripción, según dicho artículo, está la del "domicilio". Véase el inciso (h), al que ya hicimos referencia en párrafos anteriores. La disposición de la vigente ley es, por tanto, clara en cuanto a que el lugar donde un elector debe votar es aquel en que tiene establecido su domicilio.

Veamos ahora cuál ha sido la trayectoria jurisprudencial del concepto domicilio. Valga señalar que por estar definido el concepto en nuestro Código Político, 1 L.P.R.A. sec. 8, y haber sido adoptada dicha definición en nuestras leyes especiales sobre asuntos electorales, debe prevalecer la misma sobre toda otra definición y sobre toda interpretación doctrinal del concepto basada en legislación extranjera, incluso la española. El Código Político no lo adoptamos de España. Lo adoptamos siguiendo el Código Político del Estado de California del 1872, *Hernández* v. *Felici et al.,*

11 D.P.R. 408, 412 (1906), y la definición de domicilio que en él se hace es una copia del Art. 52 del código californiano. Véase, *Kerr's C. Codes of California*, 2da ed., 1920, Parte I.

El primer caso en que tuvo ocasión de expresarse este Tribunal sobre el concepto del domicilio en materia electoral fue, como hemos visto, *El Pueblo* v. *Menéndez*, supra. Aunque allí no se definió el concepto, vimos que se dio énfasis a la intención del elector de no cambiar de domicilio, para reconocerle el derecho a inscribirse y votar donde lo hizo. Pág. 385. A partir de este caso, no hallamos que hasta ahora tuviera este Tribunal que expresarse sobre el domicilio en lo referente al derecho al sufragio. Empero, no son menos aplicables las decisiones sobre domicilio en cuanto a otras áreas, pues en todo caso la legislación tiene el mismo origen.

En *Pastor* v. *Miró*, 34 D.P.R. 52 (1925), se resolvió que una persona que nació en España, pero que por 25 años estuvo domiciliado en Puerto Rico no perdió su domicilio aquí al trasladarse a España y morir allá, no empece que en una carta escrita tres meses antes de su partida para España y seis meses antes de su muerte, decía: "cuando me embarque me quiero llevar lo poco que tengo para poder disfrutar los pocos años que me quedan de vivir con ustedes . . .". A juicio de este Tribunal, esa prueba no fue suficiente para demostrar que se perdió el domicilio en Puerto Rico con el traslado a España.

En *Carrero* v. *Del Castillo*, 41 D.P.R. 417, 418–419 (1930), dijo este Tribunal:

> El sitio en que una persona realmente vive se presume que es *prima facie* su domicilio legal, pero la verdadera residencia es meramente una circunstancia, y la presunción que surge en virtud de la misma no es concluyente. Una vez obtenido o adquirido un domicilio, se presume que continúa, y a la parte que alega que ha habido un cambio, incumbe probarlo.

*Lokpez* v. *Fernández*, 61 D.P.R. 522, 540 (1943), señala que el propósito manifestado por una persona de irse a vivir permanentemente a otro sitio no implica un cambio de domicilio. Se adopta la siguiente cita de *Restatement of the Law, Conflict of Laws:* "Para la adquisición de un domicilio por elección, la *intención* de constituir un hogar debe ser una intención de *constituirlo en ese momento y no en el futuro"*. A continuación se señala que es éste "el mismo concepto estatutario del domicilio del Artículo 11 de nuestro Código Político". A base de ese mismo concepto estatutario se reconoció en *González* v. *Secretario de Hacienda*, 76 D.P.R. 135, 141 (1954), que ". . . para adquirir un domicilio por selección voluntaria, es necesario que concurran dos requisitos, a saber: (1) presencia física y (2) intención de permanecer en el sitio seleccionado". La presencia física es un hecho objetivo que no ofrece dificultad de prueba. La intención de permanecer o *animus manendi, Carrero* v. *Del Castillo*, supra, pág. 420, que "transmuta un cambio de residencia en uno de domicilio", es una cuestión subjetiva que hay que determinar a base de la totalidad de la prueba, como se hizo en el citado caso de *Lokpez*. Véanse al mismo efecto, *Foss* v. *Ferris*, 63 D.P.R. 570 (1944), y *Green* v. *Green*, 87 D.P.R. 837 (1963).

En *Fiddler* v. *Srio. de Hacienda*, supra, págs. 322–323, expresó este Tribunal:

Mertens, en su obra *Law of Federal Income Taxation*, Vol. 3, sec. 19.31, pág. 75, distingue los términos "domicilio" y "residencia" de la siguiente manera:

"Una estada temporera, en cualquier lugar de morada puede constituir una 'residencia', pero un 'domicilio' constituye un lugar de morada fijo, permanente, o, por lo menos, de duración indeterminada. La duración de la estada en una morada no es el factor determinante que distingue una 'residencia' de un 'domicilio', ya que una 'residencia' puede extenderse por meses y aun años, mientras que un 'domicilio' puede quedar establecido desde el primer momento en

que se instala el individuo en el lugar. La cuestión de 'domicilio' es una mixta de hecho y de derecho, siendo el factor primordial uno de intención de permanencia por tiempo indefinido. . . ."

La ley en Puerto Rico exige algo más que la intención para que se cambie el domicilio. Dispone el Código Político, en su Art. 11, 1 L.P.R.A. sec. 8, inciso 7, que:

"El domicilio puede cambiarse sólo mediante la unión del acto y del intento."

La intención del contribuyente en cuanto a su domicilio, puede ser determinada por sus actuaciones, testimonio, conducta, y la persistente actitud de regresar a su domicilio establecido. Mertens, *Law of Federal Income Taxation*, supra, págs. 76–77. La intención del contribuyente con relación a su domicilio también puede ser determinada por actuaciones tales como: lugar donde vota y ejerce derechos políticos, lugar donde paga contribuciones, sitio donde tiene establecidas oficinas o sitio de negocio, lugar donde pertenece a asociaciones de índole social, fraternidades, etc.

Una más concisa explicación sobre la determinación del domicilio la hallamos en *González Miranda* v. *Santiago*, 84 D.P.R. 380, 385 (1962), citando de *Bixby* v. *Bixby*, 361 P.2d 1075 (Okla. 1961):

"Para que tenga lugar un cambio de domicilio debe coexistir el hecho de abandonar físicamente el primer domicilio y la intención firme de no retornar; y debe existir un nuevo domicilio adquirido mediante el hecho de residir en otro lugar con la intención de que ese sea su hogar permanente."

En un caso más reciente, *Prawl* v. *Lafita Delfín*, 100 D.P.R. 35 (1971), distinguimos nuevamente entre residencia y domicilio, al considerar la disposición del Código Civil que requiere que una persona haya "residido en el Estado Libre Asociado un año inmediatamente antes de hacer la demanda [de divorcio] . . .". Art. 97 (31 L.P.R.A. sec. 331). No tuvimos que entrar a fondo en la cuestión, pero citamos los casos de *Fiddler* y de *González Miranda*, supra, entre otros, siguiendo así la jurisprudencia anterior a que nos hemos referido.

Hasta aquí nuestra jurisprudencia. Como hemos visto, salvo *El Pueblo* v. *Menéndez*, supra, en ningún otro caso tuvo este Tribunal que enfrentarse a la cuestión del domicilio para fines electorales.

La jurisprudencia norteamericana, en sus jurisdicciones estatales, se ha ocupado del tema en su relación con el derecho al voto, y es numerosa. Le echaremos una ojeada por el valor persuasivo que pueda tener. Cabe señalar como nota preliminar que, aunque en sus estatutos los estados utilizan casi exclusivamente el término "residencia", se ha equiparado dicho término al de "domicilio" y en este sentido se exige generalmente. Nota, *State Residency Requirements for Purposes of Voting: The Eligibility of Students to Vote in Their College Communities*, 21 Am. U.L. Rev. 774, 780 (1972). Véanse, *Everman* v. *Thomas*, 197 S.W.2d 58 (1946); *Mitchell* v. *Kinney*, 5 So.2d 788 (Ala. 1942); *Sharp* v. *McIntire*, 46 P. 115 (Colo. 1896); *Coulombre* v. *Board of Registrars of Voters*, 326 N.E.2d 360, 362 (Mass. 1975): Nota, *Constitutional Law—Twenty-Six Amendment—Residency Requirements and the Right to Vote*, 21 De Paul L. Rev. 843, 845 (1972); Nota, *The College Voter and Residency Requirements*, 17 S.D. L. Rev. 131, 132 (1972).

No cabe duda de que la residencia o domicilio del elector es uno de los factores que el estado puede considerar al establecer los requisitos de un elector potencial. Véanse: *Dunn* v. *Blumstein*, 405 U.S. 330, 343–344 (1972); *Oregon* v. *Mitchell*, 400 U.S. 112, 122 (1970); *Carrington* v. *Rash*, 380 U.S. 89, 96 (1965); *Lassiter* v. *Northampton Election Bd.*, 360 U.S. 45, 51 (1959), *inter alia*. El interés del estado en tal exigencia se basa en que debe prevenir el fraude y la votación múltiple; preservar la integridad de la comunidad donde se celebra la elección y excluir a los transeúntes; y que debe participar el electorado directamente concernido y afectado por la elección. Véase Nota, *The College Voter and Residency Requirements*, supra;

Nota, *State Residency Requirements for Purposes of Voting: The Eligibility of Students to Vote in Their College Communities*, supra, págs. 778-779.

El requisito de residencia *bona fide* debe ser distinguido del requisito de continuidad (*durational*). El primero limita el sufragio a aquellos que son catalogados residentes del estado. El segundo permite el derecho al voto sólo a aquellos que han residido en el estado por un período designado. Al requisito de continuidad se le ha aplicado el criterio de escrutinio estricto. Sería inconsistente en Puerto Rico el no hacerlo con el de residencia *bona fide*. Nota, *State Restrictions on Municipal Elections: An Equal Protection Analysis*, 93 Harv. L. Rev. 1491, 1497 (1980). Cuando el estado impone una pesada y especial carga sobre la movilidad de los ciudadanos, se viola el derecho fundamental constitucional de viajar. En vista de que se ha resuelto que las limitaciones al derecho al voto basadas en requisitos de continuidad son inconstitucionales porque menoscaban el derecho a viajar, los mismos argumentos son aplicables al requisito de residencia *bona fide*. Nota, *State Residency Requirements for Purposes of Voting: The Eligibility of Students to Vote in Their College Communities*, supra, pág. 787.

La persona que alega el cambio de domicilio de un elector que aparece inscrito en el Registro de Votantes tiene el peso de probar la existencia del cambio de domicilio. *Stucky* v. *Stucky*, 185 N.W.2d 656 (Neb. 1971); *Guerra* v. *Peña*, supra, págs. 775-776; *Application of People ex rel. Croen*, supra; *Collins* v. *Collins*, supra; *Dilsaver* v. *Pollard*, 214 N.W.2d 478 (Neb. 1974); *Hubbard* v. *McKey*, supra, *inter alia*. Ordinariamente existe una presunción a favor del domicilio original y la prueba del cambio debe ser clara y convincente. *Hamlin* v. *Holland*, supra, pág. 27. Es decir, el recusador debe presentar prueba clara y convincente de que el elector no es domiciliado del lugar donde intenta votar. *Guerra* v. *Peña*, supra, pág.

776. De todos los actos formales que deben escudriñarse para determinar el domicilio de una persona, el acto de inscribirse y de votar es el más importante y, aunque no es necesariamente concluyente, es por lo general el más convincente y persuasivo. *In re Meyers' Estate*, 288 N.W. 35, 38 (Neb. 1939). Véanse, además, a *Ex parte Weissinger*, supra. En *In re Estate of Loudenslager*, supra, pág. 480, se señaló que "se requiere menos prueba para demostrar que se mantiene un domicilio que para establecer un nuevo domicilio".

No puede eliminarse el nombre de un elector del Registro de Votantes a base de meras inferencias e incertidumbres. *Application of People ex rel. Croen*, supra, pág. 708. En ausencia de fraude, el beneficio de la duda debe ejercerse a favor del derecho al voto en el pueblo que el ciudadano considera su hogar. *McGee* v. *Bragg*, supra, pág. 431. Esto es así porque, para efectos electorales, el domicilio original permanece inalterado y continúa hasta que se haya adquirido otro domicilio. *Kay* v. *Strobeck*, 254 P. 150, 152 (Colo. 1927).

La prueba del cambio de domicilio del elector no puede ser de referencia. *Collins* v. *Collins*, supra, págs. 627–628. En *Atkinson* v. *Thomas*, supra, pág. 244, se exigió algo más que *scintilla* de prueba para establecer el domicilio original del elector. Está claramente establecido que el elector no tiene que estar presente físicamente todo el tiempo en el distrito en que intenta emitir su voto. *Swan* v. *Bowker*, 281 N.W. 891 (Neb. 1938). La presencia física del elector en la jurisdicción no es esencial al derecho al voto si ha adquirido y retenido allí su domicilio. *Pope* v. *Howle*, supra, pág. 224; *Gray* v. *Main*, 309 F.Supp. 207, 217 (N.D. Ala. 1968).

La ausencia temporal del domicilio, para propósitos de empleo, sin la intención de abandonar su pueblo natal y de adquirir otro permanentemente o por tiempo indefinido, no puede ser considerada como la decisiva para

negar el derecho al sufragio. *Wilkerson* v. *Lee*, 181 So. 296 (Ala. 1938). Véase, además, *Martin* v. *Hefley*, 533 S.W.2d 521, 522 (Ark. 1976). Un cambio de residencia por motivos de salud no tiene usualmente el efecto de cambiar el domicilio. *In re Meyers' Estate*, supra. En *Newburger* v. *Peterson*, 344 F.Supp. 559 (D.N.H. 1972), se impugnó con éxito un estatuto de New Hampshire que descalificaba a los ciudadanos del derecho al voto en las elecciones municipales si tenían la firme intención de abandonar el pueblo en un futuro fijo. Se dice que aplica el *standard* del escrutinio estricto y que el requisito de intención indefinida es inconstitucional por violar la igual protección de las leyes. Obviamente el solo hecho de tener negocios en una localidad no es suficiente para establecer el domicilio. *Pope* v. *Board of Election Comr's*, 18 N.E.2d 214 (Ill. 1938). Tampoco constituye prueba per se del domicilio un número postal. Véase *Kyser* v. *Board of Elections of Cuyahoga County*, 303 N.E.2d 77, 80 (Ohio 1973), donde se dice que el lugar donde una persona recoge su correspondencia no puede considerarse su hogar. Tampoco es necesario que tenga un título de propiedad para demostrar su presencia. Es suficiente si el elector renta el lugar donde vive. *Phoenix* v. *Kolodziejski*, 399 U.S. 204 (1970).

Esta exposición jurisprudencial es muy similar a la adoptada y promulgada por el *American Law Institute*, en su *Restatement of the Law Second, Conflict of Laws 2d*, Vol. 1. Así, por ejemplo, el *Restatement* señala que para propósitos electorales el concepto residencia se ha equiparado al de domicilio. Sec. 11, pág. 46. Tampoco requiere una presencia física habitual y se da énfasis a la actitud mental del ciudadano en torno a cuál es su domicilio. Sec. 16, pág. 63. El ciudadano tampoco adquiere un domicilio por elección, cuando su presencia en el lugar es por obligación legal o por coacción. *Ibid.*, Sec. 17, pág. 66. El peso de la prueba corresponde a quien alega el cambio de domicilio. *Ibid.*, Sec. 20, pág. 81.

Hemos señalado que nuestro concepto de domicilio nos viene de uno de los estados de la Unión norteamericana. No es de estirpe civilista. La jurisprudencia que hemos comentado y citado, de los tribunales estatales y federales, se inclina pesadamente hacia el reconocimiento del domicilio como determinante del sitio en que el elector debe votar. Al así hacerlo, dicha jurisprudencia establece normas sobre la prueba requerida para determinar el domicilio, que tienen más en cuenta el elemento subjetivo de intención del elector que el objetivo de habitualidad de su residencia.

Hemos visto cómo la legislación electoral puertorriqueña ha evolucionado desde comienzos del presente siglo, quedando atrás el requisito de residencia por un año en el lugar en que el elector deberá votar. La Ley Electoral del 1977, ahora vigente, requiere "residencia legal", que es lo mismo que domicilio, sin aquella limitación de tiempo. Basta que el elector esté debidamente inscrito en el lugar en que vote, "con antelación" a la fecha de la elección. Arts. 2.003 y 2.007 (16 L.P.R.A. secs. 3053 y 3057, respectivamente). De seguro esta legislación ha tomado en cuenta los cambios sociales y económicos que se han producido, transformando nuestra economía de una eminentemente agrícola que afincaba a la gente a la tierra, a una industrial que obliga a una gran parte de la población a desplazarse continuamente hacia nuevos lugares de trabajo.

Finalmente, forzoso es repetir que el desarrollo del proceso democrático en nuestro país y las experiencias históricas sobre el ejercicio del sufragio han creado una profunda conciencia sobre el valor del voto, reconocido como una prerrogativa fundamental del pueblo en la Carta de Derechos de nuestra Constitución, que manda que las leyes garanticen que sea universal, igual, directo y secreto.

▆ Considerados esos factores y fundamentos, el enfoque sobre la validez del voto emitido en determinado sitio, desde el punto de vista del domicilio del elector, ha

ser necesariamente un enfoque liberal. A base de esas consideraciones concluimos que los siguientes criterios debieron ser aplicados y deberán prevalecer para fines de determinar el domicilio de un elector:

(1) que es una cuestión mixta de hecho y de derecho;

(2) que el lugar en que un elector resida es solo un factor a considerar;

(3) que el factor de mayor peso es la intención del elector, teniéndose presente a este fin que una cosa es la intención de permanecer en un lugar (*animus manendi*), y otra el propósito de fijar el domicilio en un lugar distinto;

(4) que el elector no pierde su domicilio por ausencia temporal de éste, sea por razón de trabajo, estudios, enfermedad suya o de su familia;

(5) que no es necesario que un elector permanezca todo el tiempo en el lugar en que tiene su domicilio para poderlo retener;

(6) que tener negocios o empleo en un determinado lugar, así como relaciones sociales y económicas y tener a su nombre en dicho lugar un apartado de correos, un teléfono, o cuentas de agua y electricidad son factores que pueden considerarse, pero que no son por sí solos determinantes de que en dicho sitio se ha adquirido un domicilio;

(7) que el peso de la prueba sobre un cambio de domicilio lo tiene quien lo alegue; y,

(8) que existe una presunción a favor del domicilio original y lugar donde vota el elector, recayendo sobre quien alegue que ha habido un cambio de domicilio el peso de probarlo mediante prueba clara, robusta y convincente, no afectada por reglas de exclusión.

Al resolver sobre las recusaciones por razón de domicilio, la Junta Revisora Electoral pasó por alto en muchos casos la intención manifiesta del elector, prefiriendo los criterios de presencia física y residencia habitual. Incidió. Al considerar cada caso más adelante, haremos las rectificaciones que sean procedentes de conformidad con los

criterios que hemos expuesto y teniendo en cuenta los criterios sobre el valor y la suficiencia de la prueba que señalamos bajo la letra "A" de esta Parte II.

E. *Se mantendrá la validez de una papeleta votada siempre que pueda determinarse con razonabilidad la intención del votante.*

Hemos señalado enfáticamente que se presume la validez del voto emitido por un elector; que quien lo impugne tiene el peso de la prueba; y que la prueba a ese efecto ha de ser clara, robusta y convincente. Parte II A de esta opinión.

En *P.S.P.* v. *Comisión Estatal de Elecciones*, supra, pág. 429, reconocimos la supremacía de la clara intención del elector al marcar su papeleta de votación, sobre cualquier interpretación literalista del estatuto, que pueda frustrar el valor de un voto emitido. Reconocimos "que el legislador no puede anticipar nunca todas las posibilidades imaginables en el elenco de situaciones en que la dinámica y conducta humanas se desenvuelven . . .", y señalamos que ". . . nuestra misión suprema es salvar —por la preeminencia del derecho envuelto— aquellas situaciones en las cuales una interpretación literal y rigurosa plantearía graves interrogantes y objeciones de carácter constitucional". Se trataba allí de decidir si es válida una papeleta votada por un elector en que, en vez de hacer la marca bajo la insignia del partido de su preferencia y dentro del cuadrante en que la insignia aparece impresa, que es como dispone la ley, la hizo fuera de dicho cuadrante y sobre la insignia. Resolvimos que siendo clara la intención del elector de votar por dicho partido, no puede anularse su voto. Dijimos: "La medida determinante es si la marca refleja claramente la intención del elector y no el evento fortuito de que la marca fue incorrectamente ubicada." Pág. 432.

Ratificamos dicha norma. Su aplicación coadyuva a obedecer el mandato constitucional de garantizar el derecho

al voto. Esa norma dispone del aspecto que ahora consideramos, pues se trata de una papeleta votada por un elector, en la que aparecen las siguientes marcas: una cruz en forma de equis (X) bajo la insignia del Partido Popular Democrático y junto a la equis la letra "F", y una raya diagonal (/) bajo la insignia del partido Independentista Puertorriqueño. Véase el Anejo "E".

La Comisión Estatal de Elecciones determinó, por votación unánime, que la marca diagonal era en este caso inconsecuente. No obstante, anuló la papeleta debido a la inicial "F" puesta al lado de la equis. El Partido Popular no estuvo conforme y en su recurso ante la Junta Revisora Electoral planteó que la papeleta era válida. Señaló que al decidir como lo hizo, la Comisión se apartó del criterio utilizado en otros casos similares, citando como ejemplos una papeleta votada en el precinto de Guayanilla en que el elector hizo una equis y escribió una "C" bajo la insignia del Partido Nuevo Progresista (*exhibit* 27 de la parte recurrente), y otra papeleta en que el elector igualmente votó por el Partido Nuevo Progresista haciendo una equis y escribiendo la letra "P" bajo la insignia de dicho partido. En ambos casos las papeletas fueron contadas como votos íntegros a favor del mencionado partido.

La Junta Revisora mantuvo la decisión de la Comisión, pero no a base de la cuestión planteada. Descartó el criterio unánime de la Comisión de que la marca diagonal es inconsecuente y resolvió que esa marca y la equis, por constituir, ambas, marcas válidas bajo la Ley Electoral, anulaban la papeleta. Invocó el Art. 6.002 (16 L.P.R.A. sec. 3262) (34) y la Regla 32 del Reglamento de las Elecciones Generales de 1980. (35) No entró a considerar cuál

---

(34) Dicho artículo dispone en su segundo párrafo:

"En adición a las causas para protestar la papeleta, dispuestas en el Artículo 1.003 de esta ley, las mismas se podrán dejar de adjudicar cuando reflejaren una votación doble por dos partidos contrarios. Estas serán las únicas razones válidas para negarse a adjudicar en el colegio."

(35) El citado Reglamento, R. 61, Manual de Procedimiento para Funciona-

fue la intención del elector. No obstante, estamos de acuerdo con la decisión de la Junta. El recurso se da contra la decisión; no contra sus fundamentos.

 Debe respetarse la intención del elector cuando ésta es clara. En este caso no lo es, pues el elector hizo dos marcas válidas: una para el Partido Popular y otra para el Partido Independentista, y son, por tanto, contradictorias.

Cualquier intento que se haga para determinar la intención del elector que votó esta papeleta estará basado necesariamente en conjeturas. Podría argüirse, por ejemplo, que el elector comenzó a hacer una cruz (X) bajo la insignia del Partido Independentista, por equivocación; o desistió de ello y se decidió antes de completar la cruz (X), por votar bajo la insignia del Partido Popular Democrático, y lo hizo de manera clara haciendo una cruz completa bajo esta insignia. Pero también podría argüirse lo contrario: que el elector votó por el Partido Popular y se arrepintió y votó por el Partido Independentista, haciendo la raya diagonal (/), que es una marca válida, bajo la insignia de este partido y escribiendo una "F" al lado de la cruz como indicación de que es falsa esa marca, de que fue un fallo suyo ponerla, etc.

Es cierto que la Comisión Estatal de Elecciones consideró, por el voto unánime de sus miembros, que la raya diagonal (/) es inconsecuente. Así lo declaró el Secretario de la Comisión, Lic. Ruiz Roche, ante la Junta Revisora. No obstante, anuló la papeleta a base de la inicial "F", y contra ello se recurrió ante la Junta Revisora.

 No estaba la Junta ante un caso de recusación de un elector en que, como hemos señalado (Parte II B), se estará únicamente al motivo aducido en la recusación para determinar su validez. Se trata de una papeleta que no

---

rios de Colegio y Coordinadores de Unidad Electoral, R. 32, reconoce como válidas "marcas en forma de cruz (X)", "una marca de cotejo (✔)" y rayas (–), puntos (.) o círculos (O) claramente distinguibles o variaciones de estas marcas que reflejen claramente la intención del elector.

identifica al votante y que fue oportunamente protestada. La Junta estaba justificada en examinarla en su totalidad y llegar a sus propias conclusiones, como lo estamos también nosotros por tratarse de prueba documental. *Díaz de Diana* v. *A.J.A.S. Ins. Co.*, 110 D.P.R. 471 (1980), *inter alia; Caribe Crown Cap Corp.* v. *Srio. de Hacienda*, 108 D.P.R. 796 (1979); *Planned Credit of P.R., Inc.* v. *Page*, 103 D.P.R. 245 (1975); *Miranda* v. *Editorial El Imparcial Inc.*, 99 D.P.R. 601 (1971); *Cooperativa Cafeteros* v. *Colón Colón*, 91 D.P.R. 372 (1964); *Central Igualdad, Inc.* v. *Srio. de Hacienda*, 83 D.P.R. 45 (1961); *Castro* v. *Meléndez*, 82 D.P.R. 573 (1961).

El hecho de que en casos anteriores se hubiese aceptado como válida una papeleta que contuviera una marca bajo la insignia de un partido, con una inicial que pudiera identificarse con algún candidato de ese partido que apareciera en la papeleta, sería un argumento persuasivo si se tratara aquí de una papeleta que solamente contuviera esas dos marcas, es decir, la cruz (X) y la inicial bajo la insignia del partido. Pero en este caso hay demasiadas marcas. La intención del elector no es clara.

Se confirmará la determinación de la Junta Revisora respecto de esta papeleta y no se adjudicará.

F. *Impedimentos físicos del elector.*

Una electora del precinto de Río Grande no pudo subir al colegio de votación por estar impedida físicamente debido a una reciente operación quirúrgica. Los funcionarios del colegio bajaron donde ella, llevando una papeleta electoral en que ella votó. Posteriormente fue recusada por el representante del Partido Popular Democrático. Ya la electora se había ido y no pudo, por tanto, contestar la recusación.

La Junta Revisora correctamente desestimó la recusación, quedando el voto adjudicado íntegramente a favor del Partido Nuevo Progresista. El no haber hecho la

recusación en presencia de la electora, dándole así la oportunidad de defender su voto, impedía que la recusación pudiera considerarse. Independientemente de ese factor, el estar impedida la persona no es ni puede ser motivo para recusar su voto. Cierto que los electores deben concurrir a votar al colegio que les corresponda, y nada dispone la ley para que los funcionarios del colegio salgan a tomarle el voto al elector que no puede ir al colegio. En este caso, sin embargo, hacerlo no ocasionaba problemas y es laudable que los funcionarios lo hicieran, para así garantizar el sufragio de un ciudadano, que es lo más importante.

El Partido Popular no ha insistido ante nos en cuanto a impugnar la actuación de la Junta, tornándose la cuestión en académica. No obstante, quede resguardado el principio de que impedimentos físicos no son motivo válido para recusar el voto y que situaciones como la que es objeto de estos comentarios deben resolverse facilitando en todo lo posible y razonable que el elector impedido tenga oportunidad de emitir su voto.

### III

### *Análisis de los Casos*

A continuación analizaremos separadamente y en detalle el caso de cada uno de los electores cuyo voto está en controversia en el recurso ante nos, aplicando al así hacerlo, los criterios que hemos expuesto en la Parte II de esta opinión. Nos referiremos a cada caso por el nombre del elector afectado, indicando, además, el número de presentación que le asignó la Junta Revisora Electoral.

(1) *Roberto Pérez* (JR-80-281)

(2) *Nellie Cortés* (JR-80-277)

(3) *Maritza Pérez Cortés* (JR-80-277)

Estos electores constituyen un grupo familiar. El Sr. Pérez y la Sra. Cortés están casados entre sí y son los padres de Maritza. Los tres votaron en el precinto de Fajardo, adjudicándose sus votos a favor del candidato Sr. Molina, del

Partido Nuevo. Fueron recusados por el Partido Popular, bajo la alegación de no estar domiciliados en Fajardo y sí en Carolina.

La prueba no controvertida establece que los esposos Pérez Cortés, naturales de Utuado, contrajeron matrimonio en Nueva York en el 1957. En 1969 se trasladaron a Puerto Rico y compraron una casa en el municipio de Carolina, donde se instalaron y fijaron su residencia. Alrededor de un año más tarde compraron un negocio de estación de gasolina en Fajardo, que atendían ambos, pero permanecieron residiendo en Carolina. En alguna fecha en la década de los años setenta, que no pudo precisar la Sra. Nellie Cortés de Pérez, se mudaron a una casa alquilada en Fajardo y luego compraron allí una casa en que vivieron durante un año. En 1978 la vendieron y volvieron a su residencia original en Carolina, de la cual nunca se desprendieron. Su hija Maritza "estudió en *Manpower*" cuando se mudaron a Carolina. Actualmente trabaja en un bufete de abogados en Santurce y estudia en el Puerto Rico Junior College.

Los esposos Pérez Cortés hacen vida social en Fajardo, donde mantienen el negocio de estación de gasolina y tienen planes de volver a residir en Fajardo en el futuro. Piensan comprar un apartamiento en Dos Marinas.

La Junta concluyó que el domicilio de estos cónyuges es en Fajardo. Discrepamos. La prueba demuestra de manera incontrovertida que al establecer residencia en Carolina en 1969, esta familia fijó allí su domicilio. Hicieron un intento de cambio para Fajardo, pero hace tres años retornaron a Carolina y allí han permanecido. El propósito de algún día —un día incierto— irse a residir a Fajardo no opera para ipso jure convertirles en domiciliados de Fajardo. Una cosa es estar domiciliado en un lugar y otra tener el propósito de domiciliarse allí en el futuro. El *animus manendi* está donde residen actualmente. Las recusaciones debieron prosperar.

En cuanto a Maritza, la Junta se negó a considerar la recusación al concluir en su resolución que "según el testimonio de Juan Gualdín Sosa quien declaró ser un buen popular y quien testificó que le habían encomendado la citación de Maritza Pérez Cortés admitió que originalmente la citación a Maritza era para el día 8 de enero de 1981, pero que al no poderla diligenciar a ésta personalmente, él sin notificación a Maritza ni a nadie, había cambiado el 8 que aparecía en citación por un 9, cambio que hizo por su cuenta y que resulta ser la fecha en que la testigo declara. Concluimos que para la citación a la electora Maritza Pérez Cortés dentro de estas circunstancias es insuficiente en derecho teniendo ella un derecho inalienable e inviolable a ser citada, comparecer y ser considerada en vista pública en defensa de la recusación de sus cualificaciones como electora. En su caso, además, hay ausencia de prueba contra ella por la parte recusadora". Esta expresión es completamente equivocada. Hemos leído la transcripción del testimonio del Sr. Juan Gualdín Sosa y en ninguna parte aparece que dijera "ser un buen popular" ni que admitiera haber hecho alteración alguna en la citación de Maritza. Presumimos que la Junta Revisora confundió el caso, quizás por la manera irregular en que se vio precisada a trabajar y su empeño legítimo en resolver los casos sin dilación.

Hemos examinado la citación y no hay un 8 cambiado por un 9. No aparece el número 9 en ningún sitio. En letra clara, sin tachaduras, borrones o sobrescritos, hizo constar el diligenciante haber entregado la citación personalmente a la electora el 7 de enero de 1981 para que compareciera ante la Junta el día 8 de ese mes y año. Véanse Anejos "F" y "F-1".

Un examen del testimonio del Sr. Juan Gualdín Sosa demuestra que Maritza fue citada conforme a derecho. Relató que al ir a entregar la citación le preguntó a Don Roberto si se encontraba Maritza y éste respondió que sí.

(T.E., pág. 6107.) Al averiguar que el Sr. Sosa traía citaciones, don Roberto Pérez rehusó dejarle entrar a la casa, le dijo que se fuera y amenazó matarlo. (T.E., pág. 6106.) Mientras ocurría este incidente, vio a una joven en la casa y ésta dijo: "Papi, déjalo, que él es de la Junta Revisora. El no es del Partido Popular, yo creo que él es de la Junta Revisora."

Vista la actitud amenazante del padre, el Sr. Sosa tuvo que dejar la citación con él, en vez de entregarla a Maritza en las manos. Ante estos hechos, no hay duda de que la citación fue suficiente en derecho. La propia parte, mediante sus actos, impidió la entrega personal.

La Ley Electoral nada dispone sobre la manera de diligenciar una citación de un elector. Pero su Art. 6.014 (16 L.P.R.A. sec. 3274), que trata del diligenciamiento de una citación a una persona cuya elección a un cargo sea impugnada, ofrece una pauta que debe ser aceptable para casos como el que nos ocupa. Dice:

> La notificación, escrito y contestación prescritas en esta sección podrán ser diligenciadas por cualquier persona competente para testificar, y se diligenciarán entregándolas personalmente a las respectivas partes, a sus representantes electorales, o *dejándoles con alguna persona mayor de dieciséis años, en la residencia u oficina de la persona a quien fueren dirigidas.* A los fines de esta sección, el representante electoral de un candidato será el miembro de la Comisión Local de precinto de su residencia que represente su partido o su candidatura. (Énfasis nuestro.)

La citación a un elector no puede depender de que el elector rehúse ser citado. El diligenciamiento "personal" no significa entrega en la mano. Basta que se identifique debidamente el elector y que éste tenga suficiente aviso de lo que se trate y la citación se le haga disponible. Al dejarla en la casa de Maritza en las circunstancias en que lo hizo el diligenciante, se cumplió el requisito de diligenciamiento personal.

En los méritos también erró la Junta. Hubo prueba abundante, robusta, clara y convincente mediante los testimonios de Nellie Cortés, madre de Maritza, y de Hipólito Suárez Velázquez, demostrativa de que desde que vinieron a Puerto Rico en 1969 Maritza ha estado domiciliada con sus padres en Carolina, donde han residido durante nueve de los once años que hace que viven en este país, inclusive los transcurridos desde el 1978.

El voto de Maritza Pérez Cortés, como el de sus padres, no podrá contarse a favor de la candidatura del Sr. Molina en el Distrito Representativo Núm. 35.

(4) *Carlos Rosado Santana* (JR-80-279)

El caso de este elector es muy similar al de los Pérez Cortés. El Sr. Rosado Santana votó en el precinto 102 de Cieba a favor del Partido Popular y su candidato Sr. Cepeda. Fue recusado por el Partido Nuevo Progresista como no domiciliado en Ceiba. Distinto al caso de los Pérez Cortés, en este caso la Junta Revisora sostuvo la validez de la recusación. Aquí actuó correctamente.

Durante la vista celebrada declararon Heriberta Pérez Rivera, José A. Añeses de la Rosa y Ernestín Muñoz en su contra.

Heriberta Pérez mandó a recusar el voto de Carlos Rosado el día de las elecciones. Testificó que el elector vive en Aguadilla con su esposa desde hace cinco o seis años. El visita a su mamá en Ceiba todos los meses. Es propietario de una casa en Aguas Claras en Ceiba, donde actualmente residen sus suegros. Ella era vecina de él en dicha urbanización. Nunca ha ido a la casa de Rosado en Aguadilla, pero sabe que vive allí, pues sus familiares, a quienes ella conoce bien, se lo han dicho.[36]

El Sr. José A. Añeses de la Rosa es Director Ejecutivo de la Autoridad para la Administración y Desarrollo de Punta Borinquen y al mismo tiempo es Administrador de

---

[36] Aunque esta es una manifestación de referencia, lo dicho quedó establecido sin lugar a dudas mediante prueba directa.

la Corporación de Industriales de Puerto Rico que administra la antigua base militar en Ramey. Tiene a su cargo el arrendamiento de viviendas allí. Atestó que Carlos Rosado Santana tiene una propiedad alquilada allí desde el 21 de octubre de 1975. La residencia que él ocupa está amueblada. Las personas que tienen apartamientos alquilados en Ramey son de todas partes de Puerto Rico. (T.E., pág. 1896.)

Ernestín Muñoz declaró que reside en Ramey, Calle Grubbs 114. Conoce a Carlos Rosado Santana y a su esposa, Elsie. Ellos residen en Ramey. Carlos y él eran compañeros de trabajo. Elsie también trabaja en Aguadilla.

El elector compareció a defender su voto. Alegó residir en la Parcela #63 de Aguas Claras, Ceiba. Declaró que es gerente de mantenimiento para Dade Diagnostic, localizada en Aguada. Mientras trabaja reside en Ramey, Aguadilla. Tiene una casa alquilada allí desde hace cinco años. Es dueño de su propiedad en Aguas Claras, Ceiba. La posee desde hace nueve años. Posee una segunda propiedad en el Barrio Mangó en Ceiba. Viaja a Ceiba tres veces al mes. Se queda en su casa en Aguas Claras. Actualmente reside su suegra allí cuidando de la casa.

El elector nació en Fajardo y se crió en Ceiba desde que tenía nueve años. Inicialmente trabajó en Roosevelt Roads desde los años 1967 a 1972. De ahí se fue a trabajar a Humacao como supervisor de mantenimiento para Tecnicom Electronics, pero se quedó viviendo en Ceiba. Se quedó allí hasta el año 1975. De ahí pasó a trabajar para Dade Diagnostic en Aguada, como gerente de mantenimiento. Se fue para allá porque le ofrecieron $16,000 anuales.

Sus niños asisten a una escuela privada en Aguadilla. Tiene cuenta de banco en Aguada. Actualmente gana $30,000 anuales. Viaja a Ceiba tres de los cuatro fines de semana de cada mes para visitar a su mamá, ir a pescar y atender un negocio de gomas que tiene allí. El negocio lo

tiene hace tres meses y medio y se lo atiende un concuñado.

Su esposa Elsie Cintrón declaró a su favor. Admitió que ella también trabaja en Aguadilla para una compañía de computadoras. Tiene cuenta de banco en Aguada. Ellos son propietarios de un bote que tienen en La Parguera, donde tienen una casa alquilada.

Aunque Carlos Rosado Santana mantiene contactos en Ceiba, él mismo hizo el cambio de empleo para trabajar con Dade en Aguada, en consideración a un sueldo mayor. Vive allí desde el año 1975. Su esposa trabaja en Aguadilla y sus niños asisten a una escuela privada en el área. Considerando el largo espacio de tiempo que el elector lleva residiendo fuera de Ceiba voluntariamente, estimamos que la prueba dejó establecido el *animus manendi* de permanecer en el área de Aguadilla.

No estamos ante el caso de una persona que es llamada por su corporación a trabajar a un sitio fuera de su domicilio. Aquí el propio obrero cambió de empleo y optó por abandonar su empleo con Tecnicom para obtener un mejor sueldo con Dade en Aguada. Al así hacerlo y permanecer fuera de Ceiba por el espacio de cinco años, él estableció su domicilio en Aguadilla y perdió el que tenía en Ceiba. Debe confirmarse la resolución de la Junta, que anula su voto por falta de domicilio en Ceiba.

(5) *María Soto Sanes* (JR-80-279)

(6) *Norma Soto Sanes* (JR-80-279)

Estas electoras votaron en el precinto de Vieques a favor del Partido Popular Democrático y su candidato Sr. Cepeda. Se les recusó bajo la alegación de no estar domiciliadas allí.

El único testigo presentado para sustanciar la recusación fue Marcelino Soto Sanes, hermano de las electoras. Declaró que Norma trabajaba en Vieques de maestra y que al morir la madre en el año 1977, salió de allí para la Isla Grande (es como los viequenses le llaman a la Isla de

Puerto Rico) (T.E., pág. 1449); que María trabajaba con el Muncipio de Vieques en los planes CETA, presentó su renuncia y se fue a trabajar a una ferretería en Vieques. Estuvo un tiempo ahí y, al morir la madre, salió para la Isla Grande. Dijo que la propiedad que era de sus padres está abandonada y que nadie vive allí. En contrainterrogatorio admitió que la casa de la madre está amueblada y que hay nevera, televisión, y una de las hermanas tiene un automóvil en Vieques. Norma y María, cuando vivían en Vieques, se quedaban en la casa de la madre.

María Soto Sanes compareció a defender su voto. Declaró que ella estudió un curso secretarial en Vieques. Trabajó en Vieques con General Electric, el Municipio de Vieques, en una ferretería y en una fábrica de camisas. La última vez que trabajó en Vieques fue en el año 1977, en la fábrica de camisas. Tuvo que dejar su empleo porque cerraron la fábrica. (T.E., págs. 1461–1462.) Vivía en casa de sus padres en Vieques. Al morir la madre, ella estaba trabajando en la ferretería y después de eso trabajó en la fábrica de camisas. Al cerrar la fábrica en el año 1978, ella no consiguió más trabajo en Vieques y se tuvo que mudar para la Isla de Puerto Rico porque no tenía recursos con qué vivir. Actualmente trabaja para Servicios Legales.

Aseveró la testigo que reside en Vieques. Viene todos los fines de semana a Vieques. Tiene un apartamiento alquilado en Río Piedras, donde vive con sus dos hermanas. Tiene un automóvil que lo deja en Vieques. Se queda en la casa que era de sus padres. Ella paga las facturas de agua y luz de la casa de Vieques. Niega expresamente que haya tenido la intención de abandonar Vieques como su sitio de residencia. Ella tiene cuenta de banco en Vieques. En cuanto a su hermano declaró que no tienen buenas relaciones desde que se hizo la división de terrenos que ellos poseen en Vieques.

Norma Soto Sanes también compareció a defender su voto. Declaró que reside en Vieques y trabaja con ASPIRA de Puerto Rico en Carolina. Lleva trabajando allí desde el 8 de agosto de 1980. Durante la semana se queda en Río Piedras en un apartamiento que tiene alquilado con sus hermanas y todos los fines de semana que le permite su trabajo viaja a Vieques.

Está inscrita en Vieques. En el año 1978 se tuvo que ir a la Universidad de Puerto Rico a hacer su maestría. Tiene pertenencias en Vieques, en la casa que era de sus padres. En sus períodos de descanso y vacaciones regresa a Vieques. Su trabajo no es permanente. Tiene un contrato por un año.

La testigo Rosa Camacho declaró a favor de las electoras. Dijo que ellas viven en Vieques (T.E., pág. 1495), pero trabajan en Río Piedras. Viajan a Vieques casi todos los fines de semana. Se quedan en la casa que era de sus padres. Ella vive como a 150 pies de su casa.

No empece la evidencia desfilada, la Junta concluyó, bajo el criterio de preponderancia de prueba, que las electoras están domiciliadas en Río Piedras. Su dictamen no puede prevalecer. La prueba no fue ni robusta, ni clara ni convincente para justificar la falta de domicilio en Vieques de las electoras.

El mero hecho de que ellas residan durante la semana en Río Piedras en un apartamiento alquilado no prueba, per se, la falta de domicilio en Vieques.

 Las actuaciones de las votantes demuestran lo contrario. Poseen propiedad en Vieques. Viajan a Vieques todos los fines de semana. La única razón por la cual se han ido del distrito es por necesidad, la falta de trabajo.

La Ley Electoral, al definir la residencia legal o domicilio, expresamente dispone que "es el lugar donde una persona reside habitualmente, *cuando no es llamada a otra parte para trabajar u otro objeto temporal y al cual*

*retorna en las épocas de descanso*". (Énfasis nuestro.) Art. 2.004(c), 16 L.P.R.A. sec. 3054(c).

Estas electoras se ausentan físicamente de Vieques debido a su trabajo y retornan allí en sus épocas de descanso. Aun bajo el criterio de preponderancia de la prueba, no se ha probado su falta de domicilio en Vieques.

(7) *José Luis Castaño* (JR-80-279)

Este elector votó en el precinto de Vieques y fue recusado por el Partido Nuevo Progresista como no domiciliado en Vieques. La Junta Revisora sostuvo la recusación.

La única prueba para sostener la recusación consistió en el testimonio de Néstor Hiram Tirado Rosa (T.E., pág. 1502 y ss.), quien declaró que ha residido toda su vida en Vieques; que conoce a José Luis Castaño desde que era niño y que éste no reside en Vieques; que el Sr. Castaño trabaja con la Vieques Air Lines, con oficina en el Aeropuerto de Isla Grande en San Juan; que no sabe dónde vive éste; que la última vez que lo vio fue durante las elecciones, y lleva fuera de Vieques siete u ocho años; que el elector está divorciado y sus padres viven en la calle Víctor Duteil en Vieques.

El elector compareció a defender su voto. Declaró que lleva trabajando con Vieques Air Lines aproximadamente cinco años; que actualmente es gerente de ventas en San Juan y sus oficinas se encuentran en el Aeropuerto de Isla Grande. (T.E., pág. 1522.) Al comenzar a trabajar con dicha firma, vivía en Vieques en la calle Víctor Duteil, Núm. 14. Residía allí con sus padres. Su relocalización en San Juan se debe a sus estudios universitarios que actualmente cursa en la Universidad Mundial. Piensa obtener un Bachillerato en Contabilidad Pública. Solicitó la transferencia de empleo en noviembre de 1976. Está hospedándose en Highland Park, Río Piedras, en casa de una tía suya. No posee propiedad en el área metropolitana.

En las elecciones de 1976 votó en Vieques. Tiene tarjeta electoral y se fotografió en Vieques. Viaja a Vieques todos

los fines de semana que sus estudios permiten. Se considera domiciliado en Vieques, regresa allí en épocas de descanso y durante las vacaciones. Tiene una hija de 12 años que se queda en Vieques con los abuelos de ésta. La Vieques Air Lines le suple transportación gratuita en avión. Cuando termine sus estudios, volverá a Vieques.

Se trató de impugnar al testigo mediante la presentación de una declaración jurada procurada por funcionarios del P.N.P. y prestada por el propio elector ante el notario Rafael Rosario Hernández, donde él admite ser residente de Río Piedras. Sin embargo, en el propio contrainterrogatorio, el elector aclaró que él no firmó el documento hasta que el notario añadió en la declaración, como efectivamente se hizo, lo siguiente:

"Para completar la declaración que aparece arriba añado que hace 4 años que resido en Río Piedras *porque* durante todo ese tiempo he sido estudiante en la Universidad Mundial, Recinto de Hato Rey, Facultad de Administración Comercial." (*Exh.* 18, P.N.P.)

Su padre, Zoilo Castaño, declaró a su favor. Dice que su hijo reside con él en Vieques. En esa casa vive su esposa y la hija de José Luis, Sharon. El hijo viaja todos los fines de semana para Vieques.

La prueba ante la Junta establece que el elector ha vivido fuera de Vieques durante los últimos 4 años. Sin embargo, no se probó el *animus manendi* de permanecer en el área metropolitana. Por el contrario, aparece claramente que el votante trabaja para una compañía de Vieques, tiene una hija menor de edad residente de Vieques y regresa allí casi todos los fines de semana. Se inscribió para votar en Vieques y es de Vieques que se considera domiciliado y donde ha de volver una vez termine sus estudios.

La propia declaración jurada presentada por el P.N.P. para demostrar que el elector reside en Río Piedras, lo que hace es confirmar su no domicilio allí, pues el elector

expresamente aclaró que se encontraba allí porque estaba estudiando. Su *animus revertendi* es volver a Vieques cuando termine su bachillerato.

La ley actual dispone que "la residencia legal o domicilio es el lugar donde una persona reside habitualmente, cuando no es llamada a otra parte para trabajar u otro *objeto temporal* y al cual retorna en las épocas de descanso". (Énfasis nuestro.) Es por sus estudios que el elector se ausenta físicamente de Vieques. Él no ha adquirido domicilio en San Juan y, por tanto, no ha perdido su domicilio en Vieques. Es imposible "[perder] un domicilio hasta tanto se adquiera otro nuevo".

Aplicando el criterio estricto de la necesidad de presentar evidencia clara, robusta y convincente para poder anular el voto de un elector, concluimos que la Junta erró al declarar a José Luis Castaño no domiciliado en Vieques. Su voto deberá contarse a favor del candidato Cepeda, por quien votó.

(8) *Awilda Moringlane Encarnación* (JR-80-279)

La electora Awilda Moringlane Encarnación votó en el precinto de Vieques por el Partido Popular y su candidato Sr. Cepeda. Fue recusada como no domiciliada allí. La prueba para sostener la recusación consistió en los testimonios de Genaro Moringlane, Awilda Feliciano y Angel Laboy.

Genaro Moringlane declaró ser el padre de la electora recusada, a quien no ha visto en Vieques hace cuatro años. La vio cuando vino a votar y él mismo la mandó a recusar. Admitió en el contrainterrogatorio que los hijos de Awilda, de nueve y siete años de edad, respectivamente, residen en Vieques con la abuela desde que nacieron, de cuya residencia él vive como a milla y media. Declaró, además, que a base de información que le suministraron los niños, Awilda vive en Santa Cruz. Antes de irse para Santa Cruz vivía en Vieques y se fue cuando cerraron una fábrica en que ella trabajaba.

Awilda Feliciano, Comisionada Electoral del P.N.P., declaró que su trabajo consistía en verificar si los electores viven en Vieques. Conoce a Awilda Moringlane, pues estudiaron juntas. La vio durante las elecciones. Admite que Awilda visita a su mamá en Vieques, pero no pudo recordar fechas. En conversaciones que ha tenido con ella pudo averiguar que vive en Santa Cruz.

Angel Laboy, residente de Santa Cruz, declaró que conoce a la electora Awilda Moringlane, porque el papá de ella es primo hermano de él. Ha visto a la electora en Santa Cruz. Vive allí desde hace un año con su esposo, Chago Herrera. Ella trabaja allí en una fábrica de relojes.

Awilda Moringlane Encarnación compareció a defender su voto. Afirma que ella no tiene relación con su padre, Genaro Moringlane, que éste la "engendró nada más", porque él no la crió. Tiene tres hijos, de 12, 11 y 4 años. (T.E., pág. 1402.) Ellos viven en Vieques, con ella y con su mamá. Siempre ha residido en esa casa. Su esposo trabaja en Santa Cruz. Ella se queda dos semanas allá con su esposo y dos semanas en Vieques con sus hijos.

Actualmente ella no está trabajando. Su esposo la mantiene. Las pensiones alimenticias de sus hijos, habidos en otros matrimonios, las recibe en el Cuartel de la Policía en Vieques. Ella trabajó tres años en Santa Cruz en un fábrica de relojes, pero eso fue hace siete años. No posee propiedad en Santa Cruz ni paga contribuciones allí. Siempre ha votado en Vieques.

Algeo Caraballo declaró a su favor. Dijo conocer a Awilda desde que nació. Vive frente a la casa de ella y de sus padres en Vieques. Expresamente afirma que ella reside en Vieques. El la ha visto allí con sus hijos. A veces ella sale de viaje a Santa Cruz a buscar trabajo para sostener a los hijos. Esto lo hace desde hace tiempo, semanal o quincenalmente. No sabe qué trabajo tiene en Santa Cruz. Awilda y el padre no mantienen relaciones.

No hay duda que el aplicar el criterio que exige evidencia clara, robusta y convincente para anular un voto, no puede prevalecer la determinación de la Junta de que la electora no está domiciliada en Puerto Rico. Esta votante comparte su tiempo igualmente entre Vieques y Santa Cruz. Sus hijos viven en Vieques desde que nacieron. Ella siempre ha votado en Vieques. No ha adquirido domicilio en Santa Cruz.

Las declaraciones presentadas para sostener la recusación son insuficientes, aun bajo el criterio de preponderancia de prueba, para rebatir la presunción de validez del voto de esta electora. El testimonio de su padre es de dudosa credibilidad por el distanciamiento afectivo que existe entre padre e hija, al extremo de que éste ni siquiera conoce a sus nietos, hijos de ella. No sabe que son tres, ni sus edades, esto no obstante residir a milla y media de la casa en que residen con su ex-esposa y abuela materna de los niños. Los otros testimonios son generalidades para hacer conjeturas, pero no para hacer una inferencia permisible que tenga valor probatorio suficiente para demostrar clara y convincentemente que la electora adquiriera domicilio en Santa Cruz y, por tanto, perdiera el de Vieques.

La papeleta de esta electora deberá contarse, según votada, por el partido Popular y el candidato Cepeda.

(9) *Juan H. Carrillo* (JR-80-279)

El caso de este elector, en cuanto a suficiencia de prueba, es más extremoso que el de Awilda Moringlane Encarnación. El Sr. Carrillo votó en el precinto 102 de Ceiba y fue recusado por el Partido Nuevo Progresista por no estar domiciliado allí. El elector contestó la recusación y afirmó que ha vivido en Río Abajo de Ceiba desde el año 1969.

La única prueba aducida para rebatir la legalidad del voto y substanciar la recusación fue la declaración de Carmen Delia Morris, al efecto de que en tres ocasiones

fue a la residencia del elector en el Barrio Río Abajo para entregarle su tarjeta electoral y la encontró abandonada. No sabe dónde él está domiciliado actualmente ni a dónde se mudó.

Nos parece que huelgan los comentarios. Ni siquiera bajo el criterio de preponderancia de prueba sería ésta suficiente para establecer que el elector no está domiciliado en Ceiba. Se revocará el dictamen de la Junta Revisora, que sostuvo la recusación, y se contará el voto según expresado en la papeleta, es decir, a favor del candidato Cepeda y de su partido.

(10) *Sonia Becerril* (JR-80-279)

Al igual que el caso del Sr. Juan H. Carrillo, la electora Sonia Becerril fue recusada por el Partido Nuevo Progresista por el motivo de no estar domiciliada en el precinto 102 de Ceiba, en que votó por el Partido Popular Democrático y su candidato Cepeda.

El único testimonio en su contra fue el de Sergio Félix Pérez, quien declaró conocer a Sonia Becerril porque vive a cuatro casas de donde ella vivía anteriormente, en la Urbanización Villa Flores de Ceiba. Dijo que ella se mudó de allí para Santa Cruz.

En contrainterrogatorio expresó no ser ciudadano americano. Es natural de Santo Domingo. Dijo que vio cuando la electora trajo de nuevo su mudanza de Santa Cruz a Puerto Rico hace 18 ó 20 días; trajo su carro, camas, ropa, estufa y cosas personales. Actualmente ella vive en Villas del Pilar en Ceiba. Son invasores en la propiedad. Declaró que ella solo estuvo siete u ocho meses viviendo en Santa Cruz.

La electora compareció y prestó testimonio en defensa de su voto. Declaró que vive en la Urbanización Villas del Pilar en Ceiba. Al celebrarse las elecciones residía en la Urbanización Villa Flores de Ceiba. Vivió allí desde diciembre de 1978. Ella no trabaja. Su esposo es soldador y trabajó en Santa Cruz desde enero a noviembre de 1980.

Actualmente él también está residiendo en Puerto Rico. Admite que ella viajó a Santa Cruz y a veces se quedaba por par de semanas. Niega que haya residido allí.

La Junta sostuvo la recusación y anuló el voto de Sonia Becerril. Los hechos de este caso, a lo sumo, demuestran que la votante residió interinamente en Santa Cruz entre los meses de enero a noviembre. La ley es clara al disponer que no se pierde un domicilio hasta tanto se adquiere otro. En este caso, la electora Sonia Becerril nunca adquirió domicilio en Santa Cruz. Nunca hubo el *animus manendi*.

Una residencia de unos cuantos meses por razón de un empleo temporero del esposo en Santa Cruz no tuvo el efecto de destruir su domicilio en Puerto Rico. Como no había perdido su domicilio en Ceiba, su voto dentro del Distrito Núm. 35 es válido y debe contarse a favor del Partido Popular y del Sr. Cepeda.

(11) *Wanda Cotto Cantres* (JR-80-279)

Esta votante ejerció el sufragio en Ceiba y fue recusada por el Partido Nuevo Progresista por no estar domiciliada allí. Ella contestó la recusación y adujo que se mudó para Loíza tres meses antes del día de las elecciones.

La controversia gira en torno a la fecha de mudanza de la electora a Loíza. Todas las personas que residían dentro del Distrito Núm. 35 para el 6 de julio de 1980 podían votar en dicho distrito electoral. 16 L.P.R.A. sec. 3066.

Gilberto Vera Álvarez, recusador de la electora, declaró que reside en la Urbanización Villa Flores en Ceiba. Conoce a Wanda Cotto. Ella residía en la misma manzana donde se encuentra su casa. Ella vivió allí como ocho años y se mudó en abril de 1980 al pueblo de Loíza. No sabe a qué sitio en Loíza se mudó. Su casa en Villa Flores la ocupa algunas veces un hermano de ella. El resto del tiempo está vacía. Actualmente ella está viviendo con un señor en Loíza. Antes de eso vivió con él en Ceiba.

La electora compareció a defender su voto. Admitió vivir con un concubino y que actualmente vive en Loíza, Medianía Baja, Parcelas Suárez, Calle 8. Vive allí desde el 22 de septiembre de 1980. Antes vivía en Ceiba en la Urbanización Villa Flores. Toda su vida había vivido en Ceiba. En la casa de Villa Flores actualmente reside su hermano. Tiene dos niñas, que nacieron en Fajardo. Su concubino se llama Miguel Feliciano Herrera y trabaja en El Comandante como entrenador de caballos. Vive con él desde hace un año. Inicialmente residían en su casa en Ceiba, pero después se mudaron a Loíza por estar más cerca del hipódromo.

La casa en Loíza era del padre de la electora. Vivían allí su abuela y su papá. Ellos murieron en febrero y abril, respectivamente. No se mudó en abril, pues un señor de Loíza estaba viviendo allí, cuidando de la casa. Recuerda que se mudó en septiembre, pues ya habían empezado las clases en agosto y ella temía que no le aceptaran a las niñas en la escuela en Loíza. Tenía su retrato electoral, pero no la querían dejar votar. Estuvo esperando desde las diez y media de la mañana hasta las tres y media para poder votar. Finalmente votó en colegio cerrado.

Vilma Correa de Jesús declaró a favor de Wanda. Ella vive en Loíza, a dos casas de la residencia actual de Wanda. Conoció a Wanda durante el mes de septiembre, cuando estaba en una caminata del partido. Eso fue un día antes de la última inscripción. Ella le dijo entonces que se había mudado a Loíza hacía unos tres o cuatro días. En el contrainterrogatorio reafirmó que Wanda vino a vivir a Loíza en septiembre. Lo sabe porque es su vecina.

Con estos testimonios la Junta concluyó por preponderancia de la prueba que Wanda Cotto no podía votar en Ceiba. Aun bajo la preponderancia de la prueba, estimamos que se debió sostener la validez del voto de Wanda Cotto. Ella suplió datos para poder precisar su fecha de mudanza en septiembre y también se presentó un testigo

que corroboró la mudanza en dicho mes. La única prueba —testimonio del recusador— no es convincente ni suficiente para anular el voto de la electora. Deberá adjudicarse a favor del Partido Popular y su candidato Sr. Cepeda.

(12) *Lydia Cardona Lebrón* (JR-80-279)

Esta electora votó en el precinto de Luquillo por el Partido Popular y el candidato Cepeda. Fue recusada por no estar domiciliada en Luquillo. Negó la recusación.

La recusación fue sostenida por la Junta Revisora a base del testimonio único de Providencia Tapia, que dijo vivir en el Barrio Juan Martín de Luquillo a cuatro casas de la propiedad de la electora; que la electora no vive allí desde fines del 1976 o principios del 1977; que el esposo de la electora le dijo que ella vivía en Berwind Country Club.

En su testimonio en defensa de su voto, declaró la electora que ella vivía en el Barrio Juan Martín de Luquillo y ahora vive en Río Grande, y dio su dirección como Calle 12 N 640, Alturas de Río Grande. Negó que haya vivido en Berwind Country Club. Tiene una hija que padece de leucemia y recibe tratamiento en el Centro Médico en Río Piedras.

El testimonio de Providencia Tapia de que sabe que la electora vive en Berwind Country Club es de referencia. Por otro lado, fue categóricamente negado por la electora, quien dijo que nunca ha residido allí. La disyuntiva que tuvo la Junta Revisora fue creer el testimonio de referencia o creer a la electora. Prefirió lo primero. No podemos aceptar que esa prueba de referencia fuera suficiente para anular el voto, mucho menos ante su contradicción categórica por parte de la votante.

Es de notar que el precinto de Río Grande, donde la electora reside, forma parte del Distrito Representativo Núm. 35 y que, por tanto, la papeleta recusada debe contarse para la candidatura a representante por dicho distrito. Se adjudicará a favor del candidato Cepeda, por quien votó.

(13) *Nancy Maldonado Cruz* (JR-80-279)

Esta electora votó en el precinto de Vieques y fue recusada por el Partido Nuevo Progresista por alegada falta de domicilio. La electora negó la recusación.

Para sustanciar la recusación testificaron Miguel A. Bonano, Irma Inglés y Francisco Ramos Quiñones.

Miguel A. Bonano atestó que conoce a Nancy Maldonado de vista. Él ha residido en Vieques por 31 años. Hacía tiempo que no veía a la electora en Vieques. Cuando la vio el día de las elecciones, la recusó. Sabe que ella no vive en Vieques, solamente por virtud de una información que le suplieron del censo tomado durante el 1980. Admitió que él personalmente no sabe si Nancy vive o no en Vieques.

Irma Inglés declaró que mediante una conversación que sostuvo por 15 minutos con Roberto Tapia, ex-esposo de Nancy, éste le informó que ellos se habían separado hace siete meses y que ella estaba residiendo en Humacao.

Francisco Ramos Quiñones también declaró en su contra. Nancy era la esposa de un sobrino de él. Dice que Nancy se llevó una guagüita, de Vieques para Humacao, desde hace más de 5 meses. No sabe en dónde reside Nancy en Humacao. Su sobrino hace como 8 meses que no vive con ella. En el contrainterrogatorio admitió que no vio cuando montaron el automóvil en el *ferry*. Expresó que se lo dijeron. También admitió que no es de personal conocimiento que ella vive en Humacao. Dice que el esposo de ella se lo dijo.

La electora compareció a defender su voto. Admitió que ella trabaja en Humacao en un "bar restaurante" y que mientras está trabajando se queda en Humacao en la calle Luis Peña. No empece lo anterior, declaró que vive en Vieques en una residencia alquilada localizada en la Calle Prudencio Quiñones. Vive con su esposo, Roberto Tapia Ramos. Ella paga la luz y el agua de dicha residencia. Lleva trabajando en Humacao dos meses y lleva residiendo allí parte de la semana hace cuatro meses y medio. Trabajaba

en una fábrica en Vieques, pero era un empleo por temporadas y la dejaban cesante. Viaja a Vieques todas las semanas en sus días libres y retorna allí en épocas de descanso. Considera que su domicilo está en Vieques. Se inscribió para votar en Vieques. Ella se separó de su esposo hace tiempo, pero siempre volvían a verse. Se divorciaron y están pensando casarse de nuevo.

Roberto Tapia Ramos declaró a favor de la electora. Atestó que trabaja y vive en Vieques. Reside en la calle Prudencio Quiñones. Su esposa paga la renta, luz y agua de dicha residencia. Ella visita Vieques los lunes y martes de la semana. Admite que cuando él termine su trabajo piensa mudarse para Humacao para estar con Nancy. Ella se mudó a Humacao a fines de junio o julio.

La Junta anuló el voto de Nancy Maldonado por residir en Humacao para la fecha de las elecciones. Su resolución no puede sostenerse.

Toda la prueba presentada en apoyo de la recusación es eminentemente de referencia. Nadie pudo precisar cuándo fue que Nancy se mudó a Humacao. Por otro lado, la prueba de la electora estableció que a la fecha de su declaración ante la Junta (entre el 10 de diciembre de 1980 y el 9 de enero de 1981) ella había empezado a trabajar en Humacao hacía 2 meses y había residido parte de la semana allí hacía 4 meses y medio. Eso la coloca en Humacao durante el mes de septiembre. Su esposo declara que ella se fue a Humacao a fines de junio o julio. Siendo esas las únicas fechas confiables, es obvio que ella se mudó dentro de los cuatro meses anteriores a la elección. Por tanto, para las elecciones de 1980, ella podía votar en Vieques.

La prueba vertida tampoco demuestra que ella haya cambiado de domicilio. Su ausencia se debe a su falta de trabajo estable en Vieques. Una estadía de 4 meses en Humacao no establece per se un cambio de domicilio. La ley es clara al disponer que sólo se pierde el domicilio al

adquirirse otro. Para que dicho cambio ocurra se requiere la unión del acto y la intención. El récord está desprovisto de prueba que sustancie la proposición de que la intención de la electora ha sido cambiar su domicilio a Humacao. A lo más se puede concluir que la falta de empleo en Vieques la ha forzado a buscar trabajo en otro lugar. La presunción de domicilio no ha sido rebatida en este caso. Deberá adjudicarse el voto de la electora como lo hizo, a favor del Partido Popular y del candidato Cepeda.

(14) *Jesusa Vizcarrondo Díaz* (JR-80-279)

Esta electora fue recusada por el Partido Nuevo Progresista por falta de domicilio en Vieques, donde votó. La electora negó la recusación. Para sustanciar la recusación declararon Ileana Pimentel y Manuela Santiago.

Ileana Pimentel declaró que vive en el Barrio Pueblo Nuevo de Vieques. Conoce a Jesusa Vizcarrondo porque, cuando ella empezó a trabajar en el Municipio de Vieques, Jesusa trabajaba para la Administración de Derecho al Trabajo, y porque fue candidata a asambleísta del Partido Popular en Vieques. También tuvo contacto con ella al trabajar en el censo y también en relación con las tarjetas electorales. Jesusa vivía en el Barrio Leguillú. Dejó de verla en Vieques para mayo de 1977. Desde esa fecha no la ha visto a ella ni a su esposo, Daniel Ochart, quien tiene un bar restaurante en Vieques. Durante el censo le informaron que ella vivía en la Cerámica en Carolina. En relación con la entrega de las tarjetas electorales, fue a la casa de Jesusa durante los meses de abril y mayo, pero no se encontraba. Los vecinos le dijeron que no vivía allí. Nadie vivía en la casa.

En el contrainterrogatorio la testigo admitió que vio a Jesusa trabajando en la misma unidad electoral de ella como funcionaria del colegio. También vio al esposo de la electora en Vieques dos días antes de las elecciones y fue invitada a asistir a una fiesta de Navidades en su residencia en Vieques. Admitió, además, que cuando se hizo el

censo la casa todavía tenía luz eléctrica y vio a Jesusa en Vieques durante el cierre de la campaña de los Populares.

Manuela Santiago declaró que ella conoció a Jesusa cuando ésta era Supervisora de Nóminas para el Municipio de Vieques. También la conoció cuando ambas eran asambleístas municipales durante el año 1977. Le dijeron que Jesusa se fue para Carolina. No la ve desde mayo de 1977. Tampoco ha visto a Jesusa durante estos últimos meses. Solo la vio durante las fiestas patronales de los años 1977 y 1978 cuando ella montó un "restaurancito" en un kiosko. No pudieron entregarle la tarjeta electoral porque no estaba. Su casa en Vieques permanece cerrada.

La electora compareció a defender su voto. Declaró que ella fue Asambleísta Municipal de Vieques hasta enero de 1978. Admite que se trasladó de Vieques a Carolina ese año. Se fue a vivir allá para cuidar a su mamá y una hija de su hermana, que está incapacitada mentalmente. La muerte de su padre en noviembre de 1979 provocó la mudanza, pues alguien tenía que cuidar de la mamá y la sobrina. Ella se quedó con la propiedad que tenía en Vieques. No la alquiló ni la vendió. Entiende que está domiciliada en Vieques. Toda la familia vive en Vieques desde julio de 1980. No piensa volver a Carolina. Nunca hizo una transferencia electoral a Carolina, pues ella siempre pensó regresar a Vieques a vivir.

De los testimonios vertidos surge que la electora se ha desempeñado en varios cargos gubernamentales para el Municipio de Vieques. Tuvo que abandonar su hogar temporeramente para cuidar de su mamá y de una sobrina incapacitada. Su *animus revertendi* queda claramente establecido por el hecho de que desde julio de 1980 ella vive en Vieques. Nunca solicitó transferencia, pues su intención era permanecer en Vieques. Su ausencia física por par de años de por sí no demuestra falta de domicilio.

La Ley Electoral dispone que la residencia legal o domicilio es el lugar donde una persona reside habitual-

mente, *cuando no es llamada a otra parte* para trabajar u *otro objeto temporal* y al cual retorna en épocas de descanso. El cuido temporal de sus familiares fue lo que provocó que la electora se ausentara de Vieques.

Nadie contradijo el hecho de que ella ha vuelto a residir en Vieques desde julio de 1980. Los actos de conservar su casa en Vieques, mantenerla amueblada, con luz eléctrica, sin alquilar, en combinación con su presencia física dentro del Distrito desde julio, demuestra la intención de mantener a Vieques como el sitio de su domicilio. Su ausencia temporal no la privó de ese domicilio. "No puede perderse un domicilio hasta tanto se adquiera otro nuevo."

(15) *Lucía Avila* (JR-80-279)

La electora Lucía Avila fue recusada por el Partido Nuevo Progresista por falta de domicilio en Vieques, donde votó. Un examen de la papeleta (*exh.* 75, P.N.P.) demuestra que Joaquín Santos la recusó por el fundamento de que ella "reside en Fajardo". Ella contestó y negó la recusación. Para sostener la recusación comparecieron Manuela Santiago y Joaquín Santos.

Manuela Santiago declaró que Lucía se mudó de Vieques hace ya unos años. No sabe a dónde se mudó. Joaquín Santos declaró que conoce a Lucía desde hace 10 ó 12 años. Ella se fue de Vieques en el año 1978. No sabe dónde vive Lucía actualmente.

Con esta prueba la Junta anuló el voto de la electora. La recusación aduce que ella vive en Fajardo, precinto comprendido dentro del Distrito Núm. 35. Nadie pudo precisar en dónde ella vive actualmente. Aun si fuera verdad que ella vive en Fajardo, su voto cuenta para el Distrito Núm. 35.

No entendemos cómo es posible que la Junta haya anulado este voto con la prueba deficiente presentada. Aparte de ser prueba débil e insatisfactoria bajo los criterios que hemos expuesto, es de notar que Fajardo, donde ella reside

según se expresó en la recusación, es precinto dentro del Distrito Representativo Núm. 35 y no podría, por tanto, anularse el voto para fines de la candidatura a representante por dicho distrito. Se revocará la determinación de la Junta y se reconocerá la validez del voto de esta electora a favor del candidato Cepeda.

(16) *Carmen Elías Medina* (JR-80-279)

La electora fue recusada por el Partido Nuevo Progresista por no estar domiciliada en Río Grande, donde votó por el Partido Popular y por el Sr. Cepeda. La electora negó la recusación al dorso de la papeleta.

Aníbal Santiago declaró para sostener la recusación. Vive en Los Maestros, Río Grande, y era vecino de la recusada. Dijo que al graduarse Carmen, ella se casó y se mudó de la casa de los padres. No sabe a dónde se mudó. Le dijeron que se mudó para Villas de Loíza. Dijo que la electora no duerme en casa de sus padres, pues no se ve el carro del esposo allí.

Ismael Santiago también declaró en su contra. Conoce a la votante por ser su vecino. Ella no vive en Los Maestros desde hace tres años. Se mudó a Villas de Loíza. Lo sabe porque ha ido varias veces a su casa. Fue una vez porque la mamá de Carmen lo mandó con el hermano a hacerle un favor y llevarle una comida. Eso fue hace dos años. También fue una segunda vez hace dos semanas a buscar una bola de baloncesto. Vio a Carmen allí.

La electora fue citada a vista, pero no compareció a defender su voto. Surge del *exh.* 49 del P.N.P. que se diligenció la citación por Irma Inglés Lucret a Carmen Elías Medina el 21 de diciembre de 1980 en Loíza, Calle 19-Q-42.

La prueba en este caso demuestra que la electora se casó, se mudó de la residencia de sus padres en Río Grande y ha establecido su residencia habitual en Villas de Loíza desde hace tres años. La prueba establece claramente, en forma robusta y convincente que la electora no está domici-

liada dentro del Distrito Núm. 35. Se confirmará la decisión de la Junta, que anuló su voto.

(17) *Ivis Raquel Castaño Monet* (JR-80-279)

Esta electora votó por el Partido Popular Democrático y su candidato Cepeda en el precinto de Vieques. Se le recusó por no estar domiciliada allí. Ella negó bajo juramento la recusación. Para sostener la recusación, prestaron declaración Abraham Galloway, Miguel Angel Bonano y Manuela Santiago.

Abraham Galloway declaró que estudia en la Universidad Interamericana en Hato Rey, pero reside en Vieques. Era funcionario del Colegio del P.N.P. el día de las elecciones. Recusó el voto de esta electora. La conoce desde *kindergarten*. Ivis tiene 20 años. Hace año y medio que no reside en Vieques. Actualmente vive en el área metropolitana.

En el contrainterrogatorio menciona que ella lo invitó a su casa en el área metropolitana y que su boda también se celebró en la Isla. Desde el año 1978 no la ha visto en Vieques. La última vez que la vio en San Juan fue en octubre de 1979.

En el contrainterrogatorio admitió que en mayo la había visto en Vieques visitando a su abuela. Sin embargo, después contesta que no la vio en casa de la abuela y que sí la vio en la plaza pública de Vieques con su esposo. Mencionó que los vio también en enero, otra vez en la plaza. Los padres de Ivis viven en Vieques, pero él no sabe dónde. El testigo no ha visto la casa de Ivis en San Juan. Ella es hija del alcalde electo de Vieques y votó en colegio abierto.

Miguel Bonano también declaró ser residente de Vieques y conocer a Ivis Raquel Castaño, pues es prima hermana suya por parte de madre. No la ha visto durante el año 1980. Antes ella vivía en Vieques, en la casa de la abuela frente al Banco Popular en la Calle Muñoz Rivera. No la

ve allí desde hace año y medio. No conoce su paradero y no sabe dónde reside.

Manuela Santiago, Presidenta del P.N.P., declaró que conoce a Ivis personalmente; que cuando se graduó de cuarto año en el 1978 se fue a vivir a la Isla [de Puerto Rico], no sabe por qué. No la ha vuelto a ver desde entonces. Hace un año el papá de Ivis le informó que ella se casaba en San Juan. En el contrainterrogatorio menciona que los abuelos se fueron de Vieques a vivir con Ivis al área metropolitana. Lo sabe porque es vecina.

La electora no fue citada y no compareció a defender su voto. Obra en autos un diligenciamiento negativo de la citación, suscrito por Luis F. Rodríguez Amador ante el notario Rafael Rosario Hernández, en que hizo constar: "Declaro: Que localicé la residencia electoral de Ivis Raquel Castaño Monet en Vieques, P.R. Que me informó su tío el Sr. Miguelo Castaño Ortiz que Raquel Castaño vive en P.R. Hace aproximadamente 8 meses".

■ El Partido Popular impugna la citación por ser insuficiente. Estamos de acuerdo. No puede bastar un diligenciamiento negativo para privar a una persona del derecho a vista y de ser oída, cuando se trata de anularle un derecho fundamental. Si no pudo localizarse a la persona en la dirección en que se esperaba que estuviese, deben hacerse diligencias para averiguar el sitio donde puede ser citada y demostrarse satisfactoriamente que se ha hecho un esfuerzo por localizarla. En caso negativo, la citación mediante edicto no puede descartarse. Compárese este caso con el de Maritza Pérez Cortés, Núm. 3, *ante*, en que la Junta Revisora determinó que no hubo un diligenciamiento válido de la electora, no obstante demostrar la prueba que el citador le dejó la citación en su casa al obstruir su padre el diligenciamiento, estando ella presente. En el caso que ahora consideramos, la prueba transcrita no revela esfuerzo alguno por localizar y notificar de la citación a la electora, aparte de un diligencia-

miento negativo. Al ser informado el diligenciante de la citación, que la electora "vive en Puerto Rico", según hizo constar en la citación, no especificó qué gestiones realizó para informarse de en qué dirección en Puerto Rico se le podía localizar.

Las gestiones mínimas hechas en este caso no cumplen con el debido proceso de ley. Al no dar una notificación adecuada, se privó a la electora de su oportunidad de comparecer y defender su voto.

En cuanto a sus méritos, la prueba es insuficiente para establecer falta de domicilio de la electora en Vieques. Ninguno de los testigos presentados ha tenido contacto personal con la electora durante el último año. En ningún sitio aparece la alegada dirección residencial de ella en el Reparto Metropolitano. Infieren que ella actualmente no vive en Vieques por prueba de referencia y porque no la han visto. Esta prueba vaga y deficiente no puede justificar anular este voto.

Vieques es una comunidad de miles de habitantes, en que 4,950 votaron en las pasadas elecciones, según cifras de la Comisión Estatal de Elecciones. Dejar de ver a una de esas personas durante algún tiempo prolongado puede ser indicio de que se ha ido a otro sitio, pero no es prueba de que ha perdido su domicilio en Vieques. Recuérdese que no se pierde un domicilio hasta haber adquirido otro. Esto no se probó aquí por prueba clara, robusta y convincente.

Se revocará la determinación de la Junta Revisora en este caso y se adjudicará y contará el voto de la electora según la expresión de su voluntad, a favor de su partido y del candidato Cepeda.

(18) *Ruth Rodríguez Díaz* (JR-80-279)

La electora votó en el precinto de Luquillo por el Partido Popular y el candidato Cepeda. Fue recusada por no estar domiciliada allí, alegándose que residía en 283 Broadway, Newburgh, New York. Ella contestó y negó la

recusación. Su caso es similar al de Ivis Raquel Castaño Monet, Núm. 17, *ante*.

El único testigo presentado para sustanciar la recusación fue Víctor Manuel Vargas. Declaró que es vecino de ella en el Barrio Juan Martín. La conoce desde hace 18 años. Ella vivía tres casas más arriba de la de él. Declara que ella salió de Puerto Rico hace 3 ó 4 años, pero todavía conserva su propiedad en Luquillo, la cual visita por temporadas. Dice que sabe que ella no vive ahí, pues es su vecino y, además, él mismo la llevó al aeropuerto cuando estaba en Puerto Rico en una de sus visitas. Cuando la vio en Puerto Rico, el testigo le preguntó por su hijo y ella le dijo que residía en los Estados Unidos, que se podía comunicar con él a la siguiente dirección: José Alvarez Rodríguez c/o Ruth Rodríguez Díaz, 283 Broadway, Newburgh, New York. La dirección no tiene el *zip code* y está escrita en puño y letra del testigo.

La electora no fue citada y no compareció a defender su voto. Se trató de diligenciar su citación a la dirección local en el Buzón 116, Barrio Juan Martín, Luquillo, pero no a su dirección estadounidense, no empece el hecho de que en el diligenciamiento negativo la emplazadora Irma Inglés Lucret expresamente menciona dicha dirección (*exh.* 32, P.N.P.) como su sitio de residencia actual. Para que la citación fuera suficiente en Derecho, se debió tratar de notificar a la electora a la dirección que aparecía en el diligenciamiento negativo. Al no hacerlo se incumplió con el debido proceso de ley, que requiere que se haga un esfuerzo razonable para hacer llegar la citación al elector para que éste pueda defender su voto. Véase la Parte II B de esta opinión. No puede considerarse citada a una electora a base de un diligenciamiento negativo y nada más.

En cuanto a los méritos, la propia prueba para sostener la recusación establece que la electora "conserva su propiedad en Luquillo la cual visita por temporadas". Hemos

señalado que el requisito de presencia física no es determinante ni requisito sine que non para mantener el domicilio. La electora negó la recusación. No puede bastar para anular un voto un testimonio que no constituye prueba clara, robusta y convincente y que la electora no tuvo oportunidad de rebatir al no ser citada.

Se revocará la determinación de la Junta Revisora, que anuló el voto de la electora, y se dispondrá que éste se cuente a favor del candidato Cepeda y su partido.

(19) *Carmen Pimentel* (JR-80-279)

La electora Carmen Pimentel votó en Vieques papeleta íntegra a favor del Partido Popular Democrático. Se le recusó bajo la alegación de no estar domiciliada allí. No contradijo la recusación, limitándose a escribir su nombre en la papeleta.

La Junta Revisora sostuvo la recusación y actuó correctamente. El hecho de que la electora pusiera su nombre no puede interpretarse como una negación de los fundamentos de la recusación. Expresamos en la Parte II, bajo la letra B de esta opinión, que el elector no puede cruzarse de brazos ante la recusación y que, si no la niega en el momento y ésta expone hechos que de ser ciertos constituyen motivo válido para anular el voto, éste no se contará y será nulo. Art. 5.034 de la Ley Electoral, 16 L.P.R.A. sec. 3234. La alegación de no estar domiciliada en Vieques aducida en la recusación es un motivo válido para anular el voto en cuanto a las candidaturas locales en Vieques y en el Distrito Núm. 35 se refiere. Se mantendrá la determinación de la Junta.

(20) *Migdalia Sánchez Hernández* (*exh.* 56, P.N.P.)

(21) *Iris D. Sánchez Hernández* (*exh.* 57, P.N.P.)

(22) *Fernando Pagán Rodríguez* (*exh.* 93, P.N.P.)

(23) *Michael Ferris* (*exh.* 62, P.N.P.)

(24) *Carmen D. López Ramos* (*exh.* 67, P.N.P.)

(25) *Gloria López Ramos* (*exh.* 68, P.N.P.)

(26) *Annie L. Pérez Ortiz* (*exh.* 63, P.N.P.)

(27) *José González Fontánez* (*exh.* 64, P.N.P.)

Los ocho casos arriba relacionados —Núms. (20) al (27)— corresponden al caso JR-80-279. Se trata de electores que votaron en diferentes precintos del Distrito Representativo Núm. 35 por el Partido Popular Democrático y su candidato a representante a la Cámara, Sr. Cepeda. Fueron recusados por el Partido Nuevo Progresista, pero el recusador no firmó la recusación en ninguno de esos casos, incumpliéndose la disposición de Ley, Art. 5.034 (16 L.P.R.A. sec. 3234), que requiere que la recusación esté "firmada por la persona o el inspector de colegio que hace la misma".

La Junta Revisora pasó por alto este requisito y procedió a considerar cada recusación en sus méritos. Incidió. Nos remitimos a la Parte II B de esta opinión en que exponemos los criterios aplicables a esta situación. Las disposiciones de la Ley Electoral sobre el procedimiento para anular el voto de un elector mediante su recusación son de estricto cumplimiento.

Se revocará la determinación de la Junta en estos ocho casos y se adjudicarán y contarán sus votos a favor del Partido Popular Democrático y su candidato Sr. Cepeda.

(28) *Carlos Olmedo* (JR-80-279)

 Este elector votó papeleta íntegra por el Partido Popular Democrático en el precinto de Río Grande. Su caso plantea dos cuestiones: primero, que de la recusación no se desprende quién fue el recusador; y, segundo, que se recusó al elector por estar "doblemente inscrito" y, sin embargo, la Junta Revisora anuló su voto por otro motivo no aducido en la recusación, a saber, falta de domicilio en el precinto en que votó. Bajo esas circunstancias, la recusación no puede prevalecer.

En cuanto al primer aspecto, el caso es similar al de los ocho electores que acabamos de considerar. Al no identifi-

carse el recusador, no asume responsabilidad por la recusación. Debe tenerse presente que el recusador puede ser un inspector de colegio o cualquier persona que sea elector. "Todo elector o inspector que tuviere motivos fundados . . .", comienza el Art. 5.034 (16 L.P.R.A. sec. 3234) al señalar quiénes podrán recusar a un elector.

■ El segundo aspecto queda también resuelto a base de los criterios que expresamos en la Parte II B. Al entender en una recusación, se atenderá únicamente a los fundamentos en ella expresados. Al momento de ser recusado, se le notifica al elector el motivo de ello, que éste contradice si considera que es falso. Se le niega el debido proceso de ley si luego se anula la recusación por un motivo que no se adujo y que el elector no tuvo oportunidad de contradecir. La recusación debe aducir todas las razones en que se funda, para dar oportunidad al elector de contestarlas y para que puedan ser consideradas.

Se revocará la disposición de la Junta Revisora en este caso y se acreditará el voto del elector a favor del candidato Sr. Cepeda y de su partido.

(29) *Jesús A. Acosta Berríos* (JR-80-281)

■ Este elector votó en el precinto de Río Grande papeleta íntegra por el Partido Nuevo Progresista. Fue recusado por el motivo de ser residente de Canóvanas. Al contestar la recusación, el elector no la desmintió. Expresó: "Acepto que resido en Canóvanas hace aproximadamente un año". El caso es similar al de Carmen Pimentel, Núm. 19, con el agravante de que en aquél la electora meramente firmó su nombre y no contestó la recusación, mientras que en éste el elector firmó y *aceptó* el motivo de la recusación. Ello era suficiente para anular el voto, conforme al citado Art. 5.034 (16 L.P.R.A. sec. 3234), que dispone que si el elector no negase la recusación, "su voto no se contará y será nulo". Erró la Junta al adjudicar el voto.

Se revocará la determinación de la Junta y se descontará al candidato del Partido Nuevo Progresista, Sr. Molina, el voto de este elector.

(30) *Angel Tibot Solís* (JR-80-281)

Este elector votó en el precinto de Luquillo y fue recusado por el Partido Popular por razón de domicilio. El elector negó la recusación. La Junta sostuvo la validez del voto en Luquillo.

La prueba presentada en apoyo de la recusación consistió en los testimonios de Livia F. Silva y Luis M. Vázquez Díaz. La resolución de la Junta ignoró el testimonio de la primera. Declaró ella que es maestra de escuela y reside en la calle 8 L-10, Brisas del Mar, en Luquillo. Conoce al elector y éste reside en la calle Belleview de Villa Palmeras, Santurce, y allí residía para el día de las elecciones. Ella era Comisionada Local del Partido Popular y ayudó a su hija a visitar las casas de electores y pudo constatar que este elector no reside en Luquillo. En la casa en que él alegó residir vivía una hermana suya, el esposo de ésta, y un sobrino. Asegura que él no reside allí, porque ella es maestra desde el 1954, le dio clases a todos los hijos de la hermana de Tibot, a todos los nietos, y ha frecuentado muchas veces la casa, la cual describió en todos sus detalles. Supo del sitio en que reside el elector en Santurce, porque a ella le tocó emplazarlo y se informó de ello por un sobrino de él. No lo halló cuando fue a citarlo, pero le dejó la citación con un vecino que le dijo que él vivía allí.

En contrainterrogatorio la testigo Livia F. Silva admitió que supo quién era Angel Luis Tibot por vista solo "hace una semana". (T.E., pág. 2758.) Explicó que ella no recuerda las personas por nombre y sí por cara, y que a él nunca lo ha visto en la casa de la hermana en Luquillo, lugar que ella frecuenta mucho.

El testigo Luis M. Vázquez Díaz declaró que vive en la calle Fernández García 154 en Luquillo, que queda a una

cuadra de la calle Del Carmen Núm. 54, donde el elector recusado alegó residir. Sabe que no reside allí, pues conoce a la familia que habita en dicha dirección. Dijo que el día de las elecciones, cuando él recusó a Angel Tibot, éste le contestó "[está] bien", pero el Sr. Cecilio Rivera Ponce le dijo "[n]o, vota", "entonces fue y votó y cuando salió[,] el señor Cecilio Rivera contestó por él la contrarrecusación y entonces él la firmó". (T.E., pág. 3140.)

En el contrainterrogatorio el testigo admitió que no conocía al elector antes de las elecciones, que en la Calle #54 vive la hermana de Tibot, Paula, y puede asegurar que desde el año 1976 el señor Tibot no vive o no puede haber vivido allí. Pero no podría decir si ha vivido en algún otro sitio de Luquillo.

Estos testimonios, por sí solos, pudieron servir para sostener la validez de la recusación y anular el voto del elector bajo el criterio de preponderancia de prueba que aplicó la Junta a otros casos, de haberse aplicado dicho criterio uniformemente. Tomada conjuntamente con el testimonio del elector, que compareció y prestó declaración, la totalidad de la prueba resulta clara, robusta y convincente para establecer que el domicilio del elector está en Santurce desde el año 1976. Veamos.

Declaró el elector que no tiene un trabajo permanente, pero se dedica a pintar e ir a la plaza, por el Condado, a "encargar". (T.E., pág. 3308.) Lo hace con frecuencia. Si consigue dinero se va a casa de su hermana en la calle Del Carmen #54, Luquillo, y se pasa el fin de semana allí. Tiene ropa y cama allí. Lleva residiendo allí desde que pasaron las elecciones pasadas. (T.E., pág. 3309.) Considera a Luquillo su residencia. (T.E., pág. 3312.) Tiene un cuarto en Santurce, en la calle Belleview #388. Allí tiene todas las cosas necesarias. No tiene trabajo en Luquillo. Dos meses después de las elecciones del 1976 (T.E., pág. 3315), consiguió un "chivo" de pintura y pudo pagar por el cuarto en la Calle Belleview por adelantado. Dice que

siempre hacía algo, "porque quería . . . mudarme de Luquillo". *Quería mudarse, pues, si aparecía una "chivita por el lado, pues, no podía meterla en [la] casa de mi hermana". Admitió que quería conseguir una residencia aparte de la de su hermana por si consigue una mujer poder vivir con ella y mantenerla.* (T.E., pág. 3316.) *Esa ha sido su intención desde que consiguió ese cuarto.* (T.E., pág. 3318.) *Quiere permanecer y radicarse en San Juan y formar una familia con quien sea.* (T.E., pág. 3318.)

¿Está domiciliado este elector en Luquillo? Si aplicásemos el criterio de residencia habitual, que fue el aplicado por la Junta en otros casos, tendríamos que concluir que no. Por propia admisión del elector, aparte de los testimonios vertidos para sostener la recusación, él reside en Santurce desde dos meses después de las elecciones de 1976 y va a Luquillo "a casa de su hermana" si consigue dinero, y se pasa el fin de semana allí. No es, por tanto, Luquillo donde reside habitualmente, "cuando no es llamad[o] a otra parte para trabajar u otro objeto temporal y al cual retorna en las épocas de descanso". Art. 2.004 (16 L.P.R.A. sec. 3054(c)). Este elector no tiene trabajo permanente en San Juan y no puede decirse que retorna a Luquillo en las épocas de descanso. Su residencia habitual está en San Juan, pero, además, allí también está su *animus manendi*. Su intención ha sido, según declaró: permanecer en San Juan y allí formar una familia. No puede discutirse seriamente que su domicilio no esté allí. Cómparese con los casos (1), (2), (3) y (4) de esta Parte III.

Se revocará la determinación de la Junta Revisora en este caso y se descontará al candidato Sr. Molina el voto de este elector.

(31) *Jesús Alverio Figueroa* (JR-80-281)

Este elector votó en el precinto 102 de Ceiba, papeleta íntegra por el Partido Nuevo Progresista. Se le recusó por no estar domiciliado en dicho precinto. La prueba para sostener la recusación consistió de los testimonios de tres

testigos: Víctor M. Meléndez Santiago (T.E., pág. 2635), Wilfredo Maldonado Montes (T.E., pág. 2665), y Rosa Iris Ayala (T.E., pág. 2704).

Víctor M. Meléndez declaró que reside en las Parcelas de Aguas Claras de Ceiba desde hace 23 años. Ha conocido a Jesús Alverio Figueroa todo ese tiempo. Este vive detrás de la casa del papá, donde tiene una casa de diez por diez, de paneles, sin pintar, con techo de zinc. Durante el año 1977 se mudó al Barrio Machos, Polo Norte, pero ya a fines de ese año había regresado. Desde entonces permanece allí. La casa del testigo queda como a cuatro o cinco casas de la del elector. El sector de Aguas Claras donde ellos viven es parte del precinto 96. El recusado se dedica a hacer "chivitos" en albañilería. En el contrainterrogatorio admite que desde hace seis meses no ha visitado la casa de Jesús.

Wilfredo Maldonado Montes declaró que es emplazador y ha conocido al elector toda su vida. Vive en la calle Severiano Fuentes Frías en Ceiba. El recusado vive en las Parcelas de Aguas Claras de Ceiba. Vive allí desde hace más de dos años. Antes vivía en Villa Palmeras, Polo Norte, en casa de doña Chefa, viuda de Tavárez. Cree que Polo Norte pertenece al barrio Machos. El esposo de doña Chefa era pariente del testigo. Jesús Alverio Figueroa vivió en casa de ellos como tres años, en un apartamiento que tenía ahí. Sabe que ahora vive en Aguas Claras, porque le ha dado pon allí. La casa del papá de Jesús es de cemento y no tiene otra estructura. No sabe adónde se va después que lo deja ahí.

Rosa Iris Ayala, cuyo testimonio no es mencionado por la Junta en su Resolución, declaró que ella emplazó al elector. Inicialmente fue a la dirección que aparecía en la lista electoral, pero no lo encontró ahí. Después fue a las parcelas de Aguas Claras, casa 330, Ceiba y allí pudo emplazarlo.

El elector compareció a defender su voto. En el directo, al preguntársele dónde vive, contestó: "Parcelas [de] Aguas Claras". (T.E., pág. 6130.) Tiene una hermana llamada Fafi, que vive en Polo Norte. Al preguntársele cuál era su hogar respondió: "Bueno, pues yo voy a casa de Fafi, duermo en [la] casa de Fafi, pero que lo mismo duermo en casa de Fafi que duermo allá en el Barrio de las Parcelas de Aguas Claras, ¿entiende?, porque yo tengo una casita allí". Al requerírsele sobre la frecuencia con que duerme en casa de Fafi, respondió, "Dos o tres noches, casi todas las noches".

A preguntas del Lic. Andreu García, contestó de la siguiente manera:

P— Don Jesús, lo cierto es que usted tiene una casita en la parte de su papá.

R— Exacto.

P— Y es suya.

R— Es mía.

P— Su casita . . . .

R— Mi casita.

P— . . . *donde usted se siente en el hogar.*

R— *En el hogar.*

Más adelante le preguntan:

Y la verdad es que usted donde más se pasa es en la casita de su papá y allá al lado, en un cafetín que uno se da el palo, allí en la esquina, a la entrada de las parcelas, ¿verdad que sí?

R— *Sí*, allí me siento yo y me paso sentao, que [en] la tienda no venden licor, pero en el otro lado venden.

A base de preponderancia de prueba, puede sostenerse que este elector está domiciliado en Aguas Claras. Más aun, la prueba para así establecerlo, incluso las admisiones del elector, son fuertes. No obstante, dejan cierta duda, sobre todo si se considera la situación particular del precinto 102. El municipio de Ceiba comprende dos precintos, el 96 y el 102. El 96 lo componen sus barrios Daguao,

Chupacallos, Quebrada Seca y Guayacán. El 102 lo componen el Pueblo y los barrios Machos, Río Abajo y Sacos. Art. 5.008 de la Ley Electoral, 16 L.P.R.A. sec. 3208. Las áreas territoriales de nuestros municipios son relativamente pequeñas y es, por tanto, difícil concebir que los intereses de las personas que están domiciliadas en un municipio en particular no se hallen en diferentes barrios. Ese es el caso de este elector, que lo mismo se le ve en el barrio Machos (precinto 102), que en Aguas Claras (precinto 96), y lo mismo duerme en la casa de su hermana en Machos, que en la casita que tiene en Aguas Claras. El elector está inscrito para votar y votó en el precinto 102, que hace presumir, cuando menos, que allí está domiciliado. La prueba no es todo lo clara y convincente como para destruir dicha presunción.

Se confirmará la determinación de la Junta Revisora y se mantendrá la validez del voto de este elector a favor del candidato Sr. Molina.

(32) *Daniel Marte Alturez* (JR-80-281)

Este elector votó en el precinto 102 de Ceiba por el Partido Nuevo Progresista. Su voto fue recusado por razón de domicilio. La Junta Revisora mantuvo la validez del voto al concluir que el elector estaba domiciliado en dicho precinto.

El caso es igual a los casos de los ocho electores que hemos numerado del (20) al (27). Aquí, como en aquéllos, el recusador no firmó la recusación. Por tanto, no era válida y no tenía que entrar en sus méritos la Junta.

Se confirmará la disposición de la Junta en este caso y se mantendrá la validez del voto adjudicado a favor del candidato Sr. Molina y su partido.

(33) *Raquel Rincón Uriguen* (JR-80-281)

Esta electora votó en el precinto de Río Grande y fue recusada por el Partido Popular por razón de domicilio. Negó la recusación. La prueba para sostener la recusación con-

sistió de los testimonios de Nilda Cordero García y Sara Rodríguez Díaz.

Nilda Cordero García declaró que conoce a Raquel Rincón Uriguen desde hace bastantes años, pues estudiaron juntas en la escuela. Después de graduarse se seguían viendo durante los fines de semana en la finca de los padres de la electora, localizada en El Verde, Río Grande. Mientras cursaban sus estudios universitarios, la electora se mudó a un apartamiento en los altos de Fotografías Castro, Calle de Diego, Río Piedras, donde ella trabajaba. Se trasladó en el año 1969. La electora se casó en el año 1979 y se fue a residir a los Condominios Bello Horizonte en el Viejo Comandante en Carolina. Vivía en el Piso 10, Apt. 11. Su esposo murió hace cinco meses. Ella fue a su entierro en Río Piedras.

En el contrainterrogatorio dijo que los padres de Raquel viven en El Verde y ella sabe que Raquel no ha vuelto a vivir con ellos, porque ella misma se lo dijo. (T.E., pág. 3179.) Después de octubre de 1980 no la ha visto.

Sara Rodríguez Díaz declaró que vive en El Verde, Río Grande; que durante las elecciones fue funcionaria de colegio para el Partido Popular en el Barrio El Verde, precinto 97 de Río Grande. Conoce a la electora, pues su familia es natural de El Verde. La casa de los padres de Raquel queda como a dos kilómetros de la suya. Cada vez que va a su trabajo en Palmer, ella tiene que pasar por la casa de los padres de Raquel. Durante las elecciones vio a la electora, cuando ésta fue a votar en colegio cerrado. (T.E., pág. 3189.) No tenía tarjeta de identificación. Recusó su voto porque hace 3 ó 5 años que no reside en El Verde. Sabe que no vive ahí, pues ella vive en el área y no la ha visto por muchos años y porque varios vecinos le han dicho que se mudó.

La electora compareció. Declaró que reside en el Condominio Bello Horizonte desde octubre de 1980. Negó que alguna vez se haya casado. Antes de octubre vivía en El

Verde y en casa de sus padres. Admite conocer a Nilda Cordero García. Niega la veracidad de lo declarado por ella ante la Junta. (T.E., pág. 3522.) Negó conocer a Sara Rodríguez Díaz.

Durante su contrainterrogatorio se confrontó a esta electora con prueba documental que obra en los autos originales como *exhibits* 38, 39 y 40 del P.N.P., que hemos examinado. El *exhibit* 40 es un documento oficial del Departamento de Hacienda titulado "Solicitud de Exoneración Contributiva y Certificación de Posesión y Uso de Propiedad", suscrito por la electora *bajo juramento* el 8 de agosto de 1980. En él hizo constar que residía en el apartamiento 1011 del Condominio Bello Horizonte en Río Piedras para el primero de enero de 1980. Esto corrobora lo declarado por Nilda Cordero García al efecto de que la electora se fue a residir allí en el año 1979, y desmiente su propio testimonio prestado ante la Junta al efecto de que reside en el mencionado condominio "desde octubre de 1980". Confrontada con dicha prueba, la electora admitió (T.E., pág. 3531–32.) que era residente de Carolina. Refiriéndose a la misma pieza documental (*exh.* 40), en que expresó bajo juramento que la localización de su residencia anterior a la de Bello Horizonte era en Villa Fontana, 3JF#6, Carolina, tuvo que admitir que así era, y que toda esa información que aparece en el mencionado *exhibit* la suministró ella misma. (T.E., pág. 3532.)

El *exhibit* 38 es una escritura pública otorgada por la electora el 8 de agosto de 1980, en que constituyó primera hipoteca sobre el referido apartamiento del Condominio Bello Horizonte en garantía de un pagaré suscrito por ella, autenticada ante notario en esa misma fecha. (*Exh.* 39, P.N.P.) En ambos documentos hizo constar la electora ser residente de Carolina, y así lo reconoció al ser confrontada con ellos, expresando que toda la información que aparece en esos documentos es cierta.

Por último, la electora declaró que tenía un "novio" llamado Bienvenido Mojica, que falleció en septiembre de 1980 (T.E., pág. 3543.), y que ambos estuvieron juntos durante cinco años.

La Junta Revisora, no obstante las expresas admisiones de la electora en el contrainterrogatorio, hechas ante su confrontación con la mencionada prueba documental de que para el primero de enero de 1980 vivía en Bello Horizonte, y antes de allí en Villa Fontana en Carolina, concluyó que residía y estaba domiciliada en El Verde en Río Grande. Es decir, dio crédito al testimonio que fue rectificado por la propia electora y que, por tanto, perdió toda validez y eficacia jurídica.

Tomada en conjunto, la prueba establece de manera clara, robusta y convincente y sin lugar a dudas que esta electora no estaba domiciliada en Río Grande ni en el Distrito Núm. 35 y su voto, por tanto, no podía contarse a favor de ningún candidato a Representante a la Cámara por dicho distrito representativo. Se revocará la disposición de la Junta en este caso y se descontará el voto de esta electora al candidato del Partido Nuevo Progresista, Sr. Molina.

(34) *José A. Acosta Anglada* (JR-80-278)

(35) *Héctor Ramírez Aponte* (JR-80-280)

(36) *Rafael T. Rodríguez Rodríguez* (JR-80-284)

(37) *María Luz Morales Meléndez* (JR-80-283)

Los casos de estos cuatro electores fueron discutidos en la Parte II C de esta opinión. Se trata de personas domiciliadas en precintos del Distrito Representativo Núm. 35, que votaron a favor del Partido Popular Democrático y su candidato Sr. Cepeda, y cuyos votos fueron anulados por no haberse perfeccionado las solicitudes que ellos oportunamente hicieron para transferirse y figurar en las listas de electores de los respectivos precintos en que votaron. Por los fundamentos que expresamos en dicha Parte II C, se

revocará la determinación de la Junta Revisora, que sostuvo la validez de la recusación en cada caso, y se acreditarán al candidato Sr. Cepeda dichos votos.

(38) *Víctor Meléndez Alvira* (JR-80-282)

(39) *Manuela Meléndez Alvira* (JR-80-282)

Los electores Víctor y Manuela Meléndez Alvira votaron en el precinto de Fajardo por el Partido Nuevo Progresista y su candidato Sr. Molina. Se les recusó como no domiciliados en dicho precinto.

La Comisión Estatal de Elecciones adjudicó los votos a base de que las recusaciones no se perfeccionaron hasta abierta la urna, cuando ya los electores se habían ido. Fue confirmada por la Junta Revisora. Estamos de acuerdo.

Los hechos indisputados fueron como sigue. Los electores son dos personas humildes, de alrededor de 60 años de edad, él de muy escasa, si alguna, preparación escolar, y ella, una persona ciega. Fueron al colegio de votación acompañados de otra persona. En el momento de votar, el funcionario que representaba al Partido Popular les recusó por razón de domicilio, escribiendo las correspondientes razones y firmando a su calce en las papeletas. Pero omitió identificarlas con sus nombres y números de identificación electoral. Estos no contradijeron sus recusaciones. Las papeletas fueron depositadas en la urna. Estas dos papeletas fueron las únicas recusadas en ese colegio y, al terminar la votación y abrir la urna, los funcionarios acordaron que se pusiera el nombre de los dos electores recusados en sus papeletas.

No hay duda de que las papeletas en que se escribieron los nombres de los electores eran las suyas. Pero no se siguió estrictamente el procedimiento que señala el Art. 5.034 de la Ley, 16 L.P.R.A. sec. 3234, para la recusación de un elector, antes citado. Señalamos en la Parte II B de esta opinión que la obediencia del procedimiento allí prescrito es de estricto cumplimiento. Además, no estando presentes los electores en el momento en que se pretendió per-

feccionar sus recusaciones, se les privó de la oportunidad de contestarlas y refutarlas en ese momento. Se confirmará la determinación de la Junta y se mantendrá la adjudicación hecha a favor de la candidatura del Sr. Molina.

(40) *Caso de Papeleta con Marcas Múltiples* (JR-80-276)

Se trata aquí de la papeleta (véase Anejo "E") en que aparecen una cruz (X) y la inicial "F" bajo la insignia del Partido Popular Democrático, y una raya diagonal (/) bajo la insignia del Partido Independentista Puertorriqueño. Por los fundamentos expresados en la Parte II E de esta opinión, en que consideramos dicho caso, se confirmará la determinación de la Junta Revisora Electoral que descontó dicho voto al candidato del Partido Popular Democrático, Sr. Cepeda.

## CONCLUSIÓN

La decisión final de la Junta Revisora Electoral, según sus enmiendas de 16 y 21 de enero de 1981, arrojó el siguiente resultado entre las candidaturas del Sr. Osvaldo Molina, del Partido Nuevo Progresista, y el Sr. Samuel Cepeda, del Partido Popular Democrático, para Representante a la Cámara por el Distrito Representativo Núm. 35: Sr. Molina, 22,918 votos; Sr. Cepeda, 22,895 votos. La diferencia determinada fue de veintitrés votos.

De conformidad con el análisis que hemos hecho en la Parte III de esta opinión, de cada uno de los cuarenta casos en controversia planteados ante nuestra consideración, se harán las siguientes rectificaciones a la resolución final de la Junta Revisora Electoral, ante nos recurrida: se descontarán al candidato Sr. Osvaldo Molina los votos de los electores Roberto Pérez (1), Nellie Cortés (2), Maritza Pérez Cortés (3), Jesús A. Acosta Berríos (29), Angel Tibot Solís (30), y Raquel Rincón Uriguen (33), cuyas papeletas fueron válidamente recusadas; y se adjudicarán a favor del candidato Sr. Samuel Cepeda los votos

de los electores María Soto Sanes (5), Norma Soto Sanes (6), José Luis Castaño (7), Awilda Moringlane Encarnación (8), Juan H. Carrillo (9), Sonia Becerril (10), Wanda Cotto Cantres (11), Lydia Cardona Lebrón (12), Nancy Maldonado Cruz (13), Jesusa Vizcarrondo Díaz (14), Lucía Avila (15), Ivis Raquel Castaño Monet (17), Ruth Rodríguez Díaz (18), Migdalia Sánchez Hernández (20), Iris D. Sánchez Hernández (21), Fernando Pagán Rodríguez (22), Michael Ferris (23), Carmen D. López Ramos (24), Gloria López Ramos (25), Annie L. Pérez Ortiz (26), José González Fontánez (27), Carlos Olmedo (28), José A. Acosta (34), Héctor Ramírez Aponte (35), Rafael T. Rodríguez Rodríguez (36), y María Luz Morales Meléndez (37), [37] cuyas recusaciones son improcedentes. En consecuencia, se enmendarán las cifras sobre el resultado final en el Distrito Representativo Núm. 35 de la manera siguiente: candidato Sr. Osvaldo Molina del Partido Nuevo Progresista, 22,912 votos; candidato Sr. Samuel Cepeda del Partido Popular Democrático, 22,921 votos.

La parte recurrente alega ante nos que la Junta Revisora Electoral actuó parcializadamente. No tenemos que pasar juicio sobre esto ni lo haremos. La resolución de la Junta está basada en criterios restrictivos sobre el ejercicio del sufragio que, como hemos señalado, no son los adecuados. Se advierte, además, en algunos casos, que esos criterios no fueron aplicados uniformemente. Reconocemos, sin embargo, que la Junta tuvo que actuar bajo presión, en momentos de gran tensión, y bajo un plan de trabajo irregular y agobiante, para producir en el más mínimo plazo posible una decisión sobre el resultado en el Distrito Representativo Núm. 35.

La extremada polarización del electorado entre los dos partidos mayoritarios y lo reñido del resultado han soli-

---

[37] Los números en paréntesis a continuación de cada nombre corresponden, respectivamente, a los números que aparecen antes del nombre de cada elector en la Parte III de esta opinión.

viantado ánimos y producido expresiones y ataques verbales contra los organismos que tienen la responsabilidad de adjudicar las controversias en un plano de la más alta y exigente juridicidad. Esos ataques en nada ayudan a devolver la calma y la tranquilidad a nuestro pueblo, perturbado por la lucha comicial que acaba de experimentar. Debemos confiar en que los líderes de este buen pueblo sepan descargar su responsabilidad histórica de no debilitar, movidos por la pasión de un momento, las instituciones creadas por la Constitución y las leyes para ser árbitros en un sistema democrático. En cuanto a esas instituciones toca, nuestro empeño ha de ser descargar nuestras responsabilidades conforme a la más rigurosa imparcialidad. Así nos ayude Dios.

*Se dictará sentencia en que se revoque la decisión de la Junta Revisora Electoral y se declare electo para el cargo de Representante a la Cámara por el Distrito Representativo Núm. 35 al Sr. Samuel Cepeda, del Partido Popular Democrático, a quien se acreditará un total de 22,921 votos contra 22,912 para el Sr. Osvaldo Molina, candidato por el Partido Nuevo Progresista.*

El Juez Asociado Señor Negrón García emitió opinión concurrente y el Juez Asociado Señor Martín emitió opinión disidente. El Juez Asociado Señor Dávila se inhibió.

---

*NOTA DEL COMPILADOR:*

La fotocomposición utilizada en estos apéndices es una cortesía de Publicaciones J.T.S., Inc.

## ANEJO A

**T-180304**

ESTADO LIBRE ASOCIADO DE PUERTO RICO
COMISION ESTATAL DE ELECCIONES

SOLICITUD DE TRANSFERENCIA

USE LETRA DE MOLDE

USE LETRA DE MOLDE

DECLARO QUE ESTOS SON LOS DATOS CORRECTOS Y VERDADEROS CON LOS CUALES APAREZCO INSCRITO

PRECINTO DE INSCRIPCION | DISTRITO | NUMERO PETICION | UNIDAD ELECTORAL | NUMERO DE IDENTIFICACION

APELLIDO PATERNO | APELLIDO MATERNO

NOMBRE | NACI EN EL MUNICIPIO DE

NOMBRE DEL PADRE | NOMBRE DE LA MADRE

DIRECCION RESIDENCIAL, NOMBRE O NUMERO DE LA CALLE PERMANENTE' NUMERO DEL BLOQUE Y DE LA CASA

ESTATURA | COLOR DE OJOS
1 AZUL
2 GRIS
3 MARRON
4 NEGRO
5 VERDE

SECTOR BARRIO O URBANIZACION | NACI EL DIA | MES | AÑO | SEXO F M

DE LA MISMA MANERA DECLARO QUE HE CAMBIADO MI DOMICILIO Y QUE MI NUEVA
DIRECCION ES LA DE LOS DATOS ABAJO EXPRESADOS QUE SON CORRECTOS Y VERDADEROS

PRECINTO | DISTRITO | UNIDAD ELECTORAL | ESCUELA O EDIFICIO PUBLICO MAS CERCANO

DIRECCION RESIDENCIAL, NOMBRE O NUMERO DE LA CALLE PERMANENTE' NUMERO DEL BLOQUE Y DE LA CASA | DIRECCION POSTAL CALLE Y NUMERO, APARTAMENTO O APARTADO POSTAL

SECTOR, BARRIO O URBANIZACION | *SECTOR, BARRIO O URBANIZACION

SI ES ZONA RURAL CAMINO VECINAL MAS CERCANO KILOMETRO Y HECTOMETRO DE LA CARRETERA | MUNICIPIO | ZONA POSTAL

DECLARO BAJO JURAMENTO QUE TODOS LOS DATOS DE ESTA SOLICITUD SON LA VERDAD SEGUN HAN SIDO SUMINISTRADOS POR MI

CERTIFICAMOS (O CERTIFICO) QUE EL SOLICITANTE ARRIBA DESCRITO FIRMO O MARCO SU SOLICITUD DE TRANSFERENCIA EN PRESENCIA NUESTRA Y SE LE DEVOLVIO UNA COPIA DE LA MISMA DESPUES DE DICHA SOLICITUD HABER SIDO FIRMADA POR NOSOTROS (O POR MI)

FIRMA DEL FUNCIONARIO PNP | NOMBRE EN LETRA DE MOLDE

FIRMA O MARCA DEL PETICIONARIO

FIRMA DEL FUNCIONARIO PPD | NOMBRE EN LETRA DE MOLDE

RAZON POR LA CUAL NO FIRMO

EN_____ P R A ____ DE ____ DE ____
MUNICIPIO | DIA | MES | AÑO | FIRMA DEL FUNCIONARIO PIP | NOMBRE EN LETRA DE MOLDE

QUINTA COPIA — ELECTOR

## ANEJO B

### CODIFICACION DE MUNICIPIOS

| NUM DEL MUNICIPIO | NOMBRE DEL MUNICIPIO | NUM DEL MUNICIPIO | NOMBRE DEL MUNICIPIO |
|---|---|---|---|
| 1 | Adjuntas | 40 | Juncos |
| 1 | Adjuntas | 41 | Lajas |
| 2 | Aguada | 42 | Lares |
| 3 | Aguadilla | 43 | Las Marías |
| 4 | Aguas Buenas | 44 | Las Piedras |
| 5 | Aibonito | 44 | Las Piedras |
| 5 | Aibonito | 45 | Loíza |
| 6 | Añasco | 46 | Luquillo |
| 7 | Arecibo | 47 | Manatí |
| 7 | Arecibo | 47 | Manatí |
| 8 | Arroyo | 48 | Maricao |
| 9 | Barceloneta | 49 | Maunabo |
| 10 | Barranquitas | 50 | Mayaguez |
| 11 | Bayamón | 50 | Mayaguez |
| 11 | Bayamón | 50 | Mayaguez |
| 11 | Bayamón | 51 | Moca |
| 11 | Bayamón (Hato Tejas) | 51 | Moca |
| 12 | Cabo Rojo | 52 | Morovis |
| 13 | Caguas | 53 | Naguabo |
| 13 | Caguas | 54 | Naranjito |
| 14 | Camuy | 55 | Orocovis |
| 15 | Canovanas | 56 | Patillas |
| 16 | Carolina | 57 | Peñuelas |
| 16 | Carolina | 58 | Ponce |
| 16 | Carolina | 58 | Ponce |
| 17 | Cataño | 58 | Ponce |
| 18 | Cayey | 59 | Quebradillas |
| 19 | Ceiba | 60 | Rincón |
| 19 | Ceiba | 61 | Río Grande |
| 20 | Ciales | 62 | Sabana Grande |
| 21 | Cidra | 63 | Salinas |
| 21 | Cidra | 64 | San Germán |
| 22 | Coamo | 64 | San Germán |
| 23 | Comerío | 65 | San Juan |
| 24 | Corozal | 65 | San Juan |
| 25 | Culebra | 65 | San Juan |
| 26 | Dorado | 65 | San Juan |
| 26 | Dorado | 65 | San Juan |
| 27 | Fajardo | 65 | San Juan |
| 28 | Florida | 65 | San Juan |
| 29 | Guánica | 66 | San Lorenzo |
| 30 | Guayama | 67 | San Sebastían |
| 30 | Guayama | 68 | Santa Isabel |
| 31 | Guayanilla | 68 | Santa Isabel |
| 31 | Guayanilla | 69 | Toa Alta |
| 32 | Guaynabo | 70 | Toa Baja |
| 32 | Guaynabo | 70 | Toa Baja |
| 32 | Guaynabo | 71 | Trujillo Alto |
| 33 | Gurabo | 71 | Trujillo Alto |
| 34 | Hatillo | 72 | Utuado |
| 34 | Hatillo | 73 | Vega Alta |
| 35 | Hormigueros | 74 | Vega Baja |
| 36 | Humacao | 75 | Vieques |
| 37 | Isabela | 76 | Villalba |
| 38 | Jayuya | 77 | Yabucoa |
| 39 | Juana Díaz | 78 | Yauco |

## ANEJO C

ESTADO LIBRE ASOCIADO DE PUERTO RICO
COMISION ESTATAL DE ELECCIONES

### PETICION DE INSCRIPCION COMO ELECTOR

Núm Electoral

Use Letra de Molde No Escriba Sobre Esta Línea Use Letra de Molde

Precinto de Inscripción Distrito Unidad Electoral Escuela o Edificio Público más Cercano

Apellido Paterno Apellido Materno

Mi Nombres es Nací en el Municipio de Fecha y Sitio de la Naturalización

Nací el Día Mes y Año Sexo Estatura Color de Ojos 1 Azul, 2. Gris 3. Marron 4. Negro 5. Verde Mi Estado Civil es Soltero(a) ☐ Casado(a) ☐ Viudo(a) ☐ Nombre y Apellido del Cónyuge

Nombre del Padre Nombre de la Madre

Dirección Residencial: Nombre o Número de la Calle Permanente Número del Bloque y de la Casa Dirección Postal. Calle y Número Apartamento o Apartado Postal

Sector, Barrio o Urbanización Sector, Barrio o Urbanización

Si es Rural Camino Vecinal más Cercano Kilómetro y Hectómetro de la Carretera Municipio Zip Code

Declaro bajo juramento que soy ciudadano de los Estados Unidos de America y que al firmar esta petición hago constar que he leído (o que me ha sido leída) en todas sus partes, que no figuro en las listas electorales vigentes y que lo arriba expresado son datos verdaderos suministrados por mí

Certificamos (o certifico) que el peticionario arriba descrito firmó o marcó su Petición de Inscripción en presencia nuestra y se le devolvio una copia de la misma despues de dicha petición haber sido firmada por nosotros (o por mí.)

_____
Firma o Marca del Peticionario

_____
Razón por la cual no Firmo

En _____ , P. R a ____ de _____ de ____
Municipio Día Mes Año

_____
Firma del Funcionario PNP Nombre en letra de molde

_____
Firma del Funcionario PPD Nombre en letra de molde

_____
Firma del Funcionario PIP Nombre en letra de molde

ORIGINAL—COMISION ESTATAL DE ELECCIONES

ESCRIBA FUERTE

ESTADO LIBRE ASOCIADO DE PUERTO RICO
COMISION ESTATAL DE ELECCIONES

## SOLICITUD DE TRANSFERENCIA

Use Letra de Molde Use Letra de Molde

Declaro que estos son los datos correctos y verdaderos con los cuales aparezco inscrito

Precinto de Inscripción Distrito Número Unidad Número de
 Petición Electoral Identificación

Apellido Paterno Apellido Materno

Nombre Nací en el Municipio de

Nombre del Padre Nombre de la Madre

Dirección Residencial Nombre o Número de la Calle Color de 1. Azul
Permanente: Número del Bloque y de la Casa Estatura Ojos 2. Gris
 3. Marron
 4. Negro
 5. Verde
Sector, Barrio o Urbanización Nací el
 Día Mes Año Sexo
 F
 M

De la misma manera declaro que he cambiado mi domicilio y que mi nueva
dirección es la de los datos abajo expresados que son correctos y verdaderos

Precinto Distrito Unidad Escuela o Edificio Público más Cercano
 Electoral

Dirección Residencial. Nombre o Número de la Calle Calle y Número Apartamento
Permanente: Número del Bloque y de la Casa Dirección Postal: o Apartado Postal

Sector, Barrio o Urbanización

Si es Zonal Rural Camino Vecinal mas Cercano Sector, Barrio o Urbanización
Kilómetro y Hectómetro de la Carretera

 Municipio Zona Postal
 0 0

Declaro bajo juramento que todos los datos de esta Certificamos (o certifico) que el solicitante arriba des-
solicitud son la verdad según han sido suministrados crito firmó o marcó su Solicitud de Transferencia en pre-
por mí. sencia nuestra y se le devolvió una copia de la misma
 después de dicha solicitud haber sido firmada por nosotros
 (o por mí).

Firma o Marca del Peticionario Firma del Funcionario PNP Nombre en letra de molde

Razón por la cual no Firmo Firma del Funcionario PPD Nombre en letra de molde

En _____ , P. R. a __ de _____ de __.
Municipio Día Mes Año Firma del Funcionario PIP Nombre en letra de molde

ORIGINAL—COMISION ESTATAL DE ELECCIONES

316

**ANEJO D**

ESTADO LIBRE ASOCIADO DE PUERTO RICO

COMISION ESTATAL DE ELECCIONES

T-180506

SOLICITUD DE TRANSFERENCIA

USE LETRA DE MOLDE USE LETRA DE MOLDE

DECLARO QUE ESTOS SON LOS DATOS CORRECTOS Y VERDADEROS CON LOS CUALES APAREZCO INSCRITO

PRECINTO DE INSCRIPCION DISTRITO NUMERO PETICION UNIDAD ELECTORAL NUMERO DE IDENTIFICACION

APELLIDO PATERNO: Morales

APELLIDO MATERNO: Melendez

NOMBRE: Maria Luz

NACI EN EL MUNICIPIO DE: Vieques

NOMBRE DEL PADRE: Benjamin

NOMBRE DE LA MADRE: Antonia

DIRECCION RESIDENCIAL, NOMBRE O NUMERO DE LA CALLE PERMANENTE NUMERO DEL BLOQUE Y DE LA CASA: 81 Cookr 20 42 de 770

ESTATURA: 05

COLOR DE OJOS: 3
1. AZUL
2. GRIS
3. MARRON
4. NEGRO
5. VERDE

SECTOR, BARRIO O URBANIZACION: Country Club

NACI EL DIA: 10 MES: 03 AÑO: 42 SEXO: F

DE LA MISMA MANERA DECLARO QUE HE CAMBIADO MI DOMICILIO Y QUE MI NUEVA DIRECCION ES LA DE LOS DATOS ABAJO EXPRESADOS QUE SON CORRECTOS Y VERDADEROS

PRECINTO: 097 Rio Grande DISTRITO: 061 UNIDAD ELECTORAL: 02

ESCUELA O EDIFICIO PUBLICO MAS CERCANO: Pedro Falu

DIRECCION RESIDENCIAL, NOMBRE O NUMERO DE LA CALLE PERMANENTE NUMERO DEL BLOQUE Y DE LA CASA: Calle 42 A472

DIRECCION POSTAL, CALLE Y NUMERO, APARTAMENTO O APARTADO POSTAL: Calle 42 A472

SECTOR, BARRIO O URBANIZACION: Jardines Rio Grande

SECTOR, BARRIO O URBANIZACION: Jardines Rio Grande

SI ES ZONA RURAL, CAMINO VECINAL MAS CERCANO KILOMETRO Y HECTOMETRO DE LA CARRETERA

MUNICIPIO: Rio Grande ZONA POSTAL: 00745

DECLARO BAJO JURAMENTO QUE TODOS LOS DATOS DE ESTA SOLICITUD SON LA VERDAD SEGUN HAN SIDO SUMINISTRADOS POR MI

FIRMA O MARCA DEL PETICIONARIO

CERTIFICAMOS (O CERTIFICO) QUE EL SOLICITANTE ARRIBA DESCRITO FIRMO O MARCO SU SOLICITUD DE TRANSFERENCIA EN PRESENCIA NUESTRA Y SE LE DEVOLVIO UNA COPIA DE LA MISMA DESPUES DE DICHA SOLICITUD HABER SIDO FIRMADA POR NOSOTROS (O POR MI)

FIRMA DEL FUNCIONARIO PNP NOMBRE EN LETRA DE MOLDE

FIRMA DEL FUNCIONARIO PPD NOMBRE EN LETRA DE MOLDE: Rosa T. Ayala

RAZON POR LA CUAL NO FIRMO

EN: Rio Grande P R A: 6 DIA DE: 2 MES DE: 90 AÑO MUNICIPIO

FIRMA DEL FUNCIONARIO PIP NOMBRE EN LETRA DE MOLDE: (ANTOI MATO)

ORIGINAL —COMISION ESTATAL DE ELECCIONES

**ANEJO E**

COMISION ESTATAL DE ELECCIONES
ELECCIONES GENERALES
**PAPELETA ELECTORAL**
4 DE NOVIEMBRE DE 1980

Municipio de ___ LUQUILLO ___

Distrito Senatorial Núm. ___ 7 ___

Precinto Núm. ___ 98 ___

Distrito Representativo Núm. ___ 35 ___

| PARTIDO NUEVO PROGRESISTA | PARTIDO POPULAR DEMOCRATICO | PARTIDO INDEPENDENTISTA PUERTORRIQUEÑO | PARTIDO SOCIALISTA PUERTORRIQUEÑO | NOMINACION DIRECTA (WRITE IN) |
|---|---|---|---|---|
| Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico | Gobernador de Puerto Rico |
| 1 Carlos Romero Barceló | 1 Rafael Hernández Colón | 1 Rubén Berríos Martínez | 1 Luis Lausell Hernández | 1 |
| Comisionado Residente en los Estados Unidos | Comisionado Residente en los Estados Unidos | Comisionado Residente en los Estados Unidos | Comisionado Residente en los Estados Unidos | Comisionado Residente en los Estados Unidos |
| 2 Baltasar Corrada del Río | 2 José Arsenio Torres | 2 Marta Font de Calero | 2 | 2 |
| Senadores por el Distrito | Senadores por el Distrito | Senadores por el Distrito | Senadores por el Distrito | Senadores por el Distrito |
| 3 Francisco Estrada Bthiloni | 3 Jesús Santa Aponte | 3 Jorge Franceschi Cuadra | 3 José Fontánez Escobar | 3 |
| 4 Tato Hernández | 4 Gilberto Rivera Ortiz | 4 Víctor A. Torres Ortiz | 4 Américo Angleró Rivera | 4 |
| Representante por el Distrito | Representante por el Distrito | Representante por el Distrito | Representante por el Distrito | Representante por el Distrito |
| 5 Osvaldo Molina Vázquez | 5 Samuel Cepeda García | 5 Vidal Vázquez Montes | 5 Rubén Berberena Reyes | 5 |

Se provee esta columna en blanco para que el elector anote en ella el *nombre* de cualquier otro candidato que desee enentalar, fuera de los que aparecen en las columnas anteriores.
Artículo 5.011
Ley Electoral

318

## ANEJO F

SAN JUAN, PUERTO RICO

C I T A C I O N

_Partido Popular Democrático Y_
Samuel Cepeda VS. Partido Nuevo
Progresista ,Gerineldo Barreto y
Osvaldo Molina

CASO NUM. JR.80-274
al JR.80-284

SOBRE:

_Apelación De Adjudicación_

De Papeletas

Por orden de la Junta Revisora Electoral de Puerto Rico, y en virtud de los poderes que le confiere a ésta, la Ley Número 4 del 20 de diciembre de 1977, según enmendada, se requiere de usted _Maritza Perez_ _____, que comparezca a vista pública en la Junta Revisora Electoral, Calle San Agustín 114, Puerta de Tierra, San Juan, el día 8 de _Enero_ de 1987 a las 10:00 a.m., en calidad de elector recusado en relación con el caso de epígrafe.

Se le apercibe, además, que de no comparecer en el día y hora antes señalados, la Junta Revisora Electoral podrá tomar la acción que proceda.

En San Juan, Puerto Rico, a 26 de diciembre de 1980.

Lourdes T. de Quiñones
Secretaria

## ANEJO F1

DILIGENCIAMIENTO POR PERSONA PARTICULAR

Yo, _____ previamente juramentado,

DECLARO: Que me llamo como queda dicho; soy mayor de 21 años de

edad; sé leer y escribir; y no soy abogado del querellante en este

caso, ni parte en este pleito, no teniendo tampoco interés en el

mismo.

Que recibí esta notificación el día _____ de _____

de 19 _____, notificándolo personalmente a _____

o sea, el querellado mencionado en dicha notificación, el día

_____ de _____ de 19 ____, a las _____ de la

_____ en _____ Puerto Rico, entre-

gándole personalmente copia de la Querella presentada y copia de

esta Notificación al dorso del cual hice constar, bajo mi firma,

la fecha y sitio de su entrega y notificación.

369

_____
Diligenciante

Jurado y suscrito ante mí por _____

quien es mayor de 18 años de edad, _____

_____, y vecino de _____

Puerto Rico, hoy día _____ de _____ de 19 ____.

—O—

Opinión concurrente del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 23 de junio de 1981

Con absoluta fidelidad al mandato fundamental de que ". . . se declarará electo aquel candidato para un cargo que obtenga un *número mayor de votos* que el obtenido por cualquiera de los demás candidatos para el mismo cargo" (énfasis nuestro), Art. VI, Sec. 4, Constitución E.L.A., aunque por diferentes fundamentos y margen, concurrimos con el dictamen del Tribunal de que el recurrente Samuel Cepeda es el candidato triunfante para el escaño del Distrito Representantivo Núm. 35.

Consistentes con la línea central de pensamiento y conciencia judicial de superar escollos en la dinámica del sufragio electoral expuesta en *P.S.P.* v. *Comisión Estatal de Elecciones*, 110 D.P.R. 400 (1980), hemos de plasmar la interpretación que en su justa implementación afianza esa conclusión.

I

El sistema de recusación, aunque de importancia para depurar que sólo electores legítimos ejerciten el voto, por constituir una intervención drástica contra la presunción que cobija a todo elector inscrito de que es apto y está cualificado, a la par que vulnerar la secretividad del sufragio, es de rigurosa y estricta observancia. El ciudadano no puede ni debe estar sujeto ni expuesto, sin resguardo constitucional o judicial, a recusaciones fáciles, viciosas, sorpresivas, dudosas, incompletas o defectuosamente hechas. En última instancia, la nitidez de la óptica que rige ese análisis no debe empañarse ante la lucha y el reclamo temporal de determinados partidos políticos. Lo importante no sólo es la constitucionalidad de la legislación, sino también la validez de la reglamentación e implementación

por el Estado de medidas restrictivas frente al derecho al sufragio del electorado.

En esa tarea es necesario recordar que la palabra *recusación* proviene de recusar, que en su acepción pertinente significa "notar a una persona de carencia de aptitud". Ahora bien, el término legal y el trámite de recusación es algo más que simplemente un inspector de colegio o un elector notar y anotar, siguiendo determinada formalidad que un ciudadano vota ilegalmente. Es un trámite *integrado* que se descompone en tres etapas —recusación, contestación y juramento— que estatutariamente precisa de un contenido mínimo sustancial y esencial. Para cada trámite de recusación en ese colegio electoral se requieren y entran en escena tres personas: recusante, elector recusado y el inspector que certifica el juramento. Veamos. De una lectura del Art. 5.034 ([1]) se desprende que para que un voto se estime válidamente recusado es menester que por escrito, al dorso de la papeleta, el recusante consigne: (a) su nombre y calidad del elector debidamente inscrito, supliendo la información del precinto a que pertenece y su dirección; (b) el nombre del elector recusado, dirección, número de colegio, precinto y municipalidad; (c) una breve anotación exponiendo las razones, fundamentos y luego su *firma*. Por su parte, si el elector recusado opta por

---

([1]) Reza:

"Todo elector o inspector que tuviere motivos fundados para creer que una persona que se presenta a votar lo hace ilegalmente, o que dicha persona ha votado ya en otro colegio electoral o precinto, podrá recusar su voto por los motivos que lo hicieren ilegal a virtud de las disposiciones de esta ley, pero dicha recusación no impedirá que dicha persona emita su voto. La papeleta de todo elector cuyo voto se recuse deberá marcarse al *dorso* con la palabra 'Recusado', seguida de una breve anotación firmada por la persona o el inspector de colegio que hace la misma, exponiendo la razón de tal recusación, el número de Tarjeta de Identificación Electoral de la persona afectada, el municipio, precinto y número de colegio electoral. Si el elector recusado niega su recusación, deberá hacerlo *bajo su firma y juramento al dorso de la papeleta*, pero si no la negare, su voto no se contará y será nulo. *El Administrador enviará a cada Colegio de Votación un modelo de Recusación para orientar a la Junta del Colegio de Votación cómo cumplimentar una recusación.*" 16 L.P.R.A. sec. 3234. (Énfasis nuestro.)

negarla, expondrá su nombre, circunstancias personales, dirección residencial presente y fundamentos en oposición. Luego el elector deberá *firmar bajo juramento tal negativa*. Concentremos en este requisito.

Lo primero que resalta es que el juramento es de importancia vital, para "someter a[l] . . . [elector] a la penalidad de perjurio si se probara que el contenido de sus manifestaciones o declaraciones . . . no es cierto . . .". *Piñero* v. *Martínez Santiago*, 104 D.P.R. 587, 590 (1976). Segundo, es una medida cautelar cardinal contra toda tentativa de fraude comicial que "adelanta . . . [ese] interés predominante . . . [como] norma que contiene suficiente vínculo de racionalidad y lógica al indicar un acto mínimo afirmativo de la persona recusada, rodeando y perpetuando, mediante un trámite sencillo y rápido, la legitimidad y veracidad del acto . . .". *P.S.P.* v. *Comisión Estatal de Elecciones*, supra.

¿A quién corresponde certificar y dejar constancia del juramento (*jurat*)? ¿Qué consecuencias tiene cuando existe una omisión al respecto? Estas incógnitas las despeja la propia ley. Los inspectores de colegio son quienes expresamente están ". . . facultados *para tomar los juramentos sobre las recusaciones* o denuncias que cualquier persona hiciere". (Énfasis nuestro.) Art. 5.035 (16 L.P.R.A. sec. 3235). Como corolario, el *jurat*, esto es, la constancia o certificación del juramento, es una circunstancia que no sólo depende del aserto del elector, sino —no habiendo ningún ritual solemne en particular— del acto ministerial y manual de que uno de los inspectores del colegio, investido con esa facultad, estampe su firma bajo la del elector recusado. De ese modo queda acreditada la manifestación externa de la intención de jurar del elector, para que trascendiendo el valor interno del juramento ante el Hacedor o el fuero de su propia conciencia, tenga tal acción eficacia —dentro y fuera del Colegio Electoral— ante los demás hombres. Obsérvese cómo el modelo de recusación que el

Administrador de la Comisión, siguiendo el mandato de ley, debió enviar a cada colegio ". . . para orientar a la Junta del Colegio de Votación cómo cumplimentar una recusación" —Apéndice A de esta ponencia— confirma indubitadamente esta interpretación.

Esta disposición confiriendo potestad de tomar juramento a los inspectores de colegio e imponiéndoles la obligación de así hacerlo constar (*jurat*), no puede reducirse a letra muerta ni tomarse livianamente. Forma parte esencial de todo el procedimiento de recusación diseñado por el legislador bajo el poder del Estado en el descargo del precepto constitucional de que las "leyes *garantizarán* la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y *protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral*". (Énfasis nuestro.) Art. II, Sec. 2, Constitución.

Por ser el trámite de recusación *limitativo de ese derecho al sufragio*, la omisión del *jurat* —al igual que la de la firma del recusante— debe aprovechar al votante al grado máximo. En este sentido, jurídicamente existen dos caminos: (1) que la negativa con la sola firma del elector se estime suficiente —conteniendo implícitamente el juramento— y por ende se repute válidamente negada la recusación, condicionando ese voto a contingencias posteriores; o (2) que se considere tal omisión un defecto de carácter sustancial que infringe y menoscaba fatalmente la ley y *anula todo el trámite de recusación* en favor del elector, impidiendo que se dilucide en sus méritos la recusación.

En recta hermenéutica constitucional-electoral, favorecemos la segunda. Si en virtud del estatuto el Poder Legislativo contempló que cuando un elector no negara por escrito firmado una recusación bien hecha, de jure, su papeleta se declararía *nula*, el Poder Judicial —correspondiendo a esa visión— no puede menos que endosar igual solución cuando la maquinaria electoral no cumple satisfactoriamente con la ley. No debemos refrendar nor-

mas, trámites y prácticas laxas de los funcionarios que en materia electoral están directamente encargados de conducir y vigilar en el día de las elecciones su implementación. Máxime cuando la interpretación versa y forma parte de una mecánica tendente a exponer al elector a una posible confiscación de su voto, violenta la confidencialidad de éste y debilita las garantías estatutarias encaminadas a evitar el fraude. Bajo este enfoque podría argumentarse que en apariencia se propicia un resultado carente de lógica —a base del supuesto de que si se cumple con la ley, y se completa todo el trámite, la recusación se ventila en sus méritos— mientras que por el contrario, si no se observa y negligentemente se omite la constancia del juramento y la firma del inspector, entonces el elector recusado obtiene el beneficio de ese descuido o laguna. No lo creemos así. Precisamente lo ilógico sería que se estimara perfeccionado en ley el trámite de recusación, contestación y juramento, cuando falta este último ingrediente esencial representativo de la manifestación externa del elector, (²) y aun así se le penalizara exponiéndolo a la ventilación en sus méritos de la recusación.

Sostenemos que el carácter sagrado y la secretividad del sufragio quedarían vulnerados y reducidos a añicos de permitirse y propiciarse que recusaciones defectuosas, incompletas o insuficientes dieran margen para discutir y anular votos. El precio que pagaría la democracia en nuestro país sería demasiado alto. En esta área debemos aspirar al perfeccionamiento y mejoramiento de las instituciones y rechazar toda tentativa que se erija sobre el conformismo o criterios de mediocridad.

En resumen, el espíritu de liberalidad judicial que ha informado nuestras pasadas decisiones en esta materia y el afán de promover normas de excelencia, nos obligan a

---

(²) Igual trámite, con la variante del fundamento, requería la ley para votar, sin tarjeta electoral, en colegio electoral cerrado. Ley Núm. 3 de 8 de septiembre de 1980, Sec. 9.

concluir, como principio rector básico, que *todo trámite de recusación que no cumpla con los requisitos de ley está errónea e imperfectamente hecho y, por lo tanto, es nulo. Por ende, la papeleta en cuestión será adjudicada sin ulterior trámite.* Bajo esta doctrina, "requisitos de ley" comprende la identificación, fundamento y firma del recusante, la negativa jurada y firmada del recusado y la constancia del *juramento (jurat)* de esa contestación mediante la firma de uno de los inspectores del colegio.[3] Aunque sería deseable, no proponemos ni pretendemos perfeccionamiento de índole notarial en la aseveración o afirmación del juramento. Lo importante es el acto de la firma del recusante,[4] del elector recusado y del inspector de colegio que toma el juramento, las cuales *así implementadas,* son elementos inseparables e indispensables para validar el trámite.

La firma es la representación gráfica del nombre y apellido de una persona, hecha de su puño y letra, en forma habitual y característica, y estampada al pie de un documento escrito a mano, a máquina, o impreso, con el único objeto de obligarse por su contenido. No es menester que exprese el nombre y el apellido completo del firmante, pues de uno u otro modo que se suscriba, la firma tiene validez. *Comoquiera que sea estampada, ella traduce una afirmación individual. En un aspecto, importa una operación intelectual, un acto con miras a la identificación personal;* bajo otro aspecto, es un conjunto ordenado de signos alfabéticos que el hombre emplea para designarse y distinguirse. Considerada como conjunto, la firma es un signo que trasunta y

[3] Claro está, excluyendo la situación en que la recusación es formulada y suscrita por un inspector del colegio. En la pugna o contienda que representa el trámite de recusación, sería absurdo, oneroso para el elector y cuestionable que el juramento de la contestación fuera certificado por el propio recusante.

[4] Bajo este prisma, sin reservas, coincidimos con la opinión del Tribunal de que la ausencia de firma por el recusante es defecto esencial que anula ab initio el trámite de recusación. No basta que al dorso de la papeleta ese recusante de su puño y letra haya consignado su nombre, sino que es menester la firma subsiguiente. Igual razonamiento se impone respecto al requisito de firma del funcionario de colegio que, luego de firmada la contestación por el elector recusado negando la recusación, toma el juramento.

prueba un pronunciamiento, *una afirmación;* puede decirse que "viene a ser la representación gráfica y auténtica de una persona y *la prueba material y visible de su conformidad con el escrito que la precede"*. Del análisis de las distintas definiciones es posible distinguir una noción común según la cual la firma es un requisito vital de ineludible empleo en la vida civil; reviste un interés particular y general; entraña un elemento de identificación del sujeto que la traza; da validez al escrito que le precede; e importa una garantía jurídica. (Énfasis nuestro.) Neri, *Tratado teórico y práctico de Derecho notarial,* 1969, T. 2, pág. 324.

Hemos visto cómo el juramento corresponde consignarlo a los funcionarios del colegio. Si uno de esos funcionarios no lo hace, la recusación y contestación —visualizada como un todo— no cumple con los requisitos de ley y por lo tanto no puede ni debe servir para exponer al elector al rigor del trámite posterior. En esas y otras instancias análogas, la presunción de idoneidad de elector no habrá quedado rebatida y le cobijará hasta la culminación del acto de votar y la ulterior adjudicación de los candidatos por él seleccionados.

[C]ualquier papeleta votada que no haya sido recusada válidamente, de cumplir con los demás requisitos, es un voto de incuestionable puridad, que posteriormente no puede bajo ninguna circunstancia ser objeto de impugnación y examen. Razones prácticas tales como que no existe constancia de la identidad del elector, que se estaría vulnerando la secretividad del sufragio y que nunca podría imprimírsele finalidad a la contienda electoral lo impiden. *P.S.P.* v. *Comisión Estatal de Elecciones,* supra.

## II

El examen individual y minucioso de las papeletas recusadas en controversia[5] elevadas ante nuestra consideración demuestra que un número sustancial está plagado de errores fundamentales y fue deficientemente

---

[5] Nos hemos circunscrito a aquellos casos sobre los cuales tenemos jurisdicción por haber sido oportunamente, dentro del término de ley, traídos ante este foro.

hecho. En particular, las siguientes recusaciones *no* fueron firmadas por el recusante o los inspectores de colegio no cumplieron con la obligación que tenían de dejar constancia del juramento (*jurat*) según exige la ley y, por tanto, son trámites de recusaciones *nulas* por defectuosas, que no afectan los votos de los electores concernidos:

(a) En favor del candidato *Osvaldo Molina:* Roberto Pérez, Nellie Cortés, Maritza Pérez Cortés, Jesús A. Acosta Berríos, Angel Tibot Solís y Raquel Rincón Uriguen. Se confirma en estos casos, por distintos fundamentos, la decisión de la Junta Revisora.

(b) En favor del candidato *Samuel Cepeda:* Carlos Rosado Santana, María Soto Dones, Norma Soto Dones, José Luis Castaño, Juan H. Carrillo, Sonia Becerril, Wanda Cotto Cantres, Lydia Cardona Lebrón, Nancy Maldonado Cruz, Ruth Rodríguez Díaz, Migdalia Sánchez Hernández, Iris Sánchez Hernández, Fernando Pagán Rodríguez, Michael Ferris, Carmen D. López Ramos, Gloria López Ramos, Annie L. Pérez Ortiz, Carlos Olmedo, José Montañez Roberto, María del Carmen Elías Medina y José González Fontánez. En la medida en que la resolución de la Junta Revisora resulta incompatible con esta determinación, debe modificarse.

Expuesto este análisis, suscribimos los pronunciamientos del Tribunal en lo concerniente a los electores que solicitaron transferencias y que por dificultades no atribuibles a ellos y omisiones en la estructura administrativa electoral no fueron procesadas: José A. Acosta, Héctor Ramos Aponte, Rafael T. Rodríguez Rodríguez y María Luz Morales Meléndez. Debe revocarse a la Junta Revisora.

Por coincidir también con el Tribunal y estimar que estaban domiciliados en el Distrito Representativo Núm. 35, deben computarse los votos emitidos por Jesusa Vizcarrondo Díaz y Lucía Avila. Por falta de jurisdicción sobre su persona y resultar insuficiente el diligenciamiento habido, debe acreditarse también el voto de Iris Raquel Castaño Monet.

No coincidimos con el análisis del Tribunal sobre la electora Awilda Moringlane Encarnación. A juicio nuestro la prueba demuestra que estaba domiciliada, con su esposo, desde hace varios años, en Santa Cruz. Sus hijos menores, bajo la custodia de la abuela materna, sí están domiciliados en Vieques. Confirmaríamos en este caso a la Junta Revisora.

## III

Hemos reflexionado sobre las alternativas de devolver el recurso a la Junta Revisora o conceder una nueva elección, contempladas en la opinión disidente. Si bien ambas opciones representan el camino más fácil de seguir, nuestra conciencia judicial nos impide adoptarlas. Nos explicamos.

Primero, la alternativa de remitir al foro de origen la adjudicación del asunto se basa expresa y taxativamente en un enfoque de dura crítica a las actuaciones de la Junta Revisora y de la Comisión Estatal de Elecciones, que forzosamente tiende a desprestigiar y minar la calidad, competencia y objetividad pública de esos organismos. Segundo, tal solución se aparta, además, de precedentes persuasivos análogos en la jurisdicción norteamericana, que en circunstancias parecidas —una vez expuestas las normas jurídicas aplicables para la evaluación de la legalidad del voto— ha utilizado la misma metodología seguida uniformemente por el tribunal hoy. Véanse *Guerra* v. *Peña*, 406 S.W.2d 769 (Tex. 1966); *Collins* v. *Collins*, 199 S.E.2d 626 (Ga. 1973). Y tercero, aun aceptando que ello fuera así ¿cómo se justifica entonces devolverles el asunto? ¿Qué garantía existe de la corrección y finalidad del dictamen que entonces se produzca? ¿No estamos con ello posponiendo irrazonablemente y por más tiempo que siga en entredicho la composición de la Asamblea Legislativa?

En cuanto a la alternativa de conceder una nueva elección, el razonamiento y motivos que animan esa recomen-

dación, aunque loable, es contraria a la doctrina prevaleciente sobre el trasfondo circunstancial que imperativamente debe existir para tal remedio. Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections*, 49 N.Y.U.L. Rev. 1092 (1974).

También vuelve a inyectar en el país las excitaciones, rivalidades y animosidades que caracterizan la contienda pública y tiende a perturbar la paz comunitaria, estabilidad y seguridad de las instituciones. Es un remedio extremo que implícitamente y por unanimidad este Tribunal declinó en abono de devolver al pueblo confianza, finalidad y tranquilidad en el proceso de las urnas —ante la impugnación de la certificación del cargo de Gobernador predicada también, entre otras, en el estrecho margen electoral— aún estando todos conscientes del siguiente escenario fáctico:

No se puede debatir seriamente que el desarrollo de las recientes elecciones no estuvo a la altura deseada ni exento de muchas de las fallas que tradicionalmente, en mayor o menor grado, agobian y caracterizan el proceso. El estrecho margen de votos entre los partidos principales —en un sistema cuya ley y estructura no estaban diseñadas para esa eventualidad y un país cuya ciudadanía no estaba acostumbrada a ello— ha contribuido al desasosiego y malestar. La tardanza inevitable que implica la relevancia que entonces toman las irregularidades inevitables y naturales habidas en un proceso que conlleva la movilización, participación y decisión de más de un millón y medio (1,500,000) de personas, y la importancia que a cada voto potencial determinado partido político le atribuye, forman parte del medio ambiente, premisas intangibles y otros factores en que se debaten los reclamos de las partes en estos recursos. *Tomamos conocimiento judicial de que en estas elecciones hubo exclusiones indebidas de electores de las listas, dobles inscripciones, errores o falta de procesamiento en las solicitudes de transferencias de precinto y otras más.* (Énfasis nuestro.) *P.S.P.* v. *Comisión Estatal de Elecciones*, supra.

## IV

Finalmente, endosamos los pronunciamientos que a manera de epílogo consigna la opinión del Tribunal sobre el reclamo de si la Junta Revisora actuó o no parcialmente. Ante el público, casos de esta naturaleza tienden a exaltar los sentimientos y a exacerbar individual y colectivamente las rivalidades y animosidades político-partidistas. A menudo se incurre en el error analítico o se cae en la superficialidad de criticar o elogiar la imparcialidad y ecuanimidad de los organismos adjudicadores por los resultados, y no por la corrección, fuerza persuasiva y nitidez de los fundamentos del dictamen. Esa actitud y postura —hijas más bien de la irreflexión o ceguera partidista— pasa por alto que cualesquiera decisiones ". . . deben fundarse en la vigencia plena del estado de Derecho y en la protección de los derechos políticos y sociales que entran en juego en la administración de la Ley Electoral, y no en preferencias políticas —a pesar de su organización eminentemente política.

En la función del juzgar, ya sea en juntas y otros organismos administrativos con atribuciones cuasi-judiciales, como en el foro propiamente judicial, es a los hombres del Derecho a quienes corresponde superar, más que nunca —*con ponderado juicio y libertad de conciencia en sus determinaciones judiciales*— *las histerias públicas que las pasiones políticas generan, asumiendo la responsabilidad de reafirmar los derechos del hombre en el orden jurídico-constitucional, para dar al imperio de la Ley sentido válido de utilidad social.*" (Énfasis nuestro.) *Partido Nuevo Progresista* v. *J.E.E.*, 96 D.P.R. 961, 962–963 (1968).

Acatando esa indelegable responsabilidad es que, por los fundamentos expuestos y como único remedio legítimo procedente en estricta juridicidad, concurrimos con la decisión de que debe certificarse al recurrente Samuel Cepeda para el escaño del Distrito Representativo Núm. 35.

## *APENDICE A*
## RECUSACION

Yo, _____, elector
debidamente inscrito, del precinto _____ de
_____, con dirección permanente en
_____
_____ recuso el voto del elector
_____, del colegio _____
del precinto _____ del municipio _____,
por los siguientes fundamentos: _____
_____
_____

_____
Recusador

## JURAMENTO

Yo, _____ , de _____
años de edad, de estado civil _____
y dirección residencial permanente en _____
_____, Puerto Rico, bajo juramento declaro:

1. Que mi nombre y demás circunstancias son las anteriormente expresadas.

2. Que niego bajo juramento los fundamentos alegados para recusar mi voto por ser falsos.

En _____ , Puerto Rico, hoy _____ de
_____ de 19

_____
Recusado

_____
Funcionario que toma el juramento

—O—

Opinión disidente del Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 23 de junio de 1981

Mi conciencia judicial no queda satisfecha ni con el resultado a que llegó la Junta Revisora Electoral al adjudicar el resultado de la elección del Distrito Representativo Núm. 35, ni con el resultado a que llega el Tribunal hoy al revisar el defectuoso y confuso récord de los apresurados procedimientos seguidos ante la referida Junta Revisora. En una elección tan cerrada ninguna de las dos decisiones garantizan la legitimidad de los márgenes. Para mí es claro que la intervención judicial es algo más que tenderle un manto de protección a los precedimientos habidos ante la Junta Revisora Electoral. Ante las graves dudas rehúso concederle finalidad a unas determinaciones inconclusas que representan una finalidad más artificial que cierta. Ordenaría una nueva elección en el Distrito Representativo Núm. 35.

I

Quede claro de entrada que la Constitución del Estado Libre Asociado de Puerto Rico garantiza la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protege al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. Art. II, Sec. 2. Esa expresión de la voluntad, o derecho al sufragio, que tiene el ciudadano constituye la espina dorsal de la sociedad democrática, y cualquier restricción al derecho de expresarla hiere el corazón del gobierno representativo. *Reynolds* v. *Sims*, 377 U.S. 533, 555 (1964). "Y el derecho al sufragio puede ser tan efectivamente negado por la adulteración o dilución del peso del voto de un ciudadano como por la total prohibición del libre ejercicio de la prerrogativa constitucional." *Id.*

En otras palabras, el ciudadano tiene tanto derecho a

que su voto cuente como a que su voto no se diluya al permitir que se cuente el voto ilegal de otro ciudadano. Al efecto la ley autoriza a los electores a recusar los votos de otros electores si tienen "motivos fundados" para creer que son ilegales, por los fundamentos que la propia ley dispone. 16 L.P.R.A. sec. 3234. Este derecho de recusación protege el derecho al sufragio evitando la dilución del voto. Por otro lado, la ley permite al elector recusado el negar la recusación, protegiéndole también a éste su derecho al sufragio. *Id.*

Las controversias en este recurso surgen precisamente como consecuencia de la validez o invalidez de un número de recusaciones así como de las contestaciones a dichas recusaciones. Las modalidades que surgen de ello toman varias formas que exigen sean consideradas desde distintos prismas jurídicos, a saber:

1. Si al decir la ley que el elector recusante deberá hacer al dorso de la papeleta "una breve anotación firmada por la persona . . . que hace la misma, exponiendo la razón de tal recusación . . .", debe entenderse que la firma debe suscribirse al pie de la anotación, y que, por tanto, el escribir de su puño y letra: Yo, Fulano de Tal, recurso a Zutano de Tal . . . etc." no la hace válida por no estar firmada.

2. Si al decir la ley que elector recusado, al negar la recusación, "deberá hacerlo bajo su firma y juramento al dorso de la papeleta . . .", debe entenderse que el recusado debe afirmar su negativa con la expresión "bajo juramento", y que el funcionario que toma el juramento debe autenticar la firma del recusado.

3. Si la recusación por domicilio (que constituye la razón más frecuente de recusación en los casos objeto de este recurso) es válida a la luz de la normas requeridas por la Ley Electoral. Y, si al aplicar dichas normas a los hechos presentes en cada caso, debe aplicarse el estándar de prueba utilizado en los casos civiles (a distinción de los casos criminales) conocido como "preponderancia de la prueba" u otro estándar de prueba más riguroso, tal como el de "prueba clara, robusta y convincente".

4. Si las fallas habidas al cumplimentar los formularios sobre transferencias de electores, por razón de cambios de domicilio, durante el proceso de inscripción y transferencia, deben perjudicar al elector si el error fue producido por el funcionario a cargo de la inscripción.

Discutiré más adelante las principales modalidades que cobran las controversias suscitadas. Pero antes deseo exponer el clima que imperaba al surgir la crisis motivada por el estrecho margen de votos que resultó al terminar la Comisión Estatal de Elecciones de contar los votos adjudicados a los candidatos al cargo de Representante a la Cámara por el Distrito Representativo Núm. 35, que comprende los precintos de Río Grande (97), Luquillo (98), Fajardo (99), Culebra (100), Vieques (101) y Ceiba (102).

## II

El drama comenzó al anunciar la Comisión Estatal de Elecciones que el candidato a representante a la Cámara por el Partido Nuevo Progresista, Osvaldo Molina, había obtenido un margen de ventaja de cinco (5) votos sobre el candidato del Partido Popular Democrático, Samuel Cepeda. Antes de que se certificaran los resultados, el Partido Popular y su candidato Cepeda apelaron ante la Junta Revisora Electoral impugnando la adjudicación de trece (13) papeletas, lo que más tarde ampliaron con cuarenta y siete (47) papeletas adicionales, para un total de sesenta (60) papeletas impugnadas. El Partido Nuevo y su candidato Molina, por su parte, impugnaron la adjudicación de cuarenta y seis (46) papeletas, para luego ampliar la impugnación con siete (7) papeletas adicionales, para un total de cincuenta y tres (53) papeletas.

Ante los varios escritos presentados ante este Tribunal por las partes envueltas en que el Partido Popular y Cepeda impugnaban la jurisdicción original de la Junta Revisora para entender en las impugnaciones presentadas por el Partido Nuevo y Molina, y la defensa de dicha

jurisdicción original de parte de estos últimos, autorizamos en 24 de diciembre de 1980 a la Junta Revisora a entender en la consideración de todas las papeletas impugnadas por las partes, y le concedimos un término de siete (7) días, hasta el 31 de diciembre de 1980, para la dilucidación y resolución de todas las papeletas envueltas. *Molina* v. *Barreto Pérez*, 110 D.P.R. 513 (1980).

En 29 de diciembre la Junta Revisora nos impuso de las dificultades que se confrontaba para resolver los casos pendientes para la fecha límite de 31 de diciembre que este Tribunal había fijado. Nos informaron:

1. Que nuestra resolución anterior de 23 de diciembre sobre paralización de procedimientos "ocasionó un serio desbalance ya que las partes y la Junta perdieron contacto y control de los testigos previamente citados y bajo las reglas de la Junta. Se perdieron dos días de Vistas por las partes no tener su prueba en sala. Hubo que volver a expedir citaciones".

2. Que las vistas fueron reanudadas el sábado 27 de 9:00 a.m. a 1:15 de la madrugada, y que recesaron a solicitud de las partes por inconvenientes para traer sus testigos para el lunes 29.

3. Que en el caso de las 54 impugnaciones así como en el de las 47 impugnaciones existían múltiples situaciones, siendo necesaria la presencia del recusador, el recusado y los varios testigos de ambas partes para sostener sus alegaciones.

4. Que en la gran mayoría de los casos los electores son de sitios tan distantes como Vieques.

5. Que estimaban que la dilucidación y resolución de cada caso, a base de dos horas por caso, tomaría alrededor de varias semanas.

6. Que requerían un término razonable adicional de acuerdo con las circunstancias prevalecientes.

Ante la situación planteada por la Junta le concedimos

un plazo adicional de quince (15) días para dilucidar y resolver los ciento trece (113) casos que tenían ante sí.

En 7 de enero de 1981 comparecieron el Partido Popular y Cepeda ante nosotros (O-80-713) y entre otras cosas nos dijeron lo siguiente:

En la tramitación de estos casos no ha sido posible establecer un orden lógico de clase alguna. La prueba de que un elector no reside en determinado precinto es generalmente seguida por prueba similar que envuelve a otra persona. La prueba dirigida a establecer la condición de elector legítimo del distrito representativo número 35 se presenta frecuentemente varios días después. Esto, por supuesto, ha sido una medida indispensable dirigida a proteger las partes de la premura con que debe desfilar la prueba, la ausencia de una oportunidad adecuada para que los abogados se preparen y la gran dificultad que significa el no haber podido hacer uso efectivo de los medios de descubrimiento de prueba.

La situación se ha agravado por el hecho de la dilación inexplicable de la Comisión Estatal de Elecciones en producir las papeletas recusadas. La ausencia de este documento ha creado controversias frecuentes, ha propiciado la presentación de prueba inútil y ha impedido que se objete la introducción de prueba que no guarda relación con el motivo por el cual la papeleta fue recusada el día de las elecciones.

Al referirse el Partido Popular y Cepeda a la necesidad de que se tomaran medidas cautelares en protección de las grabaciones de los testimonios, para sustituir la exposición narrativa, nos dijeron (O-80-713):

. . . la propia naturaleza de las controversias dificultará que los abogados de los dos partidos adversarios puedan ponerse de acuerdo sobre la prueba que desfiló sobre determinado elector.

. . . la prueba relacionada con un elector surge de forma intermitente y puede haberse esparcido durante tres o cuatro días de sesión.

. . . el crecido número de casos de electores recusados y de días de sesión obstaculizarán la utilización del recuerdo.

. . . . la extensión de los procedimientos ha requerido que

ambas partes utilicen un número considerable de abogados, los que no están simultáneamente en el salón de sesiones.

La propia Junta Revisora en su resolución de los casos objeto del presente recurso manifestó (pág. 5):

La Junta se confrontó con serias dificultades procesales en la vista de estos casos ya que con la premura que tuvo que proceder, las partes no pudieron radicar alegaciones responsivas ni procedimiento alguno que en circunstancias normales hubieran simplificado las cuestiones litigiosas.

Los casos se vieron fraccionados y con alteraciones constantes del orden de la prueba ya que las partes se confrontaban con el problema de citar a los testigos con poco tiempo y los mismos eran en la gran mayoría de lugares distantes como Vieques, además de ser personas humildes y de poca preparación académica. Si a todo esto le añadimos el período Navideño y un horario irregular, vemos que el procedimiento fue el mejor dentro de las circunstancias.

En el trasfondo de estos procedimientos, el país entero se encontraba en tal estado de tensión motivado por la incertidumbre reinante respecto a los resultados electorales finales, que nos movió a repetir en 24 de diciembre (O-80-713) lo que ya habíamos expresado en 14 de noviembre anterior en *P.P.D.* v. *Barreto Pérez*, 110 D.P.R. 376 (1980):

El país está atravesando momentos de gran dificultad y tensión. En estas trabajosas circunstancias, es imprescindible que se actúe con serenidad y sensatez. Lo vital es que triunfe el pueblo entero de Puerto Rico; que no se reduzca la calidad de su democracia ni se mancille la limpieza de sus procesos electorales; que se respeten escrupulosamente nuestra Constitución y nuestras leyes. Hacemos un llamado al país para mantener en toda ocasión la máxima tranquilidad y mesura.

Las circunstancias relatadas precedentemente dan una idea cabal de las dificultades a que se enfrentaban la Junta Revisora, los recusadores, los testigos y los abogados de las partes, especialmente si se tiene en cuenta la

presión del corto tiempo al que estaba limitada la contienda en el nivel administrativo por la orden emitida por este Tribunal sin percatarse de la magnitud de los procedimientos, unido esto a la exaltación de las pasiones de la ciudadanía. Es evidente que en esas circunstancias ni los electores recusantes (en protección de la dilución de su voto) como tampoco los recusados (en protección de su derecho a que su voto fuese contado) podían gozar del debido proceso de ley a fin de defender sus respectivos derechos al sufragio. Véase *Márquez* v. *Junta Insular de Elecciones*, 41 D.P.R. 1 (1930). Los procedimientos ante la Junta estuvieron, pues, tan viciados que no puede justificarse su decisión en cuanto a los casos que ante ella se ventilaron. Un examen detenido de la transcripción de los testimonios vertidos revelan, cuando menos, una desconfianza motivada por la ausencia de la serenidad que es condición absoluta para decisiones pausadas y mesuradas que inspiren algún grado de certeza.

Dramatiza más aún la situación el escaso margen de cinco (5) votos por el que resultó ganador Molina en el escrutinio de la Comisión Estatal de Elecciones, y luego el también escaso margen de veintitrés (23) votos obtenido por Molina tras la apelación a la Junta Revisora, y ahora el de nueve (9) votos a favor de Cepeda, adjudicados mediante la opinión de este Tribunal. A continuación paso a exponer las fallas jurídicas que estimo contiene la opinión del Tribunal en cuanto a la utilización de ciertos criterios normativos que expone y adopta.

### III

El primero de los criterios que adopta el Tribunal abandona el estándar de prueba existente en casos civiles al efecto de que las determinaciones de hecho se hacen a base de la preponderancia de la prueba; y exige, para casos *electorales*, una prueba más rigurosa que denomina "prueba clara, robusta y convincente". Lo que sorprende

no es la adopción del nuevo criterio, sino su utilización para dejar sin efecto las determinaciones que hizo la Junta Revisora a base del estándar de prueba vigente en esta jurisdicción para casos civiles, conforme lo dispuesto por nuestra Ley de Evidencia, Regla 10(F), que reza así:

En los casos civiles la decisión del juzgador deberá producirse de acuerdo con la preponderancia de las pruebas a base de criterios de probabilidad; en casos criminales la culpabilidad del acusado debe establecerse más allá de duda razonable.

Concluye el Tribunal lo siguiente:

Cuando las determinaciones de hecho, en un asunto de tanta trascendencia, se basan en un criterio de prueba *erróneo*, ni podemos, ni debemos estar obligados por ellas. En tales circunstancias es nuestro deber *reevaluar* la prueba a tenor de los criterios correctos y hacer las determinaciones que sean procedentes. (Énfasis nuestro.)

Comienzo por decir que no he podido encontrar un caso *electoral* de esta jurisdicción en que se haya impuesto el criterio de "prueba clara, robusta y convincente". Tampoco he podido localizar precedente alguno en la jurisdicción federal, en que se haya establecido ese criterio de prueba en casos *electorales*. Por tanto, la Junta Revisora no podía exigir prueba más rigurosa que la que hasta entonces se exigía en casos civiles. No hizo otra cosa que ajustarse a las normas existentes en esta jurisdicción. Si este Tribunal ha decidido variar dicha norma de prueba, por entender que es requisito constitucional, lo menos que puede hacer es remitir nuevamente los casos en que tal norma está en cuestión para que sea la Junta Revisora la que evalúe la evidencia presentada ante ella a base de la nueva norma.

La opinión del Tribunal cita varios casos resueltos por el Tribunal Supremo de los Estados Unidos en los que se ha requerido "prueba clara, inequívoca y convincente" como estándar de prueba en casos de deportación de un ciudadano y de desnaturalización bajo las leyes federales

de inmigración. *Woodby* v. *INS*, 385 U.S. 276 (1966); *Schneiderman* v. *United States*, 320 U.S. 118 (1943). En el caso de *Woodby* el Tribunal Supremo federal exigió, amparado en el precepto constitucional de debido proceso de ley, la norma de "prueba clara, inequívoca y convincente", por ser más rigurosa que la de "razonable, substancial y probatoria" aplicada por el Servicio de Inmigración y Naturalización. Pero nótese que en *Woodby* no se hizo disposición final alguna a favor del apelante, sino que el Tribunal Supremo federal devolvió el caso al Servicio de Inmigración y Naturalización para que se hiciese allí la determinación que procediese bajo la norma más estricta. Adviértase que el Tribunal Supremo no dispone finalmente del caso, sino que lo remite al juzgador de los hechos. También devolvió el caso de *Schneiderman* al tribunal de circuito para las determinaciones que procediesen sobre una controversia respecto a la desnaturalización de un ciudadano americano sin haberse probado en instancia su falta de adhesión (*attachment*) a la Constitución con prueba "clara, inequívoca y convincente".

Merece un comentario el caso de *Addington* v. *Texas*, 441 U.S. 418 (1979), que cita el Tribunal en su opinión de hoy. Se trata de una persona que está siendo recluida contra su voluntad en un hospital de enfermos mentales bajo la ley del estado de Texas. El tribunal estatal de instancia instruyó al jurado que el Estado debía demostrar mediante prueba "clara, inequívoca y convincente" que el apelante estaba mentalmente enfermo y que requería hospitalización para su propio bienestar y para la protección de otros. El jurado determinó, a base de dicho estándar de prueba, que debía ser hospitalizado. En apelación, el tribunal estatal intermedio revocó por entender que el estándar de prueba debía ser más estricto y requirió el de "fuera de duda razonable", que es el mismo que se aplica en casos penales. El Tribunal Supremo de Texas revocó y reinstaló la reclusión del apelante por entender que el estándar

aplicado por el tribunal de instancia (el juzgador) era más riguroso que el de "preponderancia de la prueba", y determinó que este último era el estándar adecuado. El apelante acudió al Tribunal Supremo de los Estados Unidos por los derechos que le confiere la Enmienda 14. El Tribunal Supremo federal revocó al Supremo estatal, declarando que el estándar de preponderancia de la prueba no era suficiente constitucionalmente para privar de la libertad a una persona en las circunstancias del apelante. Pero no hizo disposición final del caso, sino que lo devolvió al Supremo estatal para que éste determinara la norma que habría de utilizar en casos de reclusión involuntaria de enfermos mentales, no pudiendo ser dicha norma menos estricta que la de "clara y convincente". Expresó, además, que la norma de "clara, inequívoca y convincente" que había adoptado el juzgador no tenía que ser tan rigurosa si el Supremo estatal así lo estimaba. Específicamente dijo que lo de "inequívoco" no era constitucionalmente requerido. Añadió que a los fines del debido proceso de ley "el estándar debe informar al *juzgador de los hechos* que la prueba debe ser mayor que la preponderancia de la evidencia". (Énfasis nuestro.) Evidentemente, el juzgador de los hechos tendría una nueva oportunidad para evaluar la prueba bajo cualquier nueva norma más estricta que impusiere el Tribunal Supremo de Texas, pero al igual que los casos de *Woodby* y *Schneiderman*, supra, la decisión del Supremo estatal no constituiría necesariamente una disposición final del caso.

Resulta muy pertinente, por su contenido jurídico aplicable a los casos de autos, la exposición que hace el Tribunal Supremo federal en *Addington* v. *Texas*, supra, pág. 423, sobre la función de la norma sobre la prueba:

La función de un criterio de prueba, en cuanto dicho concepto tiene cabida en la Cláusula del Debido Proceso y en la función de determinar los hechos, es la de "instruir al juzgador sobre el grado de confianza que nuestra sociedad

entiende que él debe tener en la corrección de sus conclusiones sobre los hechos para un tipo particular de adjudicación". *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurrente). El criterio sirve para ubicar el riesgo de error entre los litigantes y para indicar la relativa importancia que la decisión final debe tener.

Se desprende de lo citado que al hablar de prueba preponderante o de prueba clara, robusta y convincente, o de cualquier otro estándar de evidencia, no se habla meramente de cualidades de la evidencia, sino del grado de efecto persuasivo que ésta debe tener en la mente del juzgador, en función de la importancia que para los litigantes tiene la determinación de hecho de que se trate. Véase McCormick, *Handbook of the Law of Evidence*, 2da ed., 1972, Sec. 339.

Según McCormick, *supra*, el criterio de preponderancia se puede definir a base de probabilidad: que se persuada al juzgador de que la ocurrencia del hecho que se intenta probar sea más probable que su no ocurrencia. El criterio de evidencia clara y convincente —o sus variantes— exige no sólo una mayor probabilidad, sino una alta probabilidad de la ocurrencia del hecho. *Id.*, Sec. 340.

Nuestras Reglas de Evidencia de 1979, en su Regla 10, establecen unos principios sobre evaluación y suficiencia de la prueba a base de los cuales el juzgador debe hacer sus conclusiones de hecho:

*Regla 10. Evaluación y suficiencia de la prueba*

El tribunal o juzgador de hechos deberá evaluar la evidencia presentada, a los fines de determinar cuáles hechos han quedado establecidos o demostrados, con sujeción a los siguientes principios:

(A) El peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por ninguna de las partes.

(B) La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en la cuestión en controversia.

(C) *Para establecer un hecho* no se exige aquel grado de prueba que, excluyendo posibilidad de error, produzca absoluta certeza; *solo se exige la certeza o convicción moral en un ánimo no prevenido.*

(D) La evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley otra cosa se disponga.

(E) El tribunal o jurado no está obligado a decidir de conformidad con las declaraciones de cualquier número de testigos, que no llevaren a su ánimo la convicción contra un número menor u otra evidencia que le convenciere.

(F) *En los casos civiles la decisión del juzgador deberá producirse de acuerdo con la preponderancia de las pruebas a base de criterios de probabilidad;* en casos criminales la culpabilidad del acusado debe establecerse más allá de duda razonable.

(G) Cuando pareciere que una parte, pudiendo haber ofrecido una prueba más firme y satisfactoria, ofrece una más débil y menos satisfactoria, la evidencia ofrecida deberá mirarse con sospecha.

(H) Cualquier hecho en controversia es susceptible de ser demostrado mediante evidencia directa o mediante evidencia indirecta o circunstancial. Se entiende por evidencia directa aquella que prueba el hecho en controversia sin que medie inferencia o presunción alguna, y que de ser cierta demuestra el hecho de modo concluyente. Se entiende por evidencia indirecta o circunstancial aquella que tiende a demostrar el hecho en controversia probando otro distinto, del cual —en unión a otros hechos ya establecidos— puede razonablemente inferirse el hecho en controversia. (Énfasis nuestro.)

Así, cuando el criterio es de preponderancia de prueba la parte que tiene la obligación y el peso de persuadir al juzgador sobre la existencia de un hecho, debe ofrecer prueba de tal credibilidad y suficiencia que al juzgador contrapesarla con la evidencia contraria, pueda concluir que la ocurrencia del hecho es más probable que la no ocurrencia. Según se incrementa la rigurosidad del estándar de prueba, mayor certeza debe tener el juzgador de la corrección de su conclusión.

Este proceso de recibir y evaluar la prueba es subjetivo y complicado, matizado por innumerables factores que son de difícil apreciación, particularmente el relativo a la credibilidad que la prueba ha merecido al juzgador, cuya apreciación está prácticamente vedada a un tribunal apelativo. Es por ello que normalmente, en ausencia de error manifiesto, pasión, prejuicio o parcialidad, este Tribunal no interviene con la apreciación que de la prueba haga el tribunal de instancia. *Pueblo* v. *Millán Meléndez*, 110 D.P.R. 171 (1980); *Pueblo* v. *López Pérez*, 106 D.P.R. 584 (1977); *Morán Simó* v. *Gracia Cristóbal*, 106 D.P.R. 155 (1977); *Soc. de Gananciales, etc.* v. *Presbyterian Hosp.*, 88 D.P.R. 391 (1963); *E.L.A.* v. *Cía. de Ferrocarriles de P. R.*, 83 D.P.R. 587 (1961).

Tratándose de decisiones de organismos administrativos, reconociendo la pericia particular que tiene cada organismo en cuanto al tipo de casos que examina, se ha establecido como norma general que no solamente deben aceptarse las conclusiones de hecho que estén sostenidas por la prueba según la totalidad del récord, sino que además debe dársele gran deferencia a las conclusiones de derecho del organismo administrativo. Véase *J.R.T.* v. *Escuela Coop. E. M. de Hostos*, 107 D.P.R. 151 (1978), opinión concurrente del Juez Presidente, señor Trías Monge.

La propia Ley Electoral da vigencia al principio de revisión limitada al disponer en su Art. 1.024 (16 L.P.R.A. sec. 3024):

Las determinaciones de *hecho* de la Junta serán finales, pero cualquier parte perjudicada podrá entablar recurso de revisión fundamentado en cuestiones de *derecho* para ante el Tribunal Supremo de Puerto Rico . . . (Énfasis nuestro.)

La Junta Revisora Electoral, que tuvo ante sí toda la voluminosa prueba ofrecida por las partes, hizo unas determinaciones de hecho abrigando en su "mente" el grado de certeza que tradicionalmente se ha requerido en

casos civiles. En un contexto tan complicado y confuso como el del presente caso, al variar este Tribunal el grado de certeza que constitucionalmente requiere ahora a uno más estricto que el existente, no puede colocarse ipso facto en igual posición que la Junta para efectuar una evaluación independiente de la prueba a la luz del nuevo estándar. Esto es particularmente evidente al considerar que la Junta recibió un volumen cuantioso de evidencia durante el corto tiempo a que la limitó este Tribunal, por lo que se vio precisada a resumir la evidencia sin que necesariamente señalara aquella evidencia que consideraba creíble y aquella que descartó por no haberle merecido crédito, limitándose a expresar que la preponderancia de la evidencia sostenía tal o cual conclusión. (Notamos cómo mientras en algunos casos sí dijo qué evidencia de la resumida le merecía credibilidad, en otros excluyó de su resumen evidencia recibida, y en otros casos incluyó en el resumen evidencia conflictiva.) No es posible, pues, para este Tribunal, aun si pudiese reevaluar la evidencia, dilucidar si es clara, robusta y convincente para sostener determinado hecho, si sólo se desprende que la Junta encontró evidencia preponderante de la ocurrencia de ese hecho, sin que haya indicio de cuál evidencia específica fue considerada y cuál fue descartada. Aun presumiendo que este Tribunal hubiere sostenido la norma de preponderancia de la prueba que utilizó la Junta Revisora Electoral, no hubiera estado en condiciones de reevaluar la prueba desfilada ante la Junta en consideración a los principios expuestos precedentemente contenidos en la Regla 10 de las de Evidencia y particularmente el elemento subjetivo primordial relativo a la credibilidad, que mereció la prueba a la Junta juzgadora de los hechos.

De los principios sobre evaluación y suficiencia de la prueba que hemos examinado, se desprende que el estándar de evidencia no sólo constituye una guía para el juzgador sobre el grado de convicción que deben llevar sus

determinaciones de hecho, sino que además informa a las partes en cuanto a la suficiencia y calidad de la evidencia que deben ofrecer para lograr persuadir al juzgador de su posición. Las partes en este caso —recusantes y recusados representados por los partidos— que en defensa de sus respectivos derechos electorales presentaron evidencia que confiaban era suficiente para prevalecer, a la luz del estándar tradicional, tienen un claro derecho bajo normas mínimas de debido procedimiento de ley a presentar evidencia que pueda cumplir con el nuevo estándar, cuya aplicación establece este Tribunal por primera vez para casos electorales al resolver controversias y disposiciones de la Ley Electoral a las que nunca antes nos habíamos enfrentado. El asumir el Tribunal hoy la prerrogativa de reevaluar la prueba bajo el nuevo y sorpresivo estándar de prueba clara, robusta y convincente es claramente una violación del debido proceso de ley que ampara tanto al recusante como al recusado, y que este Tribunal viene obligado a proteger bajo las constituciones del Estado Libre Asociado de Puerto Rico y de los Estados Unidos.

## IV

El segundo de los criteros adoptados por el Tribunal rechaza la validez de las recusaciones hechas al dorso de la papeleta en las que el recusador no estampó su firma al pie de la anotación en que expone la razón de la recusación. El Tribunal apoya su decisión en la definición que de la firma contiene el *Diccionario de la Real Academia Española* al efecto de que la firma es el nombre y apellido de una persona que ésta pone con rúbrica al pie de un documento escrito de mano propia o ajena, para darle autenticidad o para obligarse a lo que en él se dice. Acto seguido da como ejemplo el requerimiento solemne que exige la ley para los testamentos ológrafos en el sentido de que la firma debe concluirlo, cerrarlo o finalizarlo. 31 L.P.R.A. sec. 2161; *Castañer* v. *Tribl. Superior*, 81 D.P.R.

869 (1960). Con respecto al requisito de la firma en los testamentos ológrafos, dice Puig Peña que la firma es la que distingue el testamento acabado del proyecto de testamento. Puig Peña, *Tratado de Derecho Civil Español*, T. V, Vol. 1, pág. 242, n. 34. Esto es así para que haya la certeza, luego de muerto el testador, de que el testamento fue concluido, y por ello la ley no reconoce las adiciones que aparezcan después de la firma, a menos que éstas sean también firmadas y fechadas, para que quede así demostrado que la firma es "una última suscripción de la voluntad testamentaria, conocida y apreciado todo el texto que la precede". *Castañer v.* Tribl. Superior, supra, pág. 872. La solemnidad exigida para los testamentos ológrafos no es requerida por la Ley Electoral para la firma del recusador, pues ni siquiera exige que la recusación sea bajo juramento ni expone al recusador a la sanción penal del perjurio. 16 L.P.R.A. sec. 3234; *P.S.P.* v. *Comisión Estatal de Elecciones*, 110 D.P.R. 400 (1980). La informalidad del procedimiento es tal que solo exige que el recusador tenga motivos fundados para creer que el voto es ilegal por una de las razones que dispone la ley.[1] *A contrario sensu,* la ley exige que el elector recusado, para que su voto se cuente, niegue la recusación "bajo su firma y juramento". La negativa, por tanto, constituye un acto formal *vis-à-vis* la informalidad de la recusación.

Las papeletas rechazadas por la falta de la firma del recusador expresan en puño y letra del recusador esencialmente lo siguiente: "Yo, Fulano de Tal, recuso al elector Zutano de Tal, por no residir en el precinto X". Aunque el nombre del recusador no está al pie de la anotación que comprende la recusación, está escrito de su puño y letra, y bajo su nombre y responsabilidad expone el motivo de la recusación. ¿Es que es necesario que vuelva a firmar para asegurar que lo que él afirma es cierto? Entendemos que

[1] El Tribunal no considera las implicaciones constitucionales respecto a la informalidad del acto de recusar a un elector.

la inadvertencia de no haber firmado se debe a que el formulario preimpreso que la ley ordenaba originalmente que se adhiriera a la papeleta, y que contenía los blancos que guiaban al recusador en el proceso de recusación, fue abandonado por una enmienda posterior que solo requiere al Administrador que envíe a cada colegio de votación "un modelo de Recusación para *orientar* a la Junta del Colegio de Votación cómo cumplimentar una recusación". (Énfasis nuestro.) Ley Núm. 4, 20 de diciembre de 1977, según enmendada por Ley Núm. 3, 8 de septiembre de 1980. Aparte de ese modelo, cuya finalidad es *orientar* a la Junta, la ley no contiene disposición alguna que dé luz sobre el requisito de la forma, como tampoco la tiene el Reglamento de la Comisión Estatal de Elecciones adoptado para instrumentar la Ley Electoral. Aprobado en 1 de octubre de 1980. Competía, pues, a la Junta del Colegio de Votación orientar y supervisar la labor de recusación para que la misma fuera efectiva. La falta de la Junta del Colegio al no advertir al recusador que, además de escribir su nombre debía firmar la recusación al final, no debe invalidar el derecho de un elector a recusar a otro elector en aras de proteger la dilución de su voto y, por tanto, su derecho al sufragio.

El *Diccionario Enciclopédico de Derecho Usual* divide el concepto de firma en lo que considera sus dos componentes, a saber: (1) su expresión material y (2) su valor. En cuanto a su expresión material, dice que el Profesor Lessona, Profesor de Procedimiento Civil de la Universidad de Siena "que se ha ocupado monográficamente de la *firma*, expresa que no está definida por la ley, cosa laudable por cuanto se ajusta al espíritu antiformalista del Derecho moderno". Observa además Lessona que "[*l*]*o que la ley pide es la expresión de la identidad de la persona y de la letra*; el juez es quien en cada caso debe aseverarla". (Énfasis nuestro.) En cuanto al valor de la firma, recalca el Diccionario citado que "[l]a firma acredita la compare-

cencia de la persona y la conformidad con los hechos y declaraciones que suscribe, salvo haber sido obtenida por sorpresa, engaño o violencia". *Diccionario Enciclopédico de Derecho Usual*, 14ta ed., Ed. Heliasta, 1979, T. III.

Luego de esa acepción de lo que constituye la firma proveniente de la prestigiosa obra y profesor citados, es forzoso concluir que el recusante, habiendo puesto su nombre de su puño y letra, y habiendo expresado su conformidad con los hechos y declaraciones que suscribe voluntariamente, convenció al recusado, en cada caso, de la seriedad de su actuación, lo que motivó a éste a contestar la recusación. Mejor demostración de la eficacia de la actuación del recusante es difícil obtenerla. De haber tenido dudas el recusado de que el recusador no intentaba recusarlo, es de suponerse que no hubiese contestado la recusación. Debe presumirse que en esas circunstancias las actuaciones recíprocas de los electores recusantes y recusados son válidas. Es significativo que tanto la Comisión como la Junta aceptaron como válidas las recusaciones, aun sin estar firmadas por el recusador al pie de la anotación, presumiblemente por considerar que la afirmación hecha por el recusante, de su puño y letra, y bajo su nombre escrito también de su puño y letra, cumplían con el requisito de firma de la ley. Debe advertirse que la Junta consideró los nueve casos envueltos en sus méritos sin que el tecnicismo de la firma fuera óbice para ello.

## V

No entramos a discutir el resto de los criterios expuestos por el Tribunal por considerar que los ya discutidos son suficientes para sostener un resultado distinto al que hoy llega el Tribunal. Tampoco entramos a discutir los méritos de cada una de las papeletas objeto de apelación por entender, como dijimos al principio de esta disidencia, que los procedimientos habidos ante la Junta están viciados por las irregularidades resultantes de unos procedi-

mientos apresurados, desordenados y desorientados, causados en gran medida por la limitación de tiempo que le impusimos, sin advertir la magnitud de las dificultades que acarreaba la movilización de personas, la preparación de la prueba de todas las partes envueltas y la difícil labor de la Junta Revisora Electoral. Basta mencionar para dar una idea de ello: que la transcripción de testimonios se extiende a casi 6,000 páginas, se grabaron los procedimientos en 47 cintas de 4 horas de duración cada una, la resolución de la Junta es de casi 200 páginas, y el horario de vistas diarias ante la Junta fue de 9 de la mañana a 12 de la noche, habiéndose extendido en varias ocasiones hasta altas horas de la madrugada.

Cerramos la disidencia haciendo énfasis en los dos criterios expuestos precedentemente que a nuestro juicio constituyen errores en la opinión del Tribunal. Uno de ellos es la interpretación que hace el Tribunal invalidando de un plumazo la recusación hecha por un elector, sin considerar los méritos de ésta, por no haber estampado su firma al pie de la recusación, a pesar de haber manifestado los motivos de la recusación y haber hecho expresión de su nombre de su puño y letra. Al así decidir este Tribunal, ha negado el derecho constitucional al sufragio que protege la dilución del voto del recusador. *Reynolds* v. *Sims*, supra, pags. 554, 555.

El segundo error se produce por la actuación de este Tribunal, en violación de los preceptos básicos constitucionales de debido proceso de ley, al reevaluar la prueba que tuvo ante sí la Junta Revisora Electoral, haciendo caso omiso de la medida de preponderancia de la prueba que utilizó la Junta e imponiendo en grado apelativo un nuevo estándar desconocido para las partes envueltas y para el organismo juzgador de la prueba. Todo ello contrario a la norma procesal seguida por el Tribunal Supremo de los Estados Unidos en los casos de *Woodby* v. *INS*, supra y *Addington* v. *Texas*, supra.

En vista de las circunstancias ya señaladas respecto al clima de tensión, confusión, desasosiego y premura en que se desarrollaron los procedimientos ante la Junta Revisora Electoral, lo que en su consecuencia produjo un récord que revela deficiencias en los hechos de tal gravedad que dicho récord no puede servir de base para pronunciar los derechos que asisten a los electores afectados; y considerando, además, que las determinaciones de derecho en que se basa la opinión del Tribunal resultan ser en violación de derechos constitucionales de los electores envueltos, soy del criterio que ni este Tribunal, ni la Junta, si se devolviese el caso estarían en condiciones de resolver con alguna finalidad quién fue el candidato que los electores cualificados intentaron elegir para representante por el Distrito Representativo Núm. 35, por lo que no puedo en conciencia llegar a otro resultado que no sea el de ordenar una nueva elección para Representante a la Cámara por el Distrito Representativo Núm. 35.